**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VANDA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | C.A. No. 23-152-JLH |
| | **JURY TRIAL DEMANDED** |
| TEVA PHARMACEUTICALS USA, INC., | |
| Defendant. | |
| VANDA PHARMACEUTICALS INC., | |
| Plaintiff, | |
| v. | C.A. No. 23-153-JLH |
| | **JURY TRIAL DEMANDED** |
| APOTEX INC. and APOTEX CORP., | |
| Defendants. | |

<u>**JOINT CLAIM CONSTRUCTION BRIEF**</u>

## TABLE OF CONTENTS

I.    AGREED-UPON CONSTRUCTIONS ................................................................1

II.   DISPUTED CONSTRUCTIONS ...................................................................1

    A.    Introductions ................................................................................1

        1.    Plaintiff's Opening Introduction ................................................. 1

        2.    Defendants' Answering Introduction............................................ 3

        3.    Plaintiff's Reply Introduction ................................................... 6

        4.    Defendants' Sur-Reply Introduction............................................ 8

    B.    "In a method of administering tasimelteon to a patient, the improvement comprising"................................................................................9

        1.    Plaintiff's Opening Position....................................................... 9

            i)    *The preamble need not be—but is—definite.* ...................... 9

            *ii)*    *Defendants' alternative construction is incorrect.* ........... 12

        2.    Defendants' Answering Position ............................................. 13

            i)    The preamble is indefinite. .............................................. 13

            ii)    If the Court does not find the preamble indefinite, the Court should construe the claim to specify the particular prior-art method that the asserted claims purportedly improve upon.................................................. 18

        3.    Plaintiff's Reply Position.......................................................... 19

            *i)*    *The preamble need not be definite as a matter of law, but it is definite regardless.* ................................. 19

            *ii)*    *Defendants' proposed construction lacks any foundation in the text of the claim, whereas Vanda's proposed construction applies the text's plain and ordinary meaning.* ............................................... 26

        4.    Defendants' Sur-Reply Position ............................................. 27

            i)    Vanda's argument that the preamble of a *Jepson* claim is not necessarily limiting ignores established Federal Circuit case law.................................................. 27

            ii)    The scope of the preamble is indefinite. .......................... 29

            iii)    In the alternative, the Court should adopt

Defendants' construction. .................................. 32

C.  "determining whether the patient is being treated with a beta-adrenergic
receptor antagonist" ................................................................32

   1.  Plaintiff's Opening Position.................................................. 33

      i)  *The "determining" term is limiting and should be
afforded patentable weight.* ........................... 33

      ii)  *A POSA would interpret the "determining" term
according to its plain and ordinary meaning.* ................. 37

   2.  Defendants' Answering Position ............................... 39

      i)  The "determining" step is not entitled to patentable
weight.............................................................. 39

      ii)  If the Court concludes the "determining" step has
patentable weight, it should be interpreted to require
asking the patient or caregiver if the patient is
taking a beta blocker. ......................................... 42

   3.  Plaintiff's Reply Position ........................................... 43

      i)  *The "determining" clause does not claim printed
matter.* .................................................... 43

      ii)  *The Court should not artificially restrict the scope
of the claims to the specific act of "asking".* ................... 47

   4.  Defendants' Sur-Reply Position ................................. 48

      i)  "Determining" is a mental step and therefore is not
entitled to patentable weight under the printed-
matter doctrine. ............................................... 48

      ii)  Alternatively, Defendants' construction should be
adopted........................................................... 50

D.  "in the case that it is determined that the patient is not being treated with a
beta-adrenergic receptor antagonist . . ." ............................................51

   1.  Plaintiff's Opening Position.................................................. 51

   2.  Defendants' Answering Position ............................... 56

   3.  Plaintiff's Reply Position ........................................... 62

   4.  Defendants' Sur-Reply Position ................................. 66

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ..................................................................................................65

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002) ...........................................................................18, 26

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) .....................................................................9, 58, 67

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) ..................................................................................................64

*Applera Corp.-Applied Biosystems Group v. Illumina, Inc.*,
375 F. App'x 12 (Fed. Cir. 2010) .............................................................................64

*Application of Ehrreich*,
590 F.2d 902, 909-10 (C.C.P.A. 1979) .......................................................................9

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
98 F.3d 1563 (Fed. Cir. 1996) ..................................................................................17

*ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*,
908 F.3d 1267 (Fed. Cir. 2018) ...........................................................................34, 43

*Arctic Cat Inc. v. GEP Power Prods., Inc.*,
919 F.3d 1320 (Fed. Cir. 2019) ................................................................................27

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ................................................................................36

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) ................................................................................24

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001) .....................................................................54, 58, 67

*Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*,
246 F.3d 1368, 1378 (Fed. Cir. 2001) .................................................................60, 62

*Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002) .........................................................................20, 21, 28

*Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*,
  38 F. Supp. 3d 589 (E.D. Pa. 2014) ....................................................................11

*Cont'l Auto. Sys., Inc. v. Horizon Glob. Americas Inc.*,
  2021 WL 2183083 (P.T.A.B. May 28, 2021) ........................................................61

*Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005)...........................................................................23

*CyberSource Corp. v. Retail Decisions, Inc.*,
  654 F.3d 1366 (Fed. Cir. 2011)...........................................................................49

*DeMarini Sports, Inc. v. Worth, Inc.*,
  239 F.3d 1314 (Fed. Cir. 2001)...........................................................................16

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
  279 F.3d 1022 (Fed. Cir. 2002)...................................................................*passim*

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012) ..............................................................42, 47, 51

*Ex Parte Schulhauser*,
  2016 WL 6277792 (P.T.A.B. Apr. 28, 2016) .............................................*passim*

*George M. Martin Co. v. All. Mach. Sys. Int'l LLC*,
  618 F.3d 1294 (Fed. Cir. 2010)...................................................................*passim*

*Hytera Commc'ns Co. v. Motorola Sols, Inc.*,
  841 F. App'x 210 (Fed. Cir. 2021) ..............................................................*passim*

*In re Distefano*,
  808 F.3d 845 (Fed. Cir. 2015)..........................................................34, 35, 36, 37

*In re Guess*,
  347 F. App'x 558 (Fed. Cir. 2009) ......................................................................10

*In re Power Integrations, Inc.*,
  884 F.3d 1370 (Fed. Cir. 2018)......................................................................13, 27

*Intel Corp. v. Qualcomm Inc.*,
  21 F.4th 801 (Fed. Cir. 2021) ............................................................................16

*Intellectual Ventures LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016)...........................................................................64

*Interdigital Technology Corp. v. Lenovo Holding Co., Inc.*,
  2021 WL 1856937 (D. Del. 2021) ...............................................................*passim*

*IOENGINE, LLC v. Ingenico Inc.*,
    100 F.4th 1395 (Fed. Cir. 2024) .................................................................. *passim*

*King Pharms., Inc. v. Eon Labs, Inc.*,
    616 F.3d 1267 (Fed. Cir. 2010)....................................................................36, 40

*Limelight Networks, Inc. v. Akamai Techs., Inc.*,
    572 U.S. 915 (2014)...............................................................................................46

*Lincoln Nat'l Life Ins. Co. v Transamerica Life Ins. Co.*,
    609 F.3d 1364 (Fed. Cir. 2010).............................................................. *passim*

*Mantissa Corp. v. First Fin. Corp.*,
    2024 WL 607717 (Fed. Cir. Feb. 14, 2024)..............................................14, 25, 29

*Micron Tech., Inc. v. Tessera, Inc.*,
    440 F. Supp. 2d 591 (E.D. Tex. 2006)....................................................13, 17, 24

*Microsoft Corp. v. I4I Ltd. P'ship*,
    564 U.S. 91 (2011)..............................................................................................9, 23

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    197 F. Supp. 2d 699 (E.D. Tex. 2001).....................................................................21

*N.Y. Trust Co. v. Eisner*,
    256 U.S. 345 (1921)...............................................................................................67

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014)................................................................................ *passim*

*Newron Pharms. S.p.A. v. Aurobindo Pharma Ltd.*,
    2023 WL 2954461 (D. Del. Apr. 14, 2023)....................................11, 23, 25, 31

*OANDA Corp. v. Gain Cap. Holdings, Inc.*,
    2024 WL 3199981 (D.N.J. June 26, 2024).............................................................38

*Orasure Techs., Inc. v. Schering-Plough Healthcare Prods., Inc.*,
    No. 2:04-CV-03507-NS (E.D. Pa. Aug. 12, 2005), D.I. 85...................................10

*Otsuka Pharm. Co., Ltd. v. Mylan Lab'ys Ltd.*,
    2023 WL 5928313 (D. Del. Sept. 12, 2023) ...................................... *passim*

*Otsuka Pharm. Co., Ltd. v. Mylan Lab'ys Ltd.*,
    C.A. No. 22-464-JLH (D. Del. Jan. 22, 2024), D.I. 213.......................................35

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................3, 12, 38

*Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*,
  890 F.3d 1024 (Fed. Cir. 2018)............................................................................ *passim*

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
  318 F.3d 1143 (Fed. Cir. 2003)....................................................................7, 12, 26

*Regents of the Univ. of Minnesota v. LSI Corp.*,
  926 F.3d 1327 (Fed. Cir. 2019)..............................................................................17

*Rowe v. Dror*,
  112 F.3d 473 (Fed. Cir. 1997)..........................................................................10, 20

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005)..............................................................................24

*Sonix Tech. Co. v. Publications Int'l, Ltd.*,
  844 F.3d 1370 (Fed. Cir. 2017)....................................................................... *passim*

*Sonrai Memory Ltd. v. Kingston Tech. Co., Inc.*,
  2022 WL 3640302 (W.D. Tex. Aug. 23, 2022)...................................11, 23, 26, 31

*Textron Innovations Inc. v. Am. Eurocopter Corp.*,
  498 F. App'x 23 (Fed. Cir. 2012) ...............................................................21, 22, 28

*Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  2022 WL 17593282 (D. Del. Dec. 13, 2022)...................................................3, 57

*Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*,
  2023 WL 3335538 (Fed. Cir. May 10, 2023) ........................................................3

*Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*,
  C.A. No. 18-651 (CFC) (D. Del.) ...........................................................3, 4, 6, 57

*Warner-Jenkinson Co v. Hilton Davis Chem. Co.*,
  520 U.S. 17, 29 (1997).............................................................................................34

*WSOU Invs. LLC v. Google LLC*,
  2023 WL 6210607 (Fed. Cir. Sept. 25, 2023) ......................................................31

**Other Authorities**

37 C.F.R. § 1.75(e)..........................................................................................10, 28, 30, 31

37 C.F.R. § 1.75(e)(2)..............................................................................................10, 23

37 C.F.R. § 1.75(e)(3).....................................................................................................33

## I.    AGREED-UPON CONSTRUCTIONS

The construction of the term on which the parties agree is shown in Part I of the Joint Claim

Construction Chart (C.A. No. 23-152, D.I. 131) and below:

| Term No. | Claim Term | Agreed Construction |
|---|---|---|
| 1. | "altenolol" <br><br> (Claim 2) | "atenolol" |

## II.    DISPUTED CONSTRUCTIONS

### A.    Introductions

#### 1.    Plaintiff's Opening Introduction

Vanda is an innovative pharmaceutical company that acquired Hetlioz® (tasimelteon)

from a large pharmaceutical company that tried, but failed, to develop it into a useful FDA-

approvable therapy. Under Vanda's stewardship, and after devoting years and many millions of

dollars to research, development, and regulatory processes, Hetlioz® became the first and only

FDA-approved therapy to treat two rare and orphan disorders: Non-24-Hour-Sleep-Wake

Disorder (Non-24) and nighttime sleep disturbances in Smith-Magenis Syndrome in patients 16

years or older.

Non-24 is a debilitating illness that occurs frequently in persons who experience

blindness with no light perception (and occasionally in sighted individuals), in which a person's

endogenous circadian rhythms, *i.e.*, the person's melatonin circadian rhythm and/or the person's

cortisol circadian rhythm, are not synchronized with the 24-hour day-night cycle. U.S. Patent

No. 11,285,129 (attached as Exhibit 1) at 1:63-2:6. "Without light as a synchronizer, and because

the period of the internal clock is typically a little longer than 24 hours, individuals with Non-24

experience their circadian drive to initiate sleep drifting later and later each day." *Id.* at 2:2-6. As

a result, such individuals experience periods of "abnormal night sleep patterns, accompanied by difficulty staying awake during the day," while their circadian rhythms are not synchronized with the 24-hour day. *Id.* at 2:6-8. Non-24's "chronic effects impact[] the social and occupational functioning" of individuals with Non-24. *Id.* at 2:8-10. In the SET study, tasimelteon was found to be "useful in entraining patients with Non-24" when administered "about 1 hour prior to target sleep time." *Id.* at 21:58-61, 34:22-25.

As part of its work, Vanda obtained U.S. Patent No. 11,285,129 (the '129 Patent). *See generally* Ex. 1 ('129 Patent). The '129 patent covers methods of administering tasimelteon to avoid a decrease in efficacy caused by coadministration with beta-adrenergic receptor antagonists (commonly called beta blockers). *Id.* at 38:41-56. Beta blockers "treat[] [] cardiac arrhythmias, myocardial infarction, congestive heart failure, and hypertension" and include "alprenolol, [atenolol], carvedilol, metoprolol, and propranolol, to name a few." *Id.* at 8:67-9:6. Beta blockers are "known to reduce endogenous melatonin levels," *id.* at 8:65-67, and the inventors found that beta blockers also decrease the efficacy of ***exogenous*** melatonin agonists, such as tasimelteon. *Id.* at 24:63-25:8. This innovation was important: the negative interaction of beta blockers and tasimelteon would not have been expected in light of literature suggesting that beta blockers could be useful in the treatment of circadian rhythm disorders. *See, e.g.*, C.A. No. 23-152, D.I. 94 at ¶ 14. Based on study data, the inventors also concluded that there was a "strong correlation between endogenous melatonin and efficacy of tasimelteon in entraining patients to a 24 hour circadian rhythm." Ex. 1 ('129 Patent) at 24:16-18.

Hetlioz®'s FDA-approved label thus advises prescribers and patients that "[n]ighttime administration of beta-adrenergic receptor antagonists may reduce the efficacy of HETLIOZ." Ex. 2 (Hetlioz® Package Insert, Revised January 2024) at 5. By addressing this unexpected

decrease in efficacy, the Hetlioz® Label ensures that patients with the debilitating circadian-rhythm-related conditions that Hetlioz® treats are treated effectively.

Defendants Teva Pharmaceuticals USA, Inc. (Teva), and Apotex Inc. and Apotex Corp. (together, Apotex) are generic drug manufacturers that hold abbreviated new drug applications (ANDAs) to make generic copies of Hetlioz®. Defendants substantively copied the Hetlioz® Label—including its reflection of the methods claimed in the '129 Patent—and have engaged and continue to engage in the commercial manufacture, use, importation, offer for sale, or sale of their respective generic products. *See* Ex. 3 (Teva's Package Insert, Revised May 2022) at 14; Ex. 4 (Apotex's Package Insert, Revised January 2024) at 14.

Defendants now propose to resist construing certain terms in the '129 Patent according to their plain and ordinary meaning (*but see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)) and endeavor to obtain early invalidity conclusions. These positions are incorrect.

### 2. Defendants' Answering Introduction

Before asserting the '129 patent at issue here, Vanda previously sued Apotex and Teva in this district alleging infringement of fourteen Orange Book-listed patents for Vanda's Hetlioz product. *See Vanda Pharms. Inc. v. Teva Pharms. USA, Inc.*, C.A. No. 18-651 (CFC) (D. Del.) (consolidated) (the "Prior Litigation"). Vanda ultimately went to trial in March 2022 on five patents (one of which Vanda dropped mid-trial), and the court found all asserted claims of the remaining four patents invalid as obvious. *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, 2022 WL 17593282 (D. Del. Dec. 13, 2022). In particular, the court found that Vanda's claimed method of treating Non-24 by administering 20 mg tasimelteon once daily 0.5–1.5 hours before bedtime was obvious over the prior art. *See id.* at *9–10, 15–17. The Federal Circuit affirmed, *Vanda Pharms., Inc. v. Teva Pharms. USA, Inc.*, 2023 WL 3335538 (Fed. Cir. May 10, 2023), and the Supreme Court denied certiorari earlier this year, 144 S. Ct. 1393 (2024).

About two weeks after the district court entered final judgment in the Prior Litigation, Vanda—apparently unhappy with the outcome in this district—filed the present consolidated actions in the District of New Jersey accusing Defendants of infringing the '129 patent. Vanda also sought a preliminary injunction to prevent Defendants from launching their generic tasimelteon products. The case was transferred to this district at Defendants' request (and over Vanda's objection), whereupon Vanda withdrew its request for a preliminary injunction.

One might suppose that Vanda chose to assert the best patents in its portfolio in the Prior Litigation—the patents for which it had the strongest infringement and validity positions—to maximize its chances of keeping generic competition off the market. That supposition would be correct. The '129 patent's only independent claim recites a purportedly improved method of administering tasimelteon that involves determining whether a patient is taking a beta blocker and then either (i) if not, administering tasimelteon according to the method found obvious in the Prior Litigation; or (ii) if so, instructing the patient to stop taking the beta blocker and then administering tasimelteon according to the method found obvious in the Prior Litigation. That claim suffers from several infirmities—infirmities that Vanda seeks to obscure by resisting construction of the three disputed limitations.[1]

*First*, the preamble of claim 1 of the '129 patent is indefinite. The claim is written in *Jepson* format, meaning the preamble recites the prior-art method that has been allegedly improved and the body of the claim recites the alleged improvements. *Jepson* claim preambles must define the

---

[1] For avoidance of doubt, Defendants observe that Vanda's account (at 2) of the purportedly "innovat[ive]" and unexpected discovery that led to this patent is misleading. As Vanda admits, it was known in the prior art that beta blockers reduce endogenous melatonin levels. Ex. 1 ('129 Patent) at 8:65–67. Tasimelteon tends to work better when melatonin levels are higher. So in fact it is entirely expected that co-administering tasimelteon with a drug that reduces melatonin levels would tend to make the tasimelteon less effective.

scope of the invention with reasonable certainty because they outline the contours of the claimed method—that is, they set forth the parameters of that which the patentee claims to have improved. *See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1029 (Fed. Cir. 2002). But this preamble does not do that. It refers only to "a method of administering tasimelteon"—which leaves unclear the nature of the method that Vanda purports to have improved. Methods of administering tasimelteon to do what? To whom? At what doses? When? The intrinsic evidence provides no answer. The claim is therefore indefinite: it does not "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

*Second*, the "determining" step of the claims is not entitled to patentable weight. Claim limitations that merely embody the "content of information" or "mental steps" lack patentable weight because information and mental steps are not patentable subject matter. *Praxair Distrib., Inc. v. Mallinckrodt Hosp. Prods. IP Ltd.*, 890 F.3d 1024, 1032–34 (Fed. Cir. 2018). But that is all the "determining" step does. It merely captures a mental process of evaluating information: determining whether the patient is taking a beta blocker. The only *functional* steps—i.e., the physical actions the physician takes—are set forth later in the claim. The "determining" step therefore adds nothing of patentable significance to the claim. That conclusion is particularly evident under Vanda's broad and amorphous construction of the term, which appears to encompass all manner of cognitive processes that a physician might employ to assess whether the patient is taking a beta blocker. *See infra* Opening Position at 37-38.

*Third*, the operative steps of the claim (beginning with "in the case that") set forth two mutually exclusive methods, only one of which can be performed to practice the claimed method for any particular patient. This conclusion is ineluctable: if, for example, the patient is not taking

5

a beta blocker, a physician who administers 20 mg tasimelteon once daily 0.5–1.5 hours to that patient has practiced the claim. The physician does not need to instruct the patient to stop taking the beta blocker because the patient is not taking one in the first place.

The consequence of this is significant. Because the method of administration already found obvious in the Prior Litigation *is sufficient to practice this claim*, this claim, too, is necessarily obvious over the prior art. *See Ex Parte Schulhauser*, 2016 WL 6277792, at *4 (P.T.A.B. Apr. 28, 2016). Defendants are not, of course, asking the Court to rule on invalidity at this stage. But the case-dispositive implication of this claim-construction dispute likely explains why Vanda attempts to resist the inescapable conclusion that the '129 patent does not (and logically cannot) require that both conditional steps must be performed on a patient to practice the claim.

Vanda's attempts to find support for its position in precedent fail. Vanda relies exclusively on cases involving computer algorithms—a context in which it makes sense to analyze whether an accused device is configured to perform either of two mutually exclusive steps in the counterfactual worlds in which either of the two conditions triggering those steps is satisfied. That analysis does not work in the context of a human-implemented method like this one. One cannot meaningfully ask whether a physician is "configured to" perform both of the conditional steps required by the '129 patent; one can only ask whether, given the condition that occurred, the physician performed the step required by the claim under that condition.

The Court should adopt Defendants' proposed constructions.

### 3.    Plaintiff's Reply Introduction

Rather than focus on claim construction, defendants seek to relitigate issues they lost in their unsuccessful motion for judgment on the pleadings. In so doing, they focus on points that are

irrelevant, if not simply wrong.[2]

Ultimately, these disputes turn on the cardinal rule of claim construction: wherever possible, a claim should be construed in accordance with its plain language. *See, e.g.*, *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003). Vanda's proposed constructions align with that governing rule. Defendants' constructions do not. For example, in defendant's telling, the "determining" step becomes, an "asking" step instead, though the plain and ordinary meaning of the word "determining" is much broader than the mere act of "asking."

Defendants' arguments on indefiniteness, limitation, and claim conditionality are no more successful. *First,* the preamble is not indefinite—by following verbatim the accepted format of *Jepson* claims, the preamble implicitly incorporates clearly defined parameters: namely, the method improves upon prior art methods of administering tasimelteon. More fundamentally, it need not, contrary to defendants' representations, be further limiting as a matter of law, and certainly need not define the scope of the claimed method all on its own. *Second,* the determining step is limiting and has patentable weight—it describes a concrete act, not merely a mental step— that sets clear boundaries on the scope of the claim. And, in any event, it concerns material

---

[2]    Defendants' assertion that the '129 patent is of lesser value than those that went to trial earlier disregards the fact that the '129 patent did not issue until the second day of trial, and thus could not have been earlier asserted. *See* Ex. 1 ('129 Patent); C.A. No. 23-152, D.I. 94 at ¶ 62.

While defendants' arguments regarding obviousness are premature, they are also wrong. Defendants suggest that the invention was obvious because (1) "it was known in the prior art that beta blockers reduce endogenous melatonin levels," and (2) "[t]asimelteon tends to work better when melatonin levels are higher." *Supra* Answering Introduction at 4 n.1. The '129 patent acknowledges that "certain therapeutic agents" such as beta-adrenergic receptor antagonists "are known to reduce endogenous levels of melatonin." Ex. 1 ('129 Patent) at 8:65-9:4. But the '129 patent says nothing about whether it was known what effect beta-adrenergic receptor antagonists would have on the administration of *exogenous melatonin receptor antagonists*, like tasimelteon. Defendants fail to provide any citation for the second prong of their argument that "[t]asimelteon tends to work better when melatonin levels are higher" (*supra* Answering Introduction at 4 n.1), and Defendants do not specify whether they are alleging such knowledge was in the prior art as of the effective priority date of the '129 patent.

"interrelat[ed] . . . with the concrete step of discontinuing treatment because of the information." *See Praxair,* 890 F.3d at 1035. And *third,* the conditional administering step does not disclose two mutually exclusive methods but is instead a run-of-the-mill conditional-method claim encompassing a single claimed method.

### 4.    Defendants' Sur-Reply Introduction

Three rounds of claim construction briefing have made one thing crystal clear: the '129 patent is an attempt to prolong exclusivity of an alleged invention that Chief Judge Connolly and the Federal Circuit held invalid. While claim construction is not the time to make a final ruling on these arguments (other than indefiniteness), the briefing showcases the arguments to come.

Even now it remains unclear what Vanda thinks the *Jepson* claim preamble means. As Vanda concedes, "*Jepson* claims inherently involve an admission by the inventor that they are claiming an improvement over something in the prior art." *Infra* Reply Position at 20. Yet, here, the identity of that "something" is anyone's guess. Vanda still has not explained which prior-art methods of administration it has improved. That creates an intractable indefiniteness problem.

As to the "determining" step, Vanda's arguments run headlong into the principle that "[a]n applicant cannot 'continue patenting a product indefinitely provided that they add a new instruction sheet'" or "information together with a purely mental step." *Praxair*, 890 F.3d at 1034 (citation omitted). "Determining" is just that: a mental evaluation of information. It therefore does not add patentable weight to the claim.

As to the dispute on the conditional administering steps, Vanda effectively concedes that it is construing the claim differently for infringement than for invalidity. For purposes of infringement, Vanda says, "an accused infringer need only practice one alternative and be 'capable of' practicing each alternative." *Infra* Reply Position at 63. But Vanda admits that the second part of this showing is meaningless: any "physician is capable of carrying out either condition." *Infra*

8

Reply Position at 65. So Vanda's position is that, to show infringement, it need only prove a physician did *one* of the conditional methods in the claim—not both. Yet Vanda maintains that, "for obviousness purposes, the prior art must teach … the response to each condition in the conditional step." *Infra* Reply Position at 63 (cleaned up). Given the "axiom[] that claims are construed the same way for both invalidity and infringement," *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003), both positions cannot be correct.

**B.     "In a method of administering tasimelteon to a patient, the improvement comprising"**

**1.     Plaintiff's Opening Position**

| Term | Vanda's Construction | Defendants' Construction |
|---|---|---|
| "In a method of administering tasimelteon to a patient, the improvement comprising" (Claim 1) | Definite. If necessary to construe, plain and ordinary meaning: In a known prior art method for administering tasimelteon to a patient, the improvement comprising | Indefinite. Alternatively, "In the prior-art method of administering to a patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before a target bedtime, an improvement comprising" |

This claim term is definite and should be construed, if at all, according to its plain and ordinary meaning. Defendants cannot meet the high burden of clear-and-convincing evidence needed to show indefiniteness. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011). Nor should the term be limited to a *specific* method of administering tasimelteon.

**i)     *The preamble need not be—but is—definite.***

In contending that the preamble is indefinite, defendants appear to misunderstand *Jepson* claims. By drafting a *Jepson* claim, the patentee implicitly admits that the subject matter recited in the preamble of such a claim is part of the prior art. *Application of Ehrreich*, 590 F.2d 902, 909-10 (C.C.P.A. 1979). By regulation, a *Jepson* claim includes "[a] phrase such as 'wherein the

improvement comprises,'" which demarcates the end of the preamble and the beginning of what the inventor "considers as the new or improved portion" of the "claimed combination." 37 C.F.R. § 1.75(e); *see Rowe v. Dror*, 112 F.3d 473, 476, 479 (Fed. Cir. 1997) (observing that a claim containing "the improvement comprising" is a *Jepson* claim). "The *Jepson* form of claiming permits a patentee to recite prior art in the preamble of the claim." *In re Guess*, 347 F. App'x 558, 559 (Fed. Cir. 2009).

    **a.**  Defendants suggest that the preamble is indefinite because it lacks a sufficiently defined comparator against which to measure the claimed improvement. Ex. 5 (Defendants' Invalidity Contentions, Dated Oct. 7, 2024) at 30-31. "This argument fails because it reads too much into the word 'improvement.'" *See George M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1303 (Fed. Cir. 2010). In a *Jepson* claim, though a patentholder has "'the intention to use the preamble to define, in part, the structural elements of his claimed invention,' the extent of the claimed 'improvement' is defined *only* by the body of the claim." *Id.* (emphasis added and internal citation omitted) (quoting *Epcon*, 279 F.3d at 1029).

    Defendants also contend that the preamble is indefinite because "the improvement" lacks antecedent basis. Ex. 5 (Defendants' Invalidity Contentions, Dated Oct. 7, 2024) at 30. But the phrase "the improvement" is *regulatory language* for *Jepson* claims that signals the transition from the preamble to the body of the claim. *See* 37 C.F.R. § 1.75(e)(2); *see Orasure Techs., Inc. v. Schering-Plough Healthcare Prods., Inc.*, No. 2:04-CV-03507-NS (E.D. Pa. Aug. 12, 2005), D.I. 85, Attach. 1 (attached as Exhibit 6) at 11 n.6 ("In a *Jepson* claim the prior art is recounted first in a preamble; a transition is then typically announced by the words 'the improvement consisting' or 'the improvement wherein'; then, the rest of the claim sets forth the improvement added by the invention."). It is difficult to imagine that the inclusion of language prescribed by

the Patent and Trademark Office's regulations could defeat patentability.[3]

**b.** Defendants' indefiniteness arguments are further undercut by three other considerations.

*First*, the fact that the Examiner understood the claims well enough to find them nonobvious over the prior art in the Notice of Allowance further proves the definiteness of the claims. Ex. 7 ('129 Patent File History Excerpt, Notice of Allowance, Dated Feb. 8, 2022) at VANDA_0000315 ("Claims 1-3 are being allowed since the instantly claimed inventions are neither obvious nor anticipated by the prior art."); *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1379-1380 (Fed. Cir. 2017) ("Although . . . application by the examiner . . . do[es] not, on [its] own, establish an objective standard, [it] nevertheless provide[s] evidence that a skilled artisan did understand the scope of this invention with reasonable certainty.").

*Second*, the fact that the claims are in *Jepson* form also lends support to their definiteness. *Newron Pharms. S.p.A. v. Aurobindo Pharma Ltd.*, 2023 WL 2954461, at *3 (D. Del. Apr. 14, 2023) ("Further, given claim 1's *Jepson* format, explaining that treating a patient with a 'stable dose of levodopa' was accomplished in the prior art, the claim language suggests that a skilled artisan would understand how to" recognize when the claim limitation has been performed.).

*Third*, defendants' own alternative construction *shows* that a skilled artisan would understand the disputed term. *Sonrai Memory Ltd. v. Kingston Tech. Co., Inc.*, 2022 WL

---

[3]     In any event, the specification provides implicit antecedent basis for "the improvement" through its description of the invention. *See* Ex. 1 ('129 Patent) at 6:48-55, 8:65-9:35. Of course, *explicit* antecedent basis is not required where "antecedent basis is present by implication." *See Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 38 F. Supp. 3d 589, 617 (E.D. Pa. 2014). Even assuming, arguendo, that the claims were not in *Jepson* form—they plainly are—a lack of antecedent basis does not render the claims indefinite. *Id.*

3640302, at *5 (W.D. Tex. Aug. 23, 2022) (finding "[d]efendants' argument that the term is indefinite is undercut by [d]efendants' proposed construction, which indicates that a POSITA would understand the meaning of this claim term with reasonable certainty."). This is particularly clear because defendants have never explained how the limitations added by their proposed construction would render the claim definite if it were not already. Of course, the addition of these limitations to the preamble could not have such an effect—especially because the words defendants seek to add *already appear* in the body of the claim. That is a tacit admission that the claim as a whole is definite.

In all, defendants cannot meet the high burden of clear-and-convincing evidence needed to show indefiniteness as to the first claim term. *Sonix*, 844 F.3d at 1377.

### ii)    *Defendants' alternative construction is incorrect.*

Defendants' proposed construction of the claim—incorporating a specific method of administering tasimelteon—should also be rejected. "Generally, terms in a patent claim are given their plain, ordinary, and accustomed meaning to one of ordinary skill in the relevant art." *Prima Tek II*, 318 F.3d at 1148. Vanda's proposal faithfully implements this principle and tracks basic principles of *Jepson* claims, in which the preamble consists of components of the claimed combination, which may be part of the prior art. *Ehrreich*, 590 F.2d at 909-10. Because Claim 1 is a Jepson claim, a POSA would understand the preamble and transition to mean: "In a known prior art method for administering tasimelteon to a patient, the improvement comprising."

Defendants' alternative construction is unpersuasive. Like all limitations, the preambles of *Jepson* claims are generally construed based on their plain and ordinary meaning. *See Phillips*, 415 F.3d at 1312. *Jepson* preambles are not construed to encompass limitations that are not present in the claim language or supported by the intrinsic record. *See Epcon*, 279 F.3d at 1029 ("The district court was correct in not restricting the" claim's preamble to specific language not specified in the

12

text of the claim.). And defendants' construction should also be rejected because it duplicates language contained in the body of the claim—rendering that later language superfluous. *See, e.g.*, *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018).

### 2.    Defendants' Answering Position

#### i)    The preamble is indefinite.

It is Vanda, not Defendants, who "appear to misunderstand *Jepson* claims," *supra* Opening Position at 9. *Jepson* claim preambles are unlike run-of-the-mill preambles in a critical respect: they, as a matter of law, define the scope of the invention. *Epcon*, 279 F.3d at 1029. But the '129 patent claim preamble's reference to "a method of administering tasimelteon" provides no discernable boundaries to the method the inventors have purported to improve and therefore renders the scope of the invention as a whole uncertain. The claim is thus indefinite. And Vanda's contrary arguments lack merit.

**a.**    As an initial matter, Vanda's assertion (at 9) that the preamble "need not be . . . definite" is flatly wrong. Vanda appears to be suggesting that the preamble is not limiting, but the Federal Circuit has said otherwise: "the preamble is a limitation in a Jepson-type claim." *Epcon*, 279 F.3d at 1029. That is because, in a *Jepson* claim, the preamble recites the "elements or steps *of the claimed invention* which are conventional or known" and thus "defines not only the context of the claimed invention, *but also its scope.*" *Id.* (emphases added; citations omitted). And, as a limitation that defines the scope of the invention, a *Jepson* claim preamble must "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*, 572 U.S. at 901. Put differently, if a *Jepson* claim preamble is of uncertain scope, then the "scope of the invention" as a whole is likewise unclear, *id.*, and the claim is therefore indefinite. *See Micron Tech., Inc. v. Tessera, Inc.*, 440 F. Supp. 2d 591, 596 (E.D. Tex. 2006) ("[I]t is reasonable to require that the preamble set forth the elements or steps of the prior art that are improved upon so

that the public may be fairly notified of the scope of the invention.").

**b.**       The '129 patent claims present the sort of "zone of uncertainty" proscribed by the definiteness requirement. *Nautilus*, 572 U.S. at 909–10. The preamble's reference to "a method of administering tasimelteon to a patient" is irredeemably vague. What, exactly, are the method or methods of administering tasimelteon the patentee has purported to improve? Methods of administering tasimelteon to treat Non-24? To treat other diseases? At what dose(s)? At what time of day? To what type of patients? Do the patients even need to be human? The claims do not tell us. Neither does the specification or the prosecution history.

This uncertainty is compounded by the fact that the specification nowhere discusses the claim's operative steps of instructing the patient to stop taking a beta blocker before taking tasimelteon. *See generally* Ex. 1 ('129 Patent). It merely observes that data from Vanda's Phase III clinical trials for Hetlioz "indicate that beta blocker therapy is indirectly related to efficacy of tasimelteon, i.e., patients receiving the beta blocker therapy were less likely to become entrained than patients who were not," *id.* 24:63–67, and then mentions in several places the idea of evaluating "information" about whether a patient is taking a beta blocker, *id.* 28:22–32, 29:3–12, 31:33–50, 34:5–14. But the specification does not describe any allegedly inventive methods of administering tasimelteon to patients receiving beta blocker therapy. All this adds up to intractable confusion about what, exactly, the method is that Vanda has purported to "improve."

That lack of clarity—not Vanda's "inclusion of language prescribed by [PTO] regulations"—is what "defeat[s] patentability," *supra* Opening Position at 10–11. Because a skilled artisan would not know what, precisely, the method is that has been allegedly improved, a skilled artisan would not understand "the scope of the invention" with "reasonable certainty." *Nautilus*, 572 U.S. at 901; *see Mantissa Corp. v. First Fin. Corp.*, 2024 WL 607717, at *4 (Fed.

Cir. Feb. 14, 2024) (holding that claim reciting a "transaction partner" was indefinite "[g]iven the breadth of transactions described" in the specification and the "dearth of details [in the intrinsic evidence] defining the contours of 'transaction partner'").

Vanda's reliance on *George M. Martin Co.*, 618 F.3d 1294, is misplaced. The court there rejected an argument that the prior art "must contain an improvement over and above the improvement recited in the body of [a *Jepson*] claim" to render the claim obvious. *Id.* at 1303. That argument failed, the court held, because "the extent of the claimed 'improvement' is defined only by the body of the claim." *Id.* Defendants' argument here is very different. Because the '129 patent claim *preamble* does not define the *method sought to be improved* with any precision, skilled artisans would not understand which purportedly improved methods would fall within the scope of the claim and which would not. *George M. Martin Co.* thus does not help Vanda.

On the contrary, a comparison of the claim at issue in *George M. Martin Co.* and the claim in this case illustrates Defendants' point. The preamble of the claim there recited "[a]n improvement in a bundle breaker for separating bundles from a log" with a specific structure, and the body of the claim specified that the "improvement compris[ed]" two "compliance structures" having particular features. *Id.* at 1298–99. Because the preamble recited the precise structure of the prior-art bundle breakers on which the patentee claimed to have improved, the claim in *George M. Martin Co.* put the public on clear notice of the scope of its invention: bundle breakers having that specific structure and also having the recited "compliance structures."[4] The claim in this case

---

[4] The preamble of the claim in *George M. Martin Co.* read as follows: "An improvement in a bundle breaker for separating bundles from a log having a generally planar top surface, said log including a plurality of sheets each having a generally planar top surface and each sheet is formed with at least one weakened line, said weakened lines are vertically aligned in said log forming a weakened plane in said log, said bundle breaker including a first conveyor for conveying said log and having an upstream end for receiving said log and a downstream end, and

does not do that. Its vague reference to "a method of administering tasimelteon to a patient" does not provide the requisite clarity about which methods are within the scope of the invention (that is, which methods Vanda purports to have improved upon) and which are not.

**c.** The "three other considerations" Vanda points to (at 11–12) as allegedly "undercut[ting]" Defendants' indefiniteness arguments are likewise unpersuasive.

*First*, that the Examiner found the claims patentable over the prior art (albeit in a conclusory and unexplained way, *see* Ex. 7 ('129 Patent File History Excerpt, Notice of Allowance, Dated Feb. 8, 2022) at VANDA_0000315), does not indicate that they are definite. It is often possible to apply prior art to indefinite claims. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 813 (Fed. Cir. 2021). More to the point, the Examiner said nothing one way or another about indefiniteness, and the Examiner's silence is not probative on this issue at all. *Cf. DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1326 (Fed. Cir. 2001) ("Drawing inferences of the meaning of claim terms from an examiner's silence is not a proper basis on which to construe a patent claim.").[5]

To the extent Vanda's point is merely that one can *infer* that the PTO found the claim definite because the PTO allowed the claim, that is true—but it does not get Vanda very far. *All*

_____

a second conveyor having an upstream end positioned immediately adjacent to said downstream end of said first conveyor providing a gap therebetween defining a bundle breaking plane, said bundle breaker including first clamp means mounted for vertical reciprocating movement above said first conveyor, and second clamp means mounted above said second conveyor for vertical reciprocating movement in relation to said second conveyor and said second conveyor and said second clamp means mounted for conjoint pivotal movement in relation to said bundle breaking plane for progressively breaking a bundle from said log along said weakened plane in said log, said improvement comprising . . . ." 618 F.3d at 1298 (emphasis removed).

[5] The Notice of Allowance Vanda cites (Ex. 7 ('129 Patent File History Excerpt, Notice of Allowance, Dated Feb. 8, 2022)) constitutes almost the entirety of the substantive prosecution history of the '129 patent. The Examiner issued one restriction requirement; the patentees responded by selecting the three claims that became the issued claims of the patent; and the PTO then allowed the claims.

claims found indefinite in litigation were allowed by the PTO at some point. And any deference due the PTO's (implied) judgment on this score is already captured in the statutory presumption of validity. *See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569 (Fed. Cir. 1996). That presumption is rebuttable for good reason: "in light of the USPTO's constrained resources and the absence of material outside input during the initial examination, it is inevitable that there are patents granted in error." *Regents of the Univ. of Minnesota v. LSI Corp.*, 926 F.3d 1327, 1332 (Fed. Cir. 2019). The presumption has been rebutted here for the reasons explained above.

*Second*, "the fact that the claims are in *Jepson* format," *supra* Opening Position at 11, does not solve the indefiniteness problem—it *is* the problem. Because *Jepson* claim preambles define the scope of the invention, the preamble must clearly "set forth the elements or steps of the prior art that are improved upon so that the public may be fairly notified of the scope of the invention." *Micron*, 440 F. Supp. 2d at 596. Many claim preambles are not limiting—i.e., they do not affect the scope of the claim—and vague language in a non-limiting preamble may therefore not present a problem. But *Jepson* claim preambles *are* limiting, as a matter of law. *Epcon*, 279 F.3d at 1029. So they must comply with statutory definiteness requirements.

*Third*, Vanda's assertion (at 11–12) that Defendants' "alternative construction *shows* that a skilled artisan would understand the disputed term" (emphasis Vanda's) is puzzling, not least because Vanda *disagrees* with that construction. Vanda should not be heard to contest Defendants' reading of the claim and then turn around and argue that a construction it disputes somehow renders the term definite. In the end, Vanda's resistance to Defendants' construction—which, unlike Vanda's, specifies a particular prior-art method to serve as a comparator for the improvement— reinforces the infirmity in these claims. Vanda apparently wants to interpret its claims to read on

improvements to *other* prior-art methods of administering tasimelteon. But the scope of that additional claim coverage is anyone's guess. The claims are indefinite.

> **ii)     If the Court does not find the preamble indefinite, the Court should construe the claim to specify the particular prior-art method that the asserted claims purportedly improve upon.**

Courts generally avoid "rewrit[ing] claims to preserve their validity." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002). If the Court declines to find indefiniteness at this stage, however, it is imperative that the Court construe the claim with sufficient precision to "appris[e] the public of what is still open to them," *Nautilus*, 572 U.S. at 909. Defendants' alternative construction accomplishes that goal: it specifies a particular prior-art method that the claimed method is purportedly an improvement upon.

Defendants' proposed comparator, moreover, is the only one supported by the intrinsic evidence. Vanda's own description of the '129 patent (at 1–2) makes clear that the alleged innovation here was the discovery that beta blockers and tasimelteon have a "negative interaction." So Vanda "improved" the method of administration set forth in its Phase III clinical trials (20 mg tasimelteon administered daily 0.5–1.5 hours before bedtime, *see* Ex. 1 ('129 Patent) at 21:51–61) by specifying that beta blockers should be discontinued prior to tasimelteon treatment.

That the method specified in Defendants' proposed construction "already appear[s] in the body of the claim," *supra* Opening Position at 12 (emphasis removed), is a feature of the construction—not a bug. As explained above, the claim is the *only* place in the '129 patent that discusses stopping beta blockers before taking tasimelteon. The specification says nothing about the alleged improvement. So the claim itself is the only indication the patentees provided regarding what method they sought to improve. And its language suggests that the "improvement" is to identify patients who are taking beta blockers and then discontinue beta-blocker administration prior to administering tasimelteon according to the method set forth in the body of the claim.

18

Vanda's proposed construction, on the other hand, merely exacerbates the indefiniteness problem. Setting aside the fact that the construction finds no support in the intrinsic evidence, it—like the original claim language—is hopelessly vague. *What* "known prior art method[s] for administering tasimelteon," *supra* Opening Position at 12, does Vanda purport to have improved? That question is critical because, as discussed at length above, the prior-art comparator in a *Jepson* claim defines the scope of the invention. But Vanda's construction provides no answer.

### 3.    Plaintiff's Reply Position

#### i)    *The preamble need not be definite as a matter of law, but it is definite regardless.*

As we explained in our opening brief (*supra* Opening Position at 9-13), defendants' assertion that the preamble is indefinite suffers from two fatal flaws: first, most fundamentally, the preamble simply need not singlehandedly define the scope of the claimed improvement as a matter of law. Second, regardless, the preamble *is* definite, and plainly so.

**a.** The process steps of claim 1 require "*administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime,*" and, as a consequence, the five preamble words "*administering tasimelteon to a patient*" need not, cannot, and do not operate to further limit the claim. A claim preamble—even when in *Jepson* format—does not necessarily impose limitations above and beyond those expressed elsewhere in the claim. Insofar as a *Jepson* preamble does not add further limitations, its definiteness is thus irrelevant. Rather, in a *Jepson* claim, "the extent of the claimed 'improvement' is defined *only* by the body of the claim." *George M. Martin Co.*, 618 F.3d at 1303 (emphasis added); *see also id.* ("[T]he transition of the claim contains the phrase 'said improvement comprising.' 'Comprising' is a term of art that indicates that only what follows is essential.").

Defendants wrongly argue that "if a *Jepson* claim preamble is of uncertain scope, then 'the

scope of the invention' as a whole is likewise unclear." *Supra* Answering Position at 13 (quoting *Nautilus*, 572 U.S. at 901). But their primary support for that contention—*Epcon*, 279 F.3d at 1029—says no such thing. In *Epcon*, after reciting the general rule that "[t]he preamble of a claim is not necessarily limiting," the Federal Circuit concluded that the highly-detailed *Jepson* claim preamble at issue in that case "help[ed] define the scope of the invention," and thus it was proper for the court to consider the information in the preamble to ascertain the scope of the claim at issue. *Id.* That conclusion is simply a matter of common sense—because *Jepson* claims inherently involve an admission by the inventor that they are claiming an improvement over something in the prior art, "the fact that the patentee has chosen the *Jepson* form of the claim evidences the intention 'to use the preamble to define, *in part*, the structural elements of his claimed invention.'" *Id.* (emphasis added) (quoting *Rowe*, 112 F.3d at 479). In other words, by situating the claimed improvement in the prior art, the preamble of a *Jepson* claim can provide some context regarding the scope of the claimed improvement, particularly where, as in *Epcon*, the preamble is highly detailed.

Here, however, defendants advance a far more audacious principle that finds no support in binding caselaw: as defendants would have it, a *Jepson* preamble must necessarily impose further limitations on the claim. According to defendants, then, to survive an indefiniteness challenge, the preamble *must* also—all on its own—provide enough detail to apprise a skilled artisan of the scope of the claimed method, even if that scope is amply disclosed in the remainder of the claim and in the intrinsic evidence. That sweeping assertion wrongly inverts the conclusion in *Epcon* and is irreconcilable with the analysis of the Federal Circuit and other courts in subsequent cases. In *Catalina Marketing International, Inc. v. Coolsavings.com, Inc.*, for instance, the Federal Circuit flatly stated that there is "no litmus test" that "defines when a preamble limits claim scope," a

principle just as applicable to *Jepson* claims, which the court clarified are merely "guideposts" that only "*generally* indicate[] intent to use the preamble to define the claimed invention, thereby limiting claim scope." 289 F.3d 801, 808 (Fed. Cir. 2002) (emphasis added).

By asserting that utilizing *Jepson* format puts a patent at risk of indefiniteness if its preamble is not sufficiently specific about the pertinent prior art, defendants transform *Jepson* claims into just the sort of "litmus test" for an independently limiting preamble that the *Catalina* court rejected. Indeed, applying *Catalina*, the Federal Circuit has observed that, though a claim employs *Jepson* format, nevertheless "[t]he question whether the court should 'treat a preamble as a limitation is a determination resolved only on review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.'" *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 498 F. App'x 23, 28 (Fed. Cir. 2012) (quotation marks and alteration omitted) (quoting *Catalina*, 289 F.3d at 808). Thus, in *Textron*, the use of *Jepson* format did not impose any further limitations on the patent's scope where "the entire preamble consist[ed] of a general description of the context in which the 'improvement' recited in the body of the claim is situated" and "d[id] not impose any structural limitations." 498 F. App'x at 28. Because the preamble of the *Jepson* claim did not "impose any structural limitations" beyond those limitations "recited in the body of the claim" (*id.*), the preamble could not suffer from indefiniteness. After all, where preamble language does not *further* limit the scope of a claim beyond very explicit and specific limitations found elsewhere, it cannot produce uncertainty as to what the claim covers, much less erode the "reasonable certainty" required under section 112(b) to preclude a finding of indefiniteness. *Cf. Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 197 F. Supp. 2d 699, 703 (E.D. Tex. 2001) ("It certainly can not be said that the preamble text [of a *Jepson* claim] is necessary to breathe life into the claim.").

Here, just as in *Textron*, there is no need to construe the preamble as limiting, its *Jepson* format notwithstanding. The term "administering tasimelteon to a patient" imposes no further limitation on claim 1 of the '129 patent than what is disclosed with greater specificity elsewhere in the claim language. Instead, the preamble simply recites a "general description" of the claimed improvement's context, and the structural limitations are instead recited in the "body of the claim." *Textron*, 498 F. App'x at 28. *See* Ex. 1 ('129 Patent) at 38:47, 38:54 (reciting limitations requiring "administering to the patient 20 mg of tasimelteon"). In such a circumstance, it makes no sense to say that the preamble invites indefiniteness problems—there is no language in the preamble that can erode a skilled artisan's understanding of the claim when the rest of the claim already includes more limiting text. *Jepson* format or not, a claim preamble for a method claim cannot be construed as somehow further "limiting" the claim when those supposed limitations are already recited in the claim body, with greater specificity.

In sum, once it is established that a preamble of a claim does not further limit the claim, the issue of whether the preamble might be indefinite becomes entirely moot. No issue remains as to whether the words of the preamble fail to provide "reasonable certainty" as to the scope of the claim because—whatever those words—they are of no relevance to claim scope. Just so here: the preamble "administering tasimelteon to a patient" cannot further limit a claim already limited to "administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime." Defendants' definiteness contention thus fails at that threshold step.

**b.** Putting all of the above aside, if the court were to conclude that the preamble is somehow independently limiting (though it is not and need not be), defendants' indefiniteness argument also fails for the simple reason that, if the preamble is limiting, the claim taken as a whole is certainly

definite.

As Vanda described in its opening brief, the recitation of "the improvement" in the preamble of the *Jepson* claim, precisely as dictated by regulation (*see* 37 C.F.R. § 1.75(e)(2)), implicitly claims an antecedent basis for "the improvement" based on the disclosure in the specification. *See supra* Opening Position at 10-11, 11 n.3. *See, e.g.*, *Cross Med. Prod., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1319 (Fed. Cir. 2005) (rejecting indefiniteness claim where antecedent basis was disclosed by implication). The definiteness of the preamble is further supported by (1) the Examiner's comprehension of the scope of the claim (*see Sonix*, 844 F.3d at 1379-1380); (2) the use of the *Jepson* format, which intrinsically helps skilled artisans understand how a claim limitation is performed (*see Newron*, 2023 WL 2954461, at *3); and (3) defendants' own proposed construction which, though incorrect, clearly shows that they understand the claimed method to pertain to prior art administrations of tasimelteon (*see Sonrai*, 2022 WL 3640302, at *5); *see also supra* Opening Position at 11-12.

Defendants fail to show otherwise, and certainly not with the clear-and-convincing evidence needed to support a claim of indefiniteness. *Microsoft*, 564 U.S. at 95. Their argument boils down to an assertion that the preamble is "irredeemably vague" because, they say, it is not clear "what . . . method or methods of administering tasimelteon the patentee has purported to improve." *Supra* Answering Position at 14. But that argument fails in multiple respects. For one thing, that argument itself shows that the preamble does discernably describe the claimed method: defendants clearly understand from the text of the claim, including the preamble, that the method pertains only to prior art methods of administering tasimelteon—precisely as Vanda's proposed claim construction says. The same would certainly be true of a skilled artisan.

Defendants' "indefiniteness" contention appears to rest on their assertion that the preamble

does not limit the claimed improvement to *some particular* prior art use of tasimelteon. But that assertion conflicts with the basic axiom of patent law that "breadth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)). Defendants fail to explain why the court should disregard that principle to impose such an extreme definiteness requirement in this case. To be sure, they never cite any binding case law analyzing a *Jepson* preamble in such a fashion.[6] While they make much of the fact that the preamble in *George M. Martin Co.* was lengthy (at 15-16), nothing in that case remotely suggests that the length of the preamble was pertinent to the claim's definiteness. *See generally* 618 F.3d at 1303. To the contrary, as we have noted, the court made clear that the definiteness of the claim is primarily a question of what comes *after* the preamble. *Id.; see also infra* Opening Position at 33–34.

Defendants also point to the Supreme Court's definiteness analysis in *Nautilus*, 572 U.S. at 909-10. *See supra* Answering Position at 13-15. But nothing in *Nautilus* supports concluding that, to be definite, a method claiming to improve upon prior art methods for administering a drug must claim to improve upon one particular such method rather than any or all of them. Instead, *Nautilus* merely requires that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable

---

[6]    Defendants cite (at 13-14) a district court opinion for the proposition that "it is reasonable to require that the preamble set forth the elements or steps of the prior art that are improved upon so that the public may be fairly notified of the scope of the invention." *Micron*, 440 F. Supp. 2d at 596. This case is plainly distinguishable. As noted above, the body of the claim explicitly limits the scope of the claim in a manner that fully addresses any "notice" function that a claim should serve. Moreover, the court's statement was made in the context of determining whether the analyzed claim was even in *Jepson* format, an inquiry made necessary by the fact that the "claims lack[ed] the necessary transitional phrase indicating that the subsequent language comprises an improvement over the previously stated prior art." *Id.* Here, there is no dispute that the claim is in *Jepson* format, and, more to the point, the cited case has nothing to say about the claim's definiteness.

certainty." *Id.* at 910. As we have explained, any skilled artisan would be reasonably certain that the claimed method improves upon prior art methods for administering tasimelteon.

*Mantissa*, 2024 WL 607717, at *4 is likewise inapposite. *Cf. supra* Answering Position at 14-15. That case concerned the meaning of a term—"transaction partner"—that did not appear in the specification and lacked a "commonly accepted definition." *Mantissa*, 2024 WL 607717, at *3. Neither is true of the term "method of administering tasimelteon." *See* Ex. 1 ('129 Patent) at 2:51-61; 4:7-5:62 (discussing tasimelteon in the specification).

Defendants' contention—that the Examiner's implicit finding of definiteness is insignificant because "any deference due the PTO's (implied) judgment [that the claim is definite] is already captured in the statutory presumption of validity" (*supra* Answering Position at 17)—conflicts with the Federal Circuit's conclusion in *Sonix*, 844 F.3d at 1380. There, in holding that the Examiner's and other experts' understanding of the patent's scope was evidence of its definiteness, the court did not rest on a baseline presumption of patent validity. Rather, those individuals' ability to understand the patent literally showed, as a matter of fact, that "skilled artisan[s] did understand the scope of this invention with reasonable certainty." *Id.* So too here.

Defendants next dispute that the claim's *Jepson* format intrinsically enhances a skilled artisan's ability to understand the boundaries of the claim (*supra* Answering Position at 17), but in doing so they simply reiterate their incorrect theory that a *Jepson* claim's preamble must fully elucidate the invention's scope. As we have shown, that is incorrect. It is also unresponsive to Vanda's point (*supra* Opening Position at 11), which is that when a claim employs a *Jepson* format, that format's reference to prior art in the preamble "suggests that a skilled artisan would understand" the prior art so designated, as a court in this district has reasoned. *Newron*, 2023 WL 2954461, at *3 (concluding the term "[i]n a method of treating idiopathic Parkinson's disease in a

patient receiving a stable dose of levodopa," appearing in a *Jepson* preamble, was definite).

Defendants have no answer for Vanda's argument that their own proposed claim construction belies their suggestion that the claim is indefinite. *See supra* Opening Position at 11-12. They point out (as is obvious) that Vanda *disagrees* with that proposed construction. *See supra* Answering Position at 17-18. But that objection misses the point. Defendants' proposed construction—which reads into the preamble only one prior art method of administering tasimelteon—clearly demonstrates that a skilled artisan reading the preamble would understand, particularly given the *Jepson* format, that the preamble references prior art methods for administering tasimelteon. That is precisely the district court's line of reasoning in *Sonrai*, 2022 WL 3640302, at *5, a case defendants disregard altogether.

> ii)    ***Defendants' proposed construction lacks any foundation in the text of the claim, whereas Vanda's proposed construction applies the text's plain and ordinary meaning.***

As noted in the opening brief (*supra* Opening Position at 12-13), Vanda's proposed claim construction applies the plain language of the preamble, which, since it appears in *Jepson* format, implicitly references prior art methods but does not designate any one such method. That approach is compelled by the cardinal rule of claim construction: "Generally, terms in a patent claim are given their plain, ordinary, and accustomed meaning to one of ordinary skill in the relevant art." *Prima Tek II,* 318 F.3d at 1148.

Defendants, on the other hand, flatly admit that their alternative proposed construction of the preamble "rewrite[s]" the claim. *See supra* Answering Position at 18 (quoting *Allen Eng'g*, 299 F.3d at 1349). That word choice is quite apt—their proposed construction inserts more than two dozen words into the claim language to arbitrarily single out one particular prior art method. Their argument that this reading is supported by intrinsic evidence (*supra* Answering Position at 18) is unavailing. The discussion of Phase III clinical trials appears in the section "Detailed

Description of the Invention," and nothing in the specification suggests that Vanda considered these trials to be prior art. A skilled artisan would thus understand the description of the trials to describe part of the invention, not the prior art. *See* Ex. 1 ('129 patent) at 4:5-21:61. Indeed, it is Vanda's construction, not defendants', that finds support in intrinsic evidence. The specification explains that "[t]asimelteon has so far been studied in hundreds of individuals and has shown a good tolerability profile." Ex. 1 ('129 Patent) at 2:59-61. That language establishes that methods of administering tasimelteon to a patient existed in the prior art, but it does not single out the specific method highlighted by the defendants in their proposed construction.

What is more, as Vanda noted (*supra* Opening Position at 13), Defendants' construction duplicates claim language and thus renders that language superfluous. Defendants do not disagree, but instead strangely insist that this is a "feature[,] . . . not a bug," of their proposed claim construction. *Supra* Answering Position at 18. But they never reckon with Federal Circuit precedent (cited by Vanda) making clear that claim constructions are highly disfavored when they invite superfluity that "renders claim language meaningless." *In re Power Integrations,* 884 F.3d at 1376.

In sum, defendants are wrong twice over that the preamble is indefinite—it need not be definite, but is. And they acknowledge that their alternative proposed claim construction rewrites the claim. If the court finds it necessary to construe the preamble at all, the court should simply apply the plain language of the preamble.

### 4.    Defendants' Sur-Reply Position

####    i)    Vanda's argument that the preamble of a *Jepson* claim is not necessarily limiting ignores established Federal Circuit case law.

It is well-established that "the preamble is a limitation in a Jepson-type claim." *Epcon,* 279 F.3d at 1029; *accord Arctic Cat Inc. v. GEP Power Prods., Inc.,* 919 F.3d 1320, 1329–30 (Fed.

Cir. 2019) (Federal Circuit has "long held that preamble language is limiting" when a patentee uses the *Jepson* form). Vanda's reading of *Epcon*—as holding merely that a *Jepson* claim preamble "can provide some context regarding the scope of the claimed improvement," *supra* Reply Position at 20—is irreconcilable with the language of the opinion. After noting that preambles *in general* are "not necessarily limiting," *Epcon* holds that the rule is otherwise for *Jepson* claims: "that the patentee has chosen the Jepson form of the claim evidences the intention to use the preamble to define, in part, the structural elements of his claimed invention. *Thus, the preamble is a limitation in a Jepson-type claim*." 279 F.3d at 1029 (cleaned up) (emphasis added).

To be clear, Defendants are not saying that the preamble must "*all on its own*[ ] provide enough detail to apprise a skilled artisan of the scope of the claimed method," *contra supra* Reply Position at 20 (emphasis added). Instead, under *Epcon* and like cases, a *Jepson* claim preamble "define[s], in part" the invention, 279 F.3d at 1029, and therefore must comply with the statutory definiteness requirement. That is far from an "audacious principle." *Contra supra* Reply Position at 20. Indeed, it is reflected in the PTO regulation on *Jepson* claims, which requires the preamble to recite "all the elements or steps of the claimed combination which are conventional or known." 37 C.F.R. § 1.75(e).

Vanda's reliance (*supra* Reply Position at 20–21) on *Catalina* is misplaced. *Catalina* did not involve a *Jepson* claim, so its statements about general rules for whether a preamble is limiting are not informative here. The non-precedential *Textron* decision did involve a *Jepson* claim, but it did not address definiteness, and it certainly nowhere suggested that *Jepson* claim preambles need not be definite. 498 F. App'x at 28; *contra supra* Reply Position at 21–22. Vanda's reading of *Textron* to hold that *Jepson* claim preambles can be non-limiting is irreconcilable with *Epcon* and its progeny.

Vanda's argument would entirely change the claim. Having written and prosecuted a *Jepson* claim, it would be inappropriate to now deem the preamble non-limiting: the effect of that would be to rewrite the claim in non-*Jepson* form. While Vanda may regret writing a *Jepson* claim, this is the claim that the patent examiner analyzed. Striking the preamble would result in a claim that the PTO did not have the opportunity to analyze and did not agree to issue.

### ii)    The scope of the preamble is indefinite.

Vanda's backup position (*supra* Reply Position at 23)—that the preamble means "the method pertains only to prior art methods of administering tasimelteon," without indicating what those methods are—fares no better. That is no construction at all, and it provides no answer to Defendants' point: the claim does not inform *which* improved methods fall within the claim and which do not. To be sure, breadth alone is not indefiniteness, but nothing in the intrinsic evidence (or even in Vanda's briefing) suggests the inventors believed they improved *all* prior-art methods of administering tasimelteon—at any dose, at any time, to any patient, for any purpose. *Cf. Mantissa*, 2024 WL 607717, at *4 (unclear term rendered claim indefinite in part because of its breadth).

While not entirely clear, Vanda appears to contend that the body of the claim answers the questions Defendants earlier posed: What is "the nature of the method that Vanda purports to have improved[?] Methods of administering tasimelteon to do what? To whom? At what doses? When?" *Supra* Answering Introduction at 5. There are three problems with this argument.

*First*, the body of the claim does not in fact answer those questions. Claim 1 does not specify any particular patient population or use for the tasimelteon. So there is still necessary work that the preamble must (but does not) do to define the scope of the invention.

*Second*, Vanda's argument here would suggest that Defendants' alternative construction (which specifies that the prior-art method being improved involves administering 20 mg

tasimelteon 0.5–1.5 hours before bedtime) is correct. But Vanda *disagrees* with that construction. *Supra* Reply Position at 26–27. "Vanda apparently wants to interpret its claims to read on improvements to *other* prior-art methods of administering tasimelteon [i.e., other than those recited in the body of the claim]. But the scope of that additional claim coverage is anyone's guess." *Supra* Answering Position at 17–18. Vanda has no answer. And the fact that Vanda cannot even consistently articulate what prior-art methods the preamble is supposed to cover reinforces the preamble's indefiniteness.[7]

*Third*, Vanda's contention that its preamble merely provides a "general description" of the "improvement's context," *supra* Reply Position at 21, is inconsistent with 37 C.F.R. § 1.75(e). That regulation requires that the preamble set forth "a general description of *all of the elements or steps of the claimed combination which are conventional or known*," *id.* (emphasis added)—not just a description of the invention's context. And Vanda's contention that the preamble need "not limit the claimed improvement to *some particular* prior art use of tasimelteon," *supra* Reply Position at 23–24, is likewise inconsistent with § 1.75(e). If this claim complies with § 1.75(e)— and Vanda presumably believes it does—it must "define, in part," the scope of the invention. *Epcon*, 279 F.3d at 1029.

Vanda otherwise repeats the three contentions from its opening brief: (i) the Examiner understood the claim, (ii) it is in *Jepson* format, and (iii) Defendants must understand the claim because they proposed a construction. *Supra* Reply Position at 25–26. These arguments are no more persuasive now.

---

[7] *Compare also supra* Reply Position at 26 (arguing that Defendants' construction "arbitrarily single[s] out one particular prior art method"), *with id.* at 27 (arguing that "nothing in the specification suggests that Vanda considered [the method in Defendants' construction] to be prior art").

Argument (i) is legally incorrect. "[I]f the court were to accept this argument, no party could ever raise an indefiniteness challenge because every claim term ever held indefinite was originally approved by a patent examiner." *WSOU Invs. LLC v. Google LLC*, 2023 WL 6210607, at *8 (Fed. Cir. Sept. 25, 2023) (cleaned up). Vanda's reliance on *Sonix* is misplaced; there, unlike here, the Examiner and the patentee engaged in a substantive back-and-forth about patentability that demonstrated that they knew how to "differentiate between which indicators were and which were not visually negligible." 844 F.3d at 1379–80. Nothing like that occurred here. *See supra* Answering Position at 16–17, 16 n.5. All we have is an unexplained allowance of the claims—and *that* is not at all probative as to definiteness.

Argument (ii) is, again, inconsistent with Rule 1.75(e), which demands an explicit articulation of the prior art improved upon, not a generic indication that imports all prior art by implication. And, as illustrated by the numerous patents on methods of using tasimelteon and the silence of the specification regarding this particular improvement, the field is not narrow enough for a skilled artisan to be able to simply infer what prior art Vanda is improving upon.[8]

Argument (iii) remains puzzling. *See supra* Answering Position at 17–18. That Defendants are able to posit a construction in the alternative is not evidence of definiteness, particularly when Vanda says the construction is wrong. This line of argument suggests that different individuals understand the claim to mean different things, which *evidences* the indefiniteness problem.[9] More

---

[8] Vanda's reliance (*supra* Reply Position at 25–26) on *Newron* is unavailing. The *Jepson* claim there specifically identified the prior-art method allegedly improved upon: "a method of treating idiopathic Parkinson's disease in a patient receiving a stable dose of levodopa." 2023 WL 2954461, at *3. The preamble here lacks that sort of specificity.

[9] *Sonrai* (*supra* Reply Position at 26) is inapposite. The defendants there advocated for a particular construction of the term in question and argued only in the alternative that the term would be indefinite if their proposed construction were not adopted. *Sonrai*, 2022 WL 3640302, at *4.

fundamentally, "amenable to construction" is not the standard: "[i]t cannot be sufficient that a court can ascribe *some* meaning to a patent's claims." *Nautilus*, 572 U.S. at 911. Instead, the standard is "reasonable certainty." *Id.* at 910. That reasonable certainty is lacking here.[10]

### iii) In the alternative, the Court should adopt Defendants' construction.

If the Court does not find the preamble indefinite, it should adopt Defendants' alternative construction. Indeed, Vanda implicitly endorses that construction in arguing that its steps "are already recited in the claim body, with greater specificity," *supra* Reply Position at 22. *Jepson* claims are supposed to set forth the prior art before claiming what is new over and above that prior art. If Vanda invented an improvement "to avoid a decrease in efficacy caused by coadministration with" beta blockers, *supra* Opening Introduction at 2, the preamble should be construed to make clear that the method improved on is that "recited in the claim body" (minus the limitations involving beta blockers). Vanda's construction, in contrast, is no more illuminating than the preamble as written. Nor does it find intrinsic support. The patent's observation that tasimelteon has "been studied in hundreds of individuals," *supra* Reply Position at 27, says nothing of which methods were studied, nor whether the claims improve on some, any, or all of them. Vanda should not be permitted to prosecute one claim and then use claim construction to obtain a much broader claim during litigation.

### C. "determining whether the patient is being treated with a beta-adrenergic receptor antagonist"

---

[10] The uncertainty is compounded by the fact that, if the "improvement" here is to "avoid a decrease in efficacy caused by coadministration [of tasimelteon with] … beta blockers," *supra* Opening Introduction at 2, it is unclear how the claimed method would accomplish that improvement. If a physician instructs the patient to discontinue beta blockers and the patient ignores that instruction, the claim has still been practiced, but the purported "decrease in efficacy" would not be avoided.

### 1.    Plaintiff's Opening Position

| Term | Vanda's Construction | Defendants' Construction |
|---|---|---|
| "determining whether the patient is being treated with a beta-adrenergic receptor antagonist"<br><br>(Claim 1) | Limiting and should be afforded its plain and ordinary meaning (*i.e.*, not limited to a particular method of determining, such as "asking") | Not limiting; not afforded patentable weight.<br><br>Alternatively, "asking the patient or his caregiver if he is taking a beta-adrenergic receptor antagonist" |

This claim term is limiting and should be construed according to its plain and ordinary meaning, which is not limited to "asking the patient or his [or her] caregiver." Defendants' contentions otherwise are wrong; the claim term is limiting and affords patentable weight, and "determining" whether a patient is being treated with a beta blocker has a plain and ordinary meaning that is not limited only to "asking" the patient or caregiver.

> ### i)    *The "determining" term is limiting and should be afforded patentable weight.*

In arguing that the "determining" term is not limiting, defendants disregard basic principles of patent interpretation.

**a.** "Determining" follows the word "comprising." In *Jepson* claims, the body of the claim—the description of the claimed improvement—defines the scope of the invention in concert with the preamble. *George M. Martin Co.*, 618 F.3d at 1303 (explaining in the context of construing a *Jepson* claim that "'[c]omprising' is a term of art that indicates that only what follows is essential"). Because the preamble to a *Jepson* claim is defined to end before "comprising," the term here cannot be part of the preamble. Instead, the "determining" term is an "element[], step[], and/or relationship[] which constitute[s] [a] portion of the claimed combination which the applicant considers as the new or improved portion." 37 C.F.R. § 1.75(e)(3).

"It is well established that '[e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention.'" *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1276 (Fed. Cir. 2018) (quoting *Warner-Jenkinson Co v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997)). There can be no doubt that "determining whether the patient is being treated with a beta-adrenergic receptor antagonist" sets boundaries on the scope of the claim. Any method that does not include that step—perhaps because it is agnostic to the use of beta blockers by the patient—falls outside the boundaries of the claim. Thus, this term—which defines a key step in the claimed method—is plainly limiting.

**b.** Nor can Defendants reasonably suggest that the "determining" term is not entitled to patentable weight. This Court previously declined to adopt similar arguments that defendants made in their motion for judgment on the pleadings (*see* C.A. No. 23-152, D.I. 98), for good reason.

"Patentable weight" is a term that is often used in the context of the "printed matter doctrine." *See, e.g., IOENGINE, LLC v. Ingenico Inc.*, 100 F.4th 1395, 1404 (Fed. Cir. 2024). This is the context in which defendants previously invoked that phrase. C.A. No. 23-152, D.I. 99 at 12. The Federal Circuit has articulated "a two-step test to determine whether a limitation should be accorded patentable weight under the printed matter doctrine." *IOENGINE*, 100 F.4th at 1404. First, the court must "determine whether the limitation in question is directed toward printed matter." *Id.* "'Only if the limitation in question is determined to be printed matter'" does the Court "proceed to the second step, which asks 'whether the printed matter nevertheless should be given patentable weight.'" *Id.* (quoting *In re Distefano*, 808 F.3d 845, 850 (Fed. Cir. 2015)). Defendants' arguments fail at both steps.

First and foremost, the "determining" clause is not directed to printed matter. A limitation

34

"is printed matter only if it claims the content of information"—*i.e.*, "matter claimed for what it communicates." *Id.* (quoting *Distefano*, 808 F.3d at 848, 850). Obviously, nothing in the limitation is necessarily "printed." And as the Federal Circuit has recently made clear, printed matter encompasses only limitations claiming "*content specifically being communicated.*" *IOENGINE*, 100 F.4th at 1404 (emphasis in original). "The fact that there is a communication itself is not content; content is what the communication actually says." *Id.* "Nor is the form of a communication . . . considered to be content." *Id.* "Printed matter encompasses *what* is communicated—the content or information being communicated—rather than the act of a communication itself." *Id.* (emphasis in original).

The "determining" limitation does not claim any information *at all*, let alone claim information for what it communicates. Under Claim 1, a practitioner of the claim determines whether a patient is taking a beta blocker and either (1) administers tasimelteon if the patient is not taking a beta blocker, or (2) "instruct[s] the patient to cease treatment with" the beta blocker before administering tasimelteon if the patient is taking a beta blocker. Ex. 1 ('129 Patent) at 38:41-56. It is on all fours with the limitation in *Otsuka Pharmaceutical Co., Ltd. v. Mylan Laboratories Ltd.*, which concerned a method in which "administering of the long-acting suspension is avoided when the patient is taking a CYP3A4 inducer." 2023 WL 5928313, at *6 (D. Del. Sept. 12, 2023) (Hall, J.).[11] Like the claim in *Otsuka*, the "determining" term "does not include merely the content of the information as to why patients taking a [beta blocker] should not be given" the relevant drug. *See id.* at *7. Though it "implicitly relies on information—that patients taking a [beta blocker] should avoid" taking tasimelteon "because such treatment is

---

[11]    *See Otsuka Pharm. Co., Ltd. v. Mylan Lab'ys Ltd.*, C.A. No. 22-464-JLH (D. Del. Jan. 22, 2024), D.I. 213 (attached as Exhibit 8) (adopting report and recommendation).

unlikely to be clinically effective for those patients," it "does not claim the content of that information." *Id.* The claim calls for taking action "in response to a certain trigger—a patient taking something else." *Id.* The "determining" term merely defines that trigger; it does not claim information.[12]

The "determining" term is thus unlike any the defendants have relied on that are *actually* directed to printed matter. In *King Pharms., Inc. v. Eon Labs, Inc.*, for example, the claims covered limitations that recited "informing the patient" or "a printed labeling" that contained information advising that taking metaxalone with food "results in an increase" in bioavailability. 616 F.3d 1267, 1277-80 (Fed. Cir. 2010); *see* Ex. 9 (U.S. Patent No. 6,407,128) at 8:34-45. Similarly, in *AstraZeneca LP v. Apotex, Inc.*, the Federal Circuit found that claim limitations covering "a label" that provided an administration method and dosing frequency constituted printed matter that lacked patentable weight. 633 F.3d 1042, 1063-65 (Fed. Cir. 2010); *see* Ex. 10 (U.S. Patent No. 6,598,603) at 12:3-8; Ex. 11 (U.S. Patent No. 6,899,099) at 11:9-14. And the offending claims in *Praxair* involved "providing" "information" to a medical provider and having the provider "think about it"—*i.e.*, the claims merely added an unpatentable mental process onto printed matter. 890 F.3d at 1033; *see, e.g.*, Ex. 12 (U.S. Patent No. 8,846,112) at 14:41-52; 14:63-15:2.

Unlike these claims, the "determining" term does not "either claim[] the content of the information or merely require[] a medical provider to think about the information provided." *Otsuka*, 2023 WL 5928313, at *7. It is not a bare recital of facts and is not in the form of a label

---

[12]     Of course, it does not matter that some implementations of the "determining" limitation might involve the communication of some information—that information is not claimed for its content. *See Distefano*, 808 F.3d at 851 ("Although the selected web assets can and likely do communicate some information, the content of the information is not claimed.").

or a limitation reciting the provision of information. Rather, the "determining" term "calls for taking a specific action as part of the claimed method—not administering something—in response to a certain trigger—a patient taking something else." *Id.* at *7. To apply the "printed matter" doctrine in circumstances such as these would expand the doctrine far past its limits.

But even assuming the limitation implicated printed matter—it does not— the "determining" term would not lack patentable weight because any "claimed informational content" in the term "has a functional or structural relation to the substrate." *Distefano*, 808 F.3d at 850. Where "claimed information" is "interrelat[ed] . . . with the concrete step of discontinuing treatment because of the information," a claim term has patentable weight. *See Praxair*, 890 F.3d at 1035. Here, the "determining" step is "functionally related to its substrate"—in other words, it modifies how the claimed methods are practiced—and necessarily *does* have patentable weight. *Id.* at 1032.

Just as in *Praxair*, any communicative content covered by the "determining" limitation is interrelated with the concrete steps of administering tasimelteon if a patient is not taking a beta blocker and instructing a patient to cease taking a beta blocker before administering tasimelteon if a patient is taking a beta blocker. 890 F.3d at 1035. If a physician *determines* that a patient is taking beta blockers, the physician then engages in an action—instructing the patient to cease treatment with beta blockers before administering the drug. If not, no such instruction is necessary, and the doctor proceeds directly to administer the drug. Thus, the "determining" step immediately affects the claimed method of administration.

### ii) *A POSA would interpret the "determining" term according to its plain and ordinary meaning.*

Defendants have already conceded that "[c]laim construction should be [] unnecessary for 'determining,' which—to the extent it is limiting—should have its plain and ordinary

meaning." C.A. No. 23-152, D.I. 99 at 5. Despite their earlier position, Defendants now change course in an apparent attempt to buttress their invalidity arguments. But, as defendants conceded during an October 18, 2024, meet and confer, there is no basis in the intrinsic evidence for interpreting "determining" to mean "asking."

Claims should generally be given their plain and ordinary meaning. *Phillips*, 415 F.3d at 1312. The "determining" term speaks for itself, and the plain and ordinary meaning is sufficient for this claim term. *Cf. OANDA Corp. v. Gain Cap. Holdings, Inc.*, 2024 WL 3199981, at *7 (D.N.J. June 26, 2024) (rejecting the accused infringer's attempt to narrow the meaning of the term "determining" and finding that "[n]o further construction beyond plain and ordinary meaning is required as to" the "determining" claim term). A "*determining*" step inherently requires performance of an *act* through which a *determination* results. The plain and ordinary meaning of "determining" whether a patient is being treated with a beta blocker cannot be construed as limited only to "asking the patient or his caregiver" a question because "asking" by itself (1) may not suffice to make the determination required under the claim (e.g., if the individual being "asked" is not competent to offer a correct answer) and (2) is not essential in order for a prescribing physician to be positioned to make the determination. Indeed, the specification itself contemplates other ways in which the act of "determining" could be carried out—including through retrieving and reviewing existing electronically stored medical records for the patient. Ex. 1 ('129 Patent) at 27:66-28:34.[13] There is no possible justification for construing the term as a mere synonym for "asking" a patient or caregiver a question, as defendants propose. Instead, it should have its plain and ordinary meaning: an affirmative act that results in the determination as set out in the claim.

---

[13]    This example further illustrates that no "communication" is necessarily involved in the "determining" step, and so it cannot claim the informational content of any communication. *Supra* Opening Position at 33-38.

2.    **Defendants' Answering Position**

i)    **The "determining" step is not entitled to patentable weight.**

Under the "printed matter" doctrine—somewhat of a "misnomer," as it does not necessarily involve "printed matter" at all, *Otsuka*, 2023 WL 5928313, at *6—a claim limitation that "claims the content of information" or a mere "mental step" is not entitled to patentable weight. *IOENGINE*, 100 F.4th at 1403–04; *Praxair*, 890 F.3d at 1033–34. That is exactly what the "determining" step does: it simply claims the "informational content" of whether the patient is currently taking a beta blocker and has the provider "think about it." *See Praxair*, 890 F.3d at 1033 ("[A]dding an ineligible mental process to ineligible information still leaves the claim limitation directed to printed matter.").

This much is evident from the fact that, even if all references to the "determining" step are deleted from the claim, the operative steps of claim 1 remain *exactly the same*:

> In a method of administering tasimelteon to a patient, the improvement comprising:
>
> . . . .
>
> in the case that . . . the patient is not being treated with a beta-adrenergic receptor antagonist, administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime; or
>
> in the case that . . . the patient is being treated with a beta-adrenergic receptor antagonist;
>
>> instructing the patient to cease treatment with the beta-adrenergic receptor antagonist; and then
>>
>> administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime.

Ex. 1 ('129 Patent) at 38:41–56.

In other words, the only work the "determining" step does in the claim is to define the

information—or, stated differently, the mental process—that the physician uses to carry out the functional steps of claim; it does not itself modify those functional steps. "The rationale behind" the Federal Circuit's printed-matter cases "is preventing the indefinite patenting of known products by the simple inclusion of novel, yet *functionally unrelated* limitations." *King Pharms*, 616 F.3d at 1279 (emphasis added). This case falls squarely within that rationale. The "determining" step does not add anything *functional* to the claim; the operative steps remain the same even if that step is not recited.

The specification supports this analysis as well. While, as explained above, the specification does not discuss discontinuing beta blocker therapy before administering tasimelteon, it mentions the concept of evaluating "treatment-related *health information*" such as "whether or not the patient is receiving, i.e., being treated with," a beta blocker. Ex. 1 ('129 Patent) 28:22–32 (emphasis added); *accord id.* 29:3–12, 31:33–50, 34:5–14. This confirms that the "determining" step is directed to *information*—not a patentable element of the claim.

This conclusion is particularly inescapable under Vanda's amorphous interpretation of the term, which encompasses not only asking the patient whether she is taking a beta blocker but also consulting medical records (as well as, apparently, other unspecified ways of evaluating information). *See supra* Opening Position at 37–38. Vanda's interpretation is apparently broad enough to encompass all manner of cognitive processes by which a physician figures out if the patent is taking a beta blocker. But cognitive processes are not patentable.

The Federal Circuit's decision in *Praxair* provides a useful analogy. The claim in question there required weighing the potential benefit of treating a neonatal patient with nitric oxide against the risk of the nitric oxide leading to pulmonary edema "in order to arrive at a decision of whether or not to treat" the patient with nitric oxide. 890 F.3d at 1033. This limitation, the court held,

40

"merely require[d] a medical provider to *think about* the information claimed." *Id.* But that "purely mental step" could not confer patentability. *Id.*

The same reasoning applies here. The "determining" step merely requires the physician to "think about" whether the patient is taking a beta blocker; the remainder of the claim specifies what the provider does with that information. In Vanda's words, "[t]he claim calls for taking action in 'response to a certain trigger,'" *supra* Opening Position at 36—and the relevant "action" is outlined elsewhere in the claim, *after* the "determining" step. Put differently, the "determining" step does not "modif[y] how the claimed methods are practiced," *contra supra* Opening Position at 37; the remaining steps are practiced the same way even if the "determining" step is excised from the claim. "Determining" thus adds nothing of patentable significance.

*Otsuka* (cited at 35) is inapposite. The limitation at issue there required "avoid[ing]" intramuscular injection of a long-acting suspension of aripiprazole "when the patient is taking a CYP3A4 inducer." 2023 WL 5928313, at *6 & n.19. This limitation, the court held, did not "claim[] the content of information"; rather, it "direct[ed] that the long-acting suspension is not to be given to [patients taking a CYP3A4 inducer] as part of the claimed method." *Id.* at *7. That is, the "term call[ed] for taking a specific action as part of the claimed method—not administering something—in response to a certain trigger—a patient taking something else." *Id.*

Here, in contrast, the "determining" limitation does not require any "specific action" at all. It merely recites information that is used as part of the physician's mental process to inform the specific actions taken in the subsequent steps of the claim. *Otsuka*'s reasoning—far from supporting Vanda's position—thus illustrates why the "determining" limitation is not entitled to patentable weight.

A real-world example further proves the point. Suppose that, before the patent's priority

date, a physician administered 20 mg tasimelteon once daily 0.5–1.5 hours before bedtime to a Non-24 patient not taking a beta blocker. If the "determining" step has patentable weight, whether that method anticipates would depend on whether the physician took the *mental step* to determine that the patient is not taking a beta blocker. That is precisely the scenario the printed-matter doctrine is designed to guard against. *See Praxair*, 890 F.3d at 1032–33.

Finally, Vanda's suggestion (at 34) that the Court addressed this dispute when ruling on Defendants' motion for judgment on the pleadings is incorrect. On the contrary, the Court expressly declined to reach the parties' claim-construction disputes because the Court viewed those as premature at the pleadings stage. *See* D.I. 111 at 2. Those disputes are now ripe for the Court's resolution. And, for the reasons explained above, the Court should hold that the "determining" step is not entitled to patentable weight.

>ii)     **If the Court concludes the "determining" step has patentable weight, it should be interpreted to require asking the patient or caregiver if the patient is taking a beta blocker.**

Alternatively, the Court should construe the "determining" step to require "asking the patient or his caregiver if he is taking" a beta blocker. If this limitation is to be accorded patentable weight, it must require some affirmative act on the part of the physician so as to avoid having infringement or invalidity turn on the physician's performance of a mental step. As explained above, Vanda's amorphous construction of the term does not do that. "Asking" the patient about the medications he is currently taking, in contrast, places a meaningful limitation on the scope of the claim and is consistent with the plain and ordinary meaning of the word "determining." *Cf. ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012) ("The plain and ordinary meaning of the term 'determining' is similar to 'asking' or 'ascertaining.'"). Accordingly, if the Court is inclined to afford this step patentable weight, it should adopt Defendants' proposed construction.

42

### 3.    Plaintiff's Reply Position

As we explained (at 33-37), the "determining" clause is a limitation entitled to patentable weight because it is "material to defining the scope of the patented invention." *ArcelorMittal*, 908 F.3d at 1276. And even if it were not, it is "functionally related" to its "substrate," which includes the structural elements of the claimed invention. *Praxair*, 890 F.3d at 1032. Defendants first argue (at 39-42) that the "determining" limitation covers "printed matter" not worthy of patentable weight. Second, they insist (at 42) that the Court artificially restrict the claim scope. Neither argument is consistent with the claim language. *See IOENGINE*, 100 F.4th at 1404.

### i)    The "determining" clause does not claim printed matter.

The "determining" clause sets forth one step of the overall method claimed by the '129 patent: "*determining* whether the patient is being treated with" a beta blocker. Ex. 1 ('129 Patent) at 38:43-44 (emphasis added). This self-evidently does not claim "printed matter." "[P]rinted matter is matter that is claimed for its communicative content—i.e., the *content specifically being communicated*. … [A] communication itself is not content; content is what the communication actually says." *IOENGINE*, 100 F.4th at 1404. Relevant examples of claims that *do* cover printed matter include: "an FDA label providing dosage instructions for using a medical product," a "label instructing a patient to take a drug with food," "instructions on how to perform a DNA test," or "numbers printed on a wristband." *Id.* Unlike these examples, the "determining" limitation does not claim any information *at all*, much less claim information for what it communicates.

Principally, Defendants claim that the "determining" clause covers printed matter because it involves merely a "mental step." But they provide no justification for this assertion. Instead, the specification teaches that "information relating to whether or not a patient is receiving, i.e., being treated with, a beta blocker" "may be stored in a computer readable form"

43

and accessed in any number of ways. Ex. 1 ('129 Patent) at 29:3-31. And the specification further provides that doctors may ascertain a patient's medical history and current treatment with beta blockers through use of "computer-based systems." Ex. 1 ('129 Patent) 27:66-28:34. Defendants themselves suggest (at 42) an interpretation of "determining" that includes "asking the patient or his caregiver," which is not a mental or cognitive process at all. "Determining" is thus simply not a purely mental or cognitive step.

The "determining" step is thus very different from the step found to be "printed matter" in *Praxair*. There, the limitations required "a medical provider to" merely "weigh potential benefit[s] . . . vs. [] potential risk[s]" in consideration of whether to pursue a certain treatment regimen. *Praxair*, 890 F.3d at 1033. The Federal Circuit found that "[t]his limitation merely require[d] a medical provider to *think about* the information claimed in the providing information limitation of" a different claim in the same patent. *Id.* By contrast, the "determining" step requires affirmative acts on the part of the prescriber to ascertain information, and the content of the information ascertained is used in later steps of the claimed method. That determination can take place by a patient inquiry, a review of the patient's medical and treatment history from their record, or any other number of ways. But none of the various methods of "determining" involve merely "thinking" about information.[14]

As we explained (at 35-37), this case is indistinguishable from *Otsuka*, 2023 WL

---

[14]     Defendants also point (at 40) to various uses of the word "information" in the specification. Once again, the fact that information is *involved* says nothing about whether it is the content of that information that is *claimed*. *IOENGINE*, 100 F.4th at 1404. The fact that information is present or relevant is simply not enough. Nor is Defendants' conclusion "inescapable" from the specification—particularly because most of the specification's uses of "information" pertain to data irrelevant to the question whether a patient is taking beta blockers. *See, e.g.*, Ex. 1 ('129 Patent) at 31:33-50 (discussing "information indicative of the levels of endogenous melatonin" and "information relating to whether or not the patient is a smoker").

5928313, at *6 (Hall, J.). Like the claim in *Otsuka*, the "determining" limitation "does not include merely the content of the information as to why patients taking a [beta blocker] should not be given" the relevant drug. *Id.* at *7. Though it "implicitly relies on information—that patients taking a [beta blocker] should avoid" taking tasimelteon "because such treatment is unlikely to be clinically effective for those patients"—it "does not claim the content of that information." *Id.* As in *Otsuka*, Claim 1 calls for taking action "in response to a certain trigger— a patient taking something else." *Id.* The "determining" term requires a practitioner to take some action to ready that trigger—it is an act in and of itself and does not simply claim information.

Defendants (at 41) have no meaningful answer to *Otsuka*. They again argue that, unlike the claim in *Otsuka*, the "determining" term does not require a "specific action" on the part of the prescriber. But a prescriber cannot "determin[e]" whether a patient is taking a beta blocker without engaging in non-cognitive actions. *See supra* Opening Position at 37-38. Nor can Defendants complain that the term does not require any "specific action"—the claim in *Otsuka* did not specify a *particular* method of ascertaining whether a patient was taking a CYP3A4 inducer either. *Otsuka*, 2023 WL 5928313, at *7. Instead, the court in *Otsuka* upheld the challenged claims because they specified a "specific action . . . *in response*" to the trigger. *Id.* Both here and in *Otsuka*, that "specific action" is a patient instruction to alter their treatment regimen based on information the prescriber ascertains. Defendants cannot twist *Otsuka*'s language to escape its clear application to this case.

**b.** Even if the "determining" step did claim only the content of some information—it does not—Defendants' argument would still fail for the independent reason that it is "functionally related to its substrate." *Praxair*, 890 F.3d at 1032. That condition is satisfied where "claimed information" is "interrelat[ed] . . . with the concrete step of discontinuing

45

treatment because of the information." *Id.* at 1035. Just so with the "determining step"—if a prescriber determines a patient is not taking a beta blocker, the prescriber, guided by the earlier determination, administers tasimelteon according to the claimed method. Ex. 1 ('129 Patent) at 38:45-49. Conversely, if a prescriber determines a patient is taking a beta blocker, the prescriber, also guided by his or her earlier determination, first instructs the patient to cease taking the beta blocker before the prescriber administers tasimelteon according to the claimed method. *Id.* at 38:50-56. Because the action a doctor takes is based directly on their prior determination, it is plainly "interrelated with the rest of the claim" such that it is entitled to patentable weight. *Praxair*, 890 F.3d at 1032.

Rather than offer a rebuttal, Defendants invent their own test. Defendants focus repeatedly on whether the "determining" limitation "add[s] anything *functional* to the claim." But the proper test asks whether the alleged printed matter is functionally *related* to the remainder of the claim. Here, the method cannot be carried out until the "determining" step is complete, and it is thus necessary to practice the claim. *See, e.g.*, *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014) ("A method patent claims a number of steps" and "is not infringed unless all the steps are carried out."). Defendants are simply wrong to assert that the "determining" step "does not add anything" to the claim. *Supra* Answering Position at 40. The "determining" step is an independent requirement that a practitioner of the '129 patent must perform that requires some affirmative, external action such as referencing medical records or collecting information from patients or caregivers—it does not merely claim information, because if it were omitted from the patent, the claimed method would differ.

Defendants' "real-world" example (at 41-42) demonstrates this point. Where a physician prescribes tasimelteon to a patient in a way that is agnostic to whether that patient is taking a beta

blocker, that physician is not practicing the claimed method. If the physician takes some action to determine whether the patient is taking a beta blocker—such as actions that might include referencing the patient's records or ascertaining the patient's beta-blocker status from the patient or a caregiver—and then modifies their direction to administer tasimelteon to the patient *based on* that determination, they are practicing the claimed method. That distinction demonstrates the critical role that determining the patient's beta-blocker status plays in the method. The "determining" step is not "functionally unrelated" to the prescribing instructions—it is the key determinant of what those instructions will be. It thus does not implicate the concerns underlying the printed matter doctrine.

      *ii)*      ***The Court should not artificially restrict the scope of the claims to the specific act of "asking".***

Defendants make no attempt to reconcile their alternative construction with their earlier concession that the "determining" term "should have its plain and ordinary meaning." C.A. No. 23-152, D.I. 99 at 5. Nor do they provide any intrinsic or extrinsic evidence that would justify departure from the term's plain meaning. As we earlier explained (at 37-38)—and defendants have no serious response—the act of "determining" is broader than the act of "asking."

Defendants (at 42) rely on a single quotation supposedly from *ePlus*, 700 F.3d at 520— "The plain and ordinary meaning of the term 'determining' is similar to 'asking' or 'ascertaining.'" *Supra* Answering Position at 42. But we cannot locate that quotation in *ePlus*, nor anywhere else. In fact, in *ePlus*, the Federal Circuit found that "determining" was not "limited to the act of looking up an item in the inventory by the party that has 'control' over the inventory information." *Id.* at 520.

At bottom, Defendants ask the Court to adopt their atextual limitation on "determining" because they claim "determining" requires "some affirmative act on the part of the physician."

*Supra* Answering Position at 42. But this fails for two reasons. First, the act of "determining" is *itself* that "affirmative act." The plain meaning of "determining" already encompasses the "affirmative act" that defendants assert is required.

Second, Defendants' construction is artificially narrow. While "asking" a patient may be one way to perform the "determining" step, it surely is not the only one. A physician may "determine" whether a patient is taking a beta blocker not just by asking the patient, but also by reviewing medical records maintained on paper or in an electronic database. Indeed, the '129 specification explicitly references electronic medical records, making clear that this is one way of performing the "determining" step. Ex. 1 ('129 Patent) at 29:5-31; *id.* at 35:30-38. Defendants' contrary construction is artificially narrow and departs from the text.

### 4.    Defendants' Sur-Reply Position

#### i)    "Determining" is a mental step and therefore is not entitled to patentable weight under the printed-matter doctrine.

**a.**    A claim limitation is not entitled to patentable weight "if it claims the content of information" or a mere "mental step." *Praxair*, 890 F.3d at 1031–34. Vanda initially asserts that "the 'determining' limitation does not claim any information *at all*," *Supra* Reply Position at 43, but subsequently concedes that this extreme position is not correct: "the 'determining' step requires affirmative acts on the part of the prescriber to *ascertain information*, and the *content of the information ascertained* is used in later steps of the claimed method." *Supra* Reply Position at 44 (emphases added). The question, then, is whether Vanda is correct that the "determining" limitation falls outside of the Federal Circuit's printed-matter cases because it requires an "affirmative act."

The answer is no. The limitation in *Praxair* also required an "affirmative act"—requiring the provider to weigh risks and benefits to arrive at a treatment decision—but it nonetheless lacked

patentable weight because it merely added "information together with a purely mental step." 890 F.3d at 1033–34. The same is true here, as Defendants have explained. *Supra* Answering Position at 40–41. And Vanda's suggestion that a limitation necessarily has patentable weight if it may involve information gathering, *see supra* Reply Position at 44, proves too much. Information gathering is a precursor to *every* mental step—one cannot cogitate on information that one has not somehow gathered. Vanda earlier conceded this. *See* Opening Position at 36 (conceding that "the offending claims in *Praxair* … involved 'providing' 'information' to a medical provider and having the provider 'think about it'—*i.e.*, the claims merely added an unpatentable mental process onto printed matter").

Vanda rejoins that "a prescriber cannot 'determin[e]' whether a patient is taking a beta blocker without engaging in non-cognitive actions." *Supra* Reply Position at 45. That assertion is difficult to understand. Reviewing a patient's medical records and concluding that the patient is taking a beta blocker—which Vanda contends would satisfy this limitation, *supra* Reply Position at 44—is plainly a cognitive process. And, because this limitation as written is broad enough to encompass purely mental steps, it is not entitled to patentable weight. *Cf. CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) (claim that is broad enough to encompass "[m]ethods which can be performed entirely in the human mind" is unpatentable).

Vanda's reliance on *Otsuka* is misplaced. The limitation in question there required "avoid[ing]" intramuscular injection of aripiprazole "when the patient is taking a CYP3A4 inducer." *Otsuka*, 2023 WL 5928313, at *6 & n.19. That limitation is analogous to the conditional step of the '129 patent that requires instructing a patient to stop beta-blocker treatment before administering tasimelteon: it required "a specific action … in response to a certain trigger—a patient taking something else." *Id.* at *7. But the question here is whether the *determining* step has

49

patentable weight. *Otsuka* did not involve a method with a "determining" step and therefore has nothing to say on that question.

**b.**    "If a claim limitation is directed to printed matter, then the next step is to ascertain whether the printed matter is functionally related to its 'substrate.'" *Praxair*, 890 F.3d at 1032. Vanda argues that the answer is yes here "[b]ecause the action a doctor takes is based directly on their prior determination." *Supra* Reply Position at 46. But just because two steps are related does not mean they are *functionally* related. For example, *Praxair* found that "'providing' a drug product together with FDA-required prescribing information does not suffice to create a functional relationship between the information and methods of providing and potentially administering the drug." 890 F.3d at 1034. Similarly here, "determining" does not have a functional relationship with the remainder of the claim because the remainder of the claim is performed the same way regardless of the presence of the determining step. *Supra* Answering Position at 39–41. The step lacks patentable weight.

### ii)    Alternatively, Defendants' construction should be adopted.

In the alternative, the Court should construe "determining" to require "asking the patient or his caregiver if he is taking" a beta blocker. Vanda disagrees with this construction because, it says, "determining" is broader than "asking." *Supra* Reply Position at 47. The problem is that "determining" includes all manner of unpatentable cognitive processes. *Supra* Answering Position at 40–41. For this term to have patentable weight, it needs to be tied to a *non-mental* act—not just an "affirmative act," *contra supra* Reply Position at 47–48—and "asking" is the most appropriate candidate in this context.

This construction is not "artificially narrow." *Contra supra* Reply Position at 48. At some point in the process, information about a patient's beta-blocker use must come from the patient— so interpreting "determining" to mean "asking" makes sense. And Defendants' construction is

further appropriate because the plain and ordinary meaning of the term "determining" is similar to "asking." *See ePlus*, 700 F.3d at 520 ("[T]he jury was free to rely on the plain and ordinary meaning of the term 'determining' and conclude that a user who prompts a vendor to report whether a particular item is available 'determines' whether that item is available—much in the same way, for example, that one may call and speak to a sales representative at a local store to determine whether a certain item is in stock.").[15]

### D.    "in the case that it is determined that the patient is not being treated with a beta-adrenergic receptor antagonist . . ."

#### 1.    Plaintiff's Opening Position

| Term | Vanda's Construction | Defendants' Construction |
|---|---|---|
| "in the case that it is determined that the patient is not being treated with a beta-adrenergic receptor antagonist, administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime; or in the case that it is determined that the patient is being treated with a beta-adrenergic receptor antagonist: instructing the patient to cease treatment with the beta-adrenergic receptor antagonist; and then administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime" | Plain and ordinary meaning: in the case that it is determined that the patient is not being treated with a beta-adrenergic receptor antagonist, administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime; or in the case that it is determined that the patient is being treated with a beta-adrenergic receptor antagonist: instructing the patient to cease treatment with the beta-adrenergic receptor antagonist; and then administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime | This clause presents two mutually exclusive, conditional methods of administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime, only one of which is performed to practice the claim. |

---

[15] For clarity, the *ePlus* parenthetical presented in Defendants' Answering Position at 42 summarizes the court's analysis of the word "determining"; the quotation marks were included inadvertently. The language from the opinion is quoted immediately above.

| (Claim 1) | | |
|---|---|---|

This claim terminology, setting forth a treatment paradigm or methodology, should be construed according to its plain and ordinary meaning. At a minimum, no claim construction of the steps setting out this treatment methodology can be proper if it simply ignores altogether the presence in the claim of the specified step "instructing the patient to cease treatment with the beta-adrenergic receptor antagonist," the performance of which can be required based upon the step of "determining" the existence of beta-adrenergic receptor antagonist treatment. Defendants' proposed claim construction should be rejected for no other reason than it represents an incomplete oversimplification of the methodology being claimed and, thus, cannot represent a proper construction of the claim language.

The defendants' proposed claim construction attempts to incorporate their (incorrect) view as to how they can demonstrate invalidity of a conditionally claimed treatment methodology. Because defendants are wrong about the operation of a conditional-method claim like this one, the Court should adopt Vanda's "plain and ordinary meaning" construction.

Defendants are attempting to relitigate the Court's denial of their motion for judgment on the pleadings through claim construction. But defendants' proposal is not a matter for claim construction—as defendants previously acknowledged. In their motion for judgment on the pleadings, defendants contended that "no claim construction is required to reach the conclusion that 'or,' as that term is used in claim 1 of the '129 patent, does not mean 'and,' as such a term needs no construction when its 'plain and ordinary meaning . . . is clear.'" C.A. No. 23-152, D.I. 99 at 5. Vanda agrees with defendants that "or," in this claim, does not mean "and" and that no construction is required for this term. Ultimately, the invalidity contention defendants assert lacks any merit. Indeed, the Court did not accept defendants' argument when it denied their motion for

judgment on the pleadings. C.A. No. 23-152, D.I. 111.

In sum, defendants' proposed construction is legally wrong. Defendants' contention—that this "term presents two mutually exclusive, conditional methods . . . only one of which is performed to practice the claim"—misstates the law governing conditional method claims. As a court in this District explained in *Interdigital Technology Corp. v. Lenovo Holding Co., Inc.*, where a claim uses "conditional claiming" with "mutually exclusive alternatives," "each condition need not actually be *practiced* at the same time"; "patented embodiments" need only "be *capable* of doing so." 2021 WL 1856937, at *5 (D. Del. 2021) (emphasis in original) (discussing *Lincoln Nat'l Life Ins. Co. v Transamerica Life Ins. Co.*, 609 F.3d 1364 (Fed. Cir. 2010); *Hytera Commc'ns Co. v. Motorola Sols, Inc.*, 841 F. App'x 210 (Fed. Cir. 2021)).

Defendants' proposed construction suggests that they need only show one of the prongs of the conditional method disclosed in the prior art for the claims to be obvious or anticipated—a proposition the Federal Circuit has squarely rejected. In *Hytera Communications Co. v. Motorola Solutions, Inc.*, the Court held that, to demonstrate obviousness where a claim "requires that a specific action be taken in response to each of two alternative specified conditions," "the prior art must teach each step of the claim, including the response to each condition in the [conditional] step." 841 F. App'x at 216, 218. In so holding, the Court concluded that it was "bound" by the "precedential opinion" in *Lincoln Nat'l*, 609 F.3d 1364, which held that, to demonstrate infringement, one had to address "each claimed responsive action" that was claimed as to "each corresponding claimed prerequisite condition." *Hytera*, 841 F. App'x at 216.

The conditional-branch claim in *Hytera* required performance of the "selecting" step (as does the conditional-branching term in the '129 patent) and therefore claimed (like the claims here) "one method in which the response to either alternative condition . . . must be performed."

*Id.* at 218. Contrary to defendants' proposed construction, the '129 patent teaches "one method in which the response to either alternative condition . . . must be performed" and the other capable of being performed (*Hytera*, 841 F. App'x at 217-18; *Interdigital*, 2021 WL 1856937, at *5), not two standalone method claims or a claim in which any one of multiple alternatives is sufficient to meet the limitation.

Vanda's claims look nothing like the claims that *Hytera* identified as actually including multiple alternatives or multiple methods. *E.g.*, *Brown v. 3M*, 265 F.3d 1349, 1352-1353 (Fed. Cir. 2001); *Schulhauser*, 2016 WL 6277792, at *3-5. *Brown* addressed a claim that "required using one of three alternative formats for a date, and provided that any of the three would be sufficient to meet the limitation"; for that reason, "the prior art anticipated the claim when it disclosed one of the three alternatives." *Hytera*, 841 F. App'x at 216. That is distinct from the claim at issue in *Hytera* (and here) that "specifies what action must occur in each scenario of the conditional limitation." *Id.*[16]

*Hytera* also distinguished the PTAB's decision in *Schulhauser* because each alternative in the two-alternative *Schulhauser* claim "could reasonably be construed as a standalone method claim." 841 F. App'x at 217. The relevant claim in *Schulhauser*—unlike the conditional-branch claim in *Hytera* and the '129 patent—lacked an "earlier step[]" targeted to assessing the condition that would trigger later steps. *Id.* The conditional-branch claim in *Hytera* could not be so construed. That claim included two conditional limitations triggered by "if"/"otherwise" conditions, with an

---

[16]        *Compare Brown*, 265 F.3d at 1352 ("a[t] least one database file . . . containing records with year-date data with years being represented *by at least one of* two-digit, three-digit, *or* four-digit year-date representations" (emphasis added)), *with Hytera*, 841 F. App'x at 215 ("*if* the timeslot is the current desired timeslot, *selecting* a synchronization pattern selected from the first set of synchronization patterns . . .; *otherwise selecting* a synchronization pattern selected from the second set of synchronization patterns . . ." (emphasis added)).

earlier step that required "knowing" the two alternative conditions. *Id.* at 215, 216. A claim like that recites "one method in which the response to either alternative condition . . . must be performed" because the "knowing" step would otherwise be unnecessary. *Id.* at 217-218. Claim 1 of the '129 Patent is indistinguishable from *Hytera*: it expressly requires "determining whether the patient is being treated with a beta-adrenergic receptor antagonist" before proceeding to one of the conditional steps contingent on that determination. Ex. 1 ('129 Patent) at 38:43-44. Thus, as in *Hytera*, the conditional-branch term in the '129 Patent constitutes "one method in which the response to either alternative condition . . . must be performed" and the other capable of being performed. 841 F. App'x at 218.[17]

Defendants' proposed construction suggests the existence of multiple methods within Claim 1 despite the fact that the preamble claims only a single method. And defendants' proposed construction suggests that the limitations reciting "administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime" present two mutually exclusive conditional methods. Defendants' proposed construction is wrong and would confuse the jury in assessing infringement and invalidity of this conditional-method claim under the *Hytera* and *Lincoln National* standards. Thus, were the Court to construe the claim, it should be given its plain and ordinary meaning, and the Court should confirm that, to infringe the claim, the alleged infringer must perform one of the conditional branches and be capable of performing the other, and, to prove anticipation or obviousness, defendants must demonstrate the invalidity of the entire claim—including both conditional limitations. *See Interdigital*, 2021 WL 1856937, at *5.

---

[17]    The Federal Circuit also underscored that "opinions from the Board are not binding" (*Hytera*, 841 F. App'x at 216), and it made "no comment on whether *Schulhauser* was correctly decided" (*id*. at 217)—statements that suggest a lack of confidence in the Board's conclusion.

### 2.    Defendants' Answering Position

**1.**    To understand the dispute regarding this claim term, a review of the full claim language is useful. Claim 1 of the '129 patent recites a purportedly "improve[d]" method of administering tasimelteon with the following steps:

> determining whether the patient is being treated with a beta-adrenergic receptor antagonist; and

> [i] in the case that it is determined that the patient is not being treated with a beta-adrenergic receptor antagonist, administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime; *or*

> [ii] in the case that it is determined that the patient is being treated with a beta-adrenergic receptor antagonist;

>> instructing the patient to cease treatment with the beta-adrenergic receptor antagonist; and then

>> administering to the patient 20 mg of tasimelteon once daily about one-half hour to about one-and-one-half hours before the target bedtime.

Ex. 1 ('129 Patent) at 38:41-56 (emphasis and reference numerals added).

By its plain language, claim 1 of the '129 patent is directed to a "conditional" method in which a physician takes either of two courses of action depending on whether the patient is taking a beta blocker. If, on the one hand, the patient is *not* taking a beta-blocker, the physician administers 20 mg of tasimelteon once daily about 0.5–1.5 hours before a target bedtime (step [i]). If, on the other hand, the patient *is* taking a beta blocker, then the physician must instruct the patient to "cease treatment" with the beta-blocker and then administer 20 mg of tasimelteon once daily about 0.5–1.5 hours before a target bedtime (step [ii]).

Steps [i] and [ii] of the claimed method are joined by "or," which means that, if step [i] is performed, the method ends and step [ii] is not reached. Conversely, if step [ii] is performed, step [i] is not. This is clear not just as a matter of grammar but of common sense. Since any given

patient either is or is not taking a beta blocker (it cannot be both), only one of steps [i] and [ii] can be practiced for any particular patient. Put differently, the clause in dispute presents two mutually exclusive methods of administration: if the patient is not taking a beta blocker, step [i] is performed; if the patient is taking a beta blocker, step [ii] is performed. Hence Defendants' proposed construction.

**2.**     Vanda's reasons for disputing this straightforward reading of the claims is clear: Vanda knows that this construction renders its patent invalid. The court in the Prior Litigation already found that step [i] of the claimed method—simply administering 20 mg tasimelteon 0.5– 1.5 hours before bedtime—was obvious in light of the prior art. *See Vanda*, 2022 WL 17593282, at *9–10, 15–17. If performing step [i] results in practicing the claim as a whole, it necessarily follows that this claim, too, is obvious in light of the prior art.[18]

Vanda's attempts to avoid this conclusion lack merit.

As an initial matter, Vanda's implication (at 53) that the Court already resolved this dispute in its favor is false. The Court declined to reach Defendants' arguments for judgment on the pleadings because they "implicate[d] claim construction arguments" and because the Court was unable to "say at th[at] stage of the case that the 'issues of patentability' [are] identical" between this case and the Prior Litigation. D.I. 111 at 2. Now, however, claim construction has arrived, and the parties' dispute regarding this limitation is squarely presented for this Court's adjudication.

---

[18] This conclusion is particularly evident if the Court agrees that the "determining" step lacks patentable weight, because in that case the method found obvious in the Prior Litigation would correspond exactly to the first conditional method of claim 1 of the '129 patent. But the obviousness conclusion holds even if the "determining" step has patentable weight because that step is indisputably not new. Physicians have routinely determined what other medications their patients are taking before prescribing drugs for decades. Vanda's own complaint admits this, stating that "some, if not all, physicians would thoroughly check for potential contraindications and for interactions if the patient is taking another medication." D.I. 94 ¶ 51.

Defendants' position is that the portion of the claim reciting steps [i] and [ii] requires performance of only one of those steps—that is, once step [i] or step [ii] is performed, the claimed method is complete and the other step need not be (and indeed cannot be) performed. For the reasons explained above, that is the only interpretation of the claims that makes sense. Vanda's own interpretation of the claims is far from clear, but Vanda appears to be arguing that "both conditional limitations" somehow must be performed to practice the claim. *See supra* Opening Position at 55 (arguing that Defendants would have to "demonstrate the invalidity of the entire claim—including both conditional limitations"—to "prove anticipation or obviousness"). That position—in addition to being logically nonsensical—fails for two principal reasons. *First*, it is inconsistent with the way Vanda reads the claims for purposes of describing its burden of proof on infringement, which contravenes the fundamental maxim that claims must be construed the same for purposes of infringement and invalidity. *Second*, it misconstrues the law on conditional claims.

a.      "It is axiomatic that claims are construed the same way for both invalidity and infringement." *Amgen*, 314 F.3d at 1330. Accordingly, if a claim is written in the alternative, such that "infringement would lie" if either of the alternatives is performed, it necessarily follows that the prior art disclosure of *either* alternative invalidates the claim. *Brown*, 265 F.3d at 1352–53 (claim written in the alternative is anticipated if any of the optional limitations is in the prior art).

That chain of logic readily applies here. If a physician concludes that the patient is *not* taking a beta blocker and carries out step [i] of the claimed method, the claim has been practiced and "infringement would lie," *id.* at 1352. Vanda implicitly concedes this, acknowledging (at 52) that the step of instructing the patient to stop taking a beta blocker merely "*can be* required" *if* the patient is already taking a beta blocker. That step is *not* required if the patient is *not* taking a beta

blocker. *See also supra* Opening Position at 53 (acknowledging that infringement would not require both steps to "be *practiced* at the same time"); *id.* at 55 ("to infringe the claim, the alleged infringer *must perform one of the conditional branches*") (emphasis added).[19] This concession is not surprising. If Vanda had to show that a physician had somehow performed both steps [i] and [ii] as part of the same method of administration to establish an act of direct infringement, Vanda could not possibly prove its case because the claim would be impossible to satisfy. Yet that outcome—a nonsensical claim that could never be directly infringed—is the necessary consequence of the interpretation Vanda appears to be advancing for purposes of invalidity. Defendants' construction, in contrast, makes sense of the claim and ensures that it will be consistently applied for both infringement and invalidity.

While the Federal Circuit has not had occasion to address a conditional method claim like this one, the Patent Trial and Appeal Board's 2016 decision in *Schulhauser* is on point. The claim in *Schulhauser* recited a "method of monitoring of cardiac conditions" in a patient having an implanted medical device that required "comparing [] electrocardiac signal data with a threshold electrocardiac criteria" and then either (i) "triggering an alarm state" if the signal data was *not* within the threshold or (ii) "determining the current activity level of the subject" if the signal data *was* within the threshold. 2016 WL 6277792, at *1–2. The Board observed that, "[g]iven the language" of the claim, the activity-level determination "only need[s] to be reached" if the signal data was within the threshold. *Id.* at *3. So, "in the event that the electrocardiac signal data is not

---

[19] Vanda attempts to avoid the damning effect of this concession by stating (at 55) that infringement would also require that the infringer "be capable of performing the other" conditional branch. That addendum is meaningless. Any doctor is "capable" of administering the medication in any way she wants. This contorted reading of the claim is an artifact of Vanda's attempt to shove this case into the inapposite mold of Federal Circuit cases involving conditional methods performed by computers, which Defendants discuss further below.

within the threshold . . . and an alarm is triggered, the remaining steps . . . need not be performed in the method as recited." *Id.* "In other words," the claim "as written cover[ed] at least two methods, one in which the prerequisite condition for the triggering step is met and one in which the prerequisite condition for the determining step is met." *Id.* at *4.

The Board found that a prior-art combination rendered obvious a method that "would literally infringe [the] claim [] by virtue of its performance of only" alternative method (i)—the one where the triggering step *was* met—and therefore that the claim as a whole was unpatentable. *Id.* at *5. This result was required, the Board held, because "it is axiomatic that that which would literally infringe if later anticipates if earlier." *Id.* (quoting *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1378 (Fed. Cir. 2001)).

The same reasoning leads inexorably to the same result here. Because Vanda wrote claim 1 in the alternative using the "or" conjunction, if the first step is performed (based on the patient not being treated with a beta-blocker), then logically the second step need not be performed—and indeed could not be performed on the same patient. Therefore, as in *Schulhauser*, steps [i] and [ii] of claim 1 are mutually exclusive and only one of the recited steps needs to be performed for purposes of infringement (or rendered obvious by the prior art for purposes of invalidity).

Vanda's attempted distinctions of *Schulhauser* fail. Vanda asserts (at 54) that the *Schulhauser* claim "lacked an earlier step targeted to assessing the condition that would trigger later steps." That is not true; the claim there expressly required "comparing the electrocardiac signal data with a threshold electrocardiac criteria," and the results of the comparison dictated which conditional step was practiced. *Schulhauser*, 2016 WL 6277792, at *1–2. Vanda also observes (at 55) that "the preamble [of claim 1 of the '129 patent] claims only a single method." But that was true in *Schulhauser* as well: the claim recited "*[a] method* for monitoring cardiac

conditions." *Schulhauser*, 2016 WL 6277792, at *1 (emphasis added).

**b.** Lacking any logical support for its resistance to Defendants' common-sense construction, Vanda seeks refuge (at 53–55) in three inapposite cases involving computer-implemented methods: *Lincoln Nat'l*, 609 F.3d 1364; *Hytera*, 841 F. App'x 210; and *Interdigital*, 2021 WL 1856937. In each of those cases, the claimed method was performed by computer algorithms. *See Lincoln Nat'l*, 609 F.3d at 1366 (claim recited a "computerized method for administering a variable annuity plan" that required making payments under either of two conditions); *Hytera*, 841 F. App'x at 215–16 (claim recited a time division multiple access system that was "configured to perform each claimed responsive action in response to each corresponding claimed prerequisite condition"); *Interdigital*, 2021 WL 1856937, at *5 (claim recited a method of telecommunications that required transmitting feedback information in different ways depending on whether "an explicit allocation is received"). In *that* context, it is possible to determine that an accused system will perform mutually exclusive steps of a conditional method by looking at the system's algorithm.

No analogous determination is possible for a human-implemented method like the one claimed here. One cannot meaningfully ask whether a physician is "configured to perform," *Hytera*, 841 F. App'x at 216, or "capable of" performing, *supra* Opening Position at 55, both conditional steps of the '129 patent; all one can do is ask whether, given the condition that occurred, the physician performed the step required by the claim under that condition. This case is therefore like *Schulhauser* (and unlike the cases on which Vanda relies): it involves conditional claims that "recite two (or more) distinct methods, one where a condition was satisfied and one where it was not," meaning "the claim is unpatentable if the prior art taught one of the methods." *Cont'l Auto. Sys., Inc. v. Horizon Glob. Americas Inc.*, 2021 WL 2183083, at *5 (P.T.A.B. May

28, 2021) (reconciling *Schulhauser*, *Hytera*, and *Lincoln National*).

Vanda's suggestion (at 55 n.17) that *Hytera* called *Schulhauser*'s reasoning into question is wrong. The *Hytera* court expressly stated that it had no need to consider whether *Schulhauser* was correctly decided because it was not on point. 841 F. App'x at 217. In *Schulhauser*, the *Hytera* court explained, the claimed method was complete once either conditional method was performed in response to the triggering step, which made it unlike the claim in *Hytera*. *See id.* This case, however, falls squarely within *Schulhauser*'s reasoning, as explained above. Once a physician performs either step [i] or step [ii] of the claimed method, the method is complete—a point Vanda concedes because it must for the sake of its infringement case. *Supra* Answering Position at 58–59. It must then follow that performance of step [i] or step [ii] in the prior art would invalidate the claim: "that which would literally infringe if later anticipates if earlier." *Schulhauser*, 2016 WL 6277792, at *4 (quoting *Bristol-Myers Squibb*, 246 F.3d at 1378).

This Court should not permit Vanda to have it both ways. Defendants' proposed construction of this term should be adopted.

### 3.    Plaintiff's Reply Position

The parties all agree on what this claim term means. The parties only dispute whether the Federal Circuit's precedential standard in *Lincoln National* governs—or whether the Court should discard that standard because of the technological background in which it arose. The Court cannot do the latter; *Lincoln National* governs, and defendants' proposed construction attempting to treat Claim 1's conditional method as two separate methods must be rejected. Ultimately, though, because there is no real claim construction issue in dispute here, the Court need not resolve this issue now.

**1.**  Defendants' answering brief confirms that Vanda and defendants agree on the meaning of this claim language. All agree that claim 1 recites a conditional method that requires

"determining" whether the patient is taking a beta blocker and then taking one of two actions in response to what is determined—if the "patient is not being treated with a [beta blocker], administering to the patient 20 mg of tasimelteon" in the specified way "*or*" if the "patient is being treated with a [beta blocker], instructing the patient to cease treatment with the [beta blocker]; and then administering to the patient 20 mg of tasimelteon" in the specified way. *See supra* Opening Position at 52-55; *supra* Answering Position at 56-58. The disagreement concerns defendants' *conclusion*—written into their proposed construction—about the legal effect of the claim's conditional structure.

The limited nature of the dispute is confirmed by defendants' attempted sleight of hand. Following a recitation of the claim language, defendants then recharacterize the claim—or, as they say, "[p]ut differently"—"the clause in dispute presents two mutually exclusive *methods* of administration." *Supra* Answering Position at 57-58 (emphasis added). But defendants' conclusion does not follow from the claim language under governing Federal Circuit law.

**2.**    As Vanda explained in its opening brief (at 53-55), conditional-method claims are governed by the Federal Circuit's *Lincoln National* standard: Where a claim uses conditional claiming with mutually exclusive alternatives, for infringement purposes, an accused infringer need only practice one alternative and be "capable of" practicing each alternative (*Interdigital*, 2021 WL 1856937, at *5; *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364, 1369-70 (Fed. Cir. 2010)), and, for obviousness purposes, the "prior art must teach each step of the claim, including the response to each condition in the [conditional] step" (*Hytera*, 841 F. App'x at 216, 218).

Defendants do not and cannot dispute the Federal Circuit's precedential holding in *Lincoln National*, the Federal Circuit's reaffirmation of this binding precedent in *Hytera*, and this

District's application of *Lincoln National* and *Hytera* to conditional-method claims in *Interdigital*. *See generally supra* Answering Position at 61-62. Instead, defendants make a singular argument: that Federal Circuit precedent governing conditional-method claims is not binding because the cases involved "computer-implemented" methods and that, instead, the Court should follow a PTAB decision expressly called into question by the Federal Circuit. *Supra* Answering Position at 59-61. Defendants are wrong.

The Federal Circuit's decision in *Hytera* forecloses defendants' attempt to distinguish Federal Circuit law on the basis of computerization. *Hytera* considered the PTAB's *Schulhauser*, 2016 WL 6277792 decision extensively, and it nowhere suggested that its divergent outcome had anything to do with the methods at issue in *Lincoln National* or *Hytera* being computer-implemented while the *Schulhauser* method was not. *See Hytera*, 841 F. App'x at 217-18. More generally, defendants have no authority whatsoever for the notion that a legal standard governing conditional-method claims is different depending on technology. *Cf. Amgen Inc. v. Sanofi*, 598 U.S. 594, 615–16 (2023) (agreeing that there is "one statutory enablement standard" that applies across different technologies). In *Hytera* itself, the Court addressed cases across technologies— including *Applera Corp.-Applied Biosystems Group v. Illumina, Inc.*, 375 F. App'x 12 (Fed. Cir. 2010), which addressed a method of sequencing DNA—and the Court concluded that "[t]o the extent any nonbinding precedent conflicts with our precedential opinion in *Lincoln*, we are bound by *Lincoln* as the controlling authority in this case." 841 F. App'x at 216-17.

Indeed, Defendants' contention runs headlong into the well-established recognition that many computer-implemented methods can "be performed by a human, mentally or with pen and paper," and vice versa. *Intellectual Ventures LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). There is no reason why the principal actions in the method claim in *Hytera*, for

64

example—"knowing," "determining," "preparing to transmit," "selecting," and "transmitting" cannot be performed by a human without assistance from a computer. 841 F. App'x at 213-214. Nor is there any reason the method in *Schulhauser* could not have been computerized. 2016 WL 6277792, at *1-2. Partly in recognition that many computer-based methods are merely more efficient rather than different in character from human-based ones, patent law is generally agnostic to a patentholder's choice to "require a generic computer to perform generic computer functions." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 225 (2014).

Nor are defendants correct to suggest that "[o]ne cannot meaningfully ask whether a physician is … 'capable of' performing" each conditional alternative. *Supra* Answering Position at 61. A physician is capable of carrying out either condition, depending on what the physician "determine[es]" in the prior step. Under the *Lincoln National* standard, to demonstrate infringement, the alleged infringer must be capable of implementing both the conditional branches when performing the method and in fact perform one. *Interdigital*, 2021 WL 1856937, at *5; *Lincoln Nat'l*, 609 F.3d at 1369-1370. To show anticipation or obviousness, the prior art must teach "each step of the claim, including the response to *each* condition." *Hytera*, 841 F. App'x at 216 (emphasis added). There is nothing inconsistent; instead, this is the governing standard for method claims that include a step with alternative responses to a condition.

**3.**   Claim 1 is a conditional-method claim governed by *Lincoln National*. In delineating the distinction between *Schulhauser* and a conditional-method claim, the Federal Circuit explained that the "triggering" and "determining" steps of the claimed method in *Schulhauser* "could [each] reasonably be construed as a standalone method claim." 841 F. App'x at 217. That was distinct from the claim at issue in *Hytera*, which included two conditional limitations that were triggered by "if"/"otherwise" conditions, and an earlier step in that claim required

65

"knowing" the two alternative conditions that would trigger the claimed "if"/"otherwise" conditions. *Id.*

Claim 1 is within the *Lincoln National* paradigm. A prescriber can only possibly draw two conclusions after "determining whether the patient is being treated with a beta-adrenergic receptor antagonist": either the patient (1) is being treated with a beta blocker, or (2) the patient is not being treated with a beta blocker. The prescriber must then take a specific action in response to each of two alternative conditions. As in *Hytera*, the conditional-branch term in the '129 patent constitutes "one method in which the response to either alternative condition … must be performed." 841 F. App'x at 218. The *Lincoln National* standard therefore governs, and, as a result, defendants' proposed construction must be rejected.

Ultimately, that Defendants are forced to rely on *Schulhauser*, a PTAB decision that the Federal Circuit has implicitly discredited, is revealing. Vanda, by contrast, relies on Federal Circuit precedent—and precedent of this Court faithfully applying those cases.

### 4.    Defendants' Sur-Reply Position

Vanda agrees that claim 1 requires the physician to "tak[e] *one of two actions*" depending on whether the patient is taking a beta blocker. *Supra* Reply Position at 63 (emphasis added). Vanda also agrees that any given patient "either … (1) is being treated with a beta blocker, or (2) … is not being treated with a beta blocker." *Supra* Reply Position at 66. It follows that the two conditional methods in claim 1 are mutually exclusive: only one need be (indeed, can be) performed to practice the claim. This is no "sleight of hand," *contra supra* Reply Position at 63; it is the only reading of the claim that makes sense. And—at least when it comes to describing its burden on infringement—Vanda agrees: "for infringement purposes, an accused infringer need only practice one alternative." *Supra* Reply Position at 63. While Vanda adds that the infringer should also "be 'capable of' practicing each alternative," it later concedes this addendum is

meaningless because any physician is "capable of carrying out either condition." *Supra* Reply Position at 65. So: if the physician determines the patient is not taking a beta blocker and administers tasimelteon, the claim is practiced; the other conditional step is irrelevant.

The real dispute here is whether this interpretation *also* applies for invalidity (meaning that, to invalidate the claim, the prior art need only disclose one of the conditional branches). The answer, of course, is yes: claims are construed the same way for invalidity and infringement. *Amgen*, 314 F.3d at 1330. The Federal Circuit made this point in *Brown* (a case Vanda ignores): since a claim written in the alternative is infringed by either alternative, it is anticipated if either alternative is in the prior art. 265 F.3d at 1352–53. That reasoning applies here.

Vanda's extended exegesis of the "*Lincoln National* standard," *see supra* Reply Position at 63–66, simply attempts to obscure this fundamental point. As Defendants explained, the rule of those cases does not fit outside the computer-algorithm context because "[o]ne cannot meaningfully ask whether a physician is 'configured to perform,' or 'capable of' performing, both conditional steps of the '129 patent; all one can do is ask whether, given the condition that occurred, the physician performed the step required by the claim under that condition." *Supra* Answering Position at 61 (citations omitted).[20]

Vanda has no answer to this point, other than to observe that there is no Federal Circuit case making it. But the fact that this question has not been squarely presented to that court is no reason to answer it in Vanda's profoundly illogical way, nor to ignore the PTAB's cogent analysis of similar claims in *Schulhauser*. Just as a page of history can be worth a volume of logic, *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921), a little logic can be worth a lot of precedent. A

---

[20] Vanda's suggestion (at 64–65) that the method at issue in *Hytera* could have been performed by humans is not credible; the claims called for a "time division multiple access system" to perform the method. 841 F. App'x at 213.

common-sense reading of the claims combined with the axiom that claims must be construed the same for infringement and invalidity leads inexorably to the conclusion that, for obviousness, the prior art need teach only one conditional branch of the claim—not both.

Dated: January 6, 2025

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

OF COUNSEL:

Paul W. Hughes
Sarah P. Hogarth
April E. Weisbruch
Christopher M. Bruno
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000

Jason A. Leonard
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017-3852
(212) 547-5400
jleonard@mwe.com

*Counsel for Plaintiff*
*Vanda Pharmaceuticals Inc.*

Respectfully submitted,

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
nhoeschen@shawkeller.com

OF COUNSEL:

J.C. Rozendaal
Deirdre M. Wells
Byron Pickard
William H. Milliken
STERNE, KESSLER, GOLDSTEIN
& FOX P.L.L.C.
1100 New York Avenue, N.W.
Suite 600
Washington, DC 20005
(202) 772-8747

*Attorneys for Defendant Teva*
*Pharmaceuticals USA, Inc.*

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
COZEN O'CONNOR
1201 N. Market Street, Suite 1001
Wilmington, DE 19801
(302) 295-2046
kekiner@cozen.com

69

OF COUNSEL:

W. Blake Coblentz
Aaron S. Lukas
Kerry B. McTigue
COZEN O'CONNOR
2001 M Street, NW, Suite 500
Washington, DC 20036
(202) 912-4800

Keri L. Schaubert
COZEN O'CONNOR
3 WTC, 175 Greenwich Street
55th Floor
New York, NY 10007
(212) 883-4900

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

70