```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4    VANDA PHARMACEUTICALS, INC.,     )
                                       )
 5                   Plaintiff,        )
                                       ) C.A. No. 23-152-JLH
 6    v.                               )
                                       )
 7    TEVA PHARMACEUTICALS U.S.A.,     )
      INC.,                            )
 8                                     )
                     Defendant.        )
 9    - - - - - - - - - - - - - - - - -
      VANDA PHARMACEUTICALS INC.,      )
10                                     )
                     Plaintiff,        )
11                                     ) C.A. No. 23-153-JLH
      v.                               )
12                                     )
      APOTEX INC., et al.,             )
13                                     )
                     Defendants.       )
14

15                                     J. Caleb Boggs Courthouse
                                       844 North King Street
16                                     Wilmington, Delaware

17                                     Thursday, February 6, 2025
                                       10:00 a.m.
18                                     Markman Hearing

19

      BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.
20

21    APPEARANCES:

22              McCARTER & ENGLISH LLP
                BY:  DANIEL M. SILVER, ESQUIRE
23
                         -and-
24

25
```

```
 1    APPEARANCES CONTINUED:

 2
                    McDERMOTT WILL & EMERY
 3                  BY:  JASON LEONARD, ESQUIRE
                    BY:  PAUL W. HUGHES, ESQUIRE
 4                  BY:  MARY SCHNOOR, ESQUIRE
                    BY:  SARAH P. HOGARTH, ESQUIRE
 5
                                    For the Plaintiff
 6

 7                  SHAW KELLER LLP
                    BY:  NATHAN R. HOESCHEN, ESQUIRE
 8
                            -and-
 9
                    STERNE KESSLER
10                  BY:  DEIRDRE M. WELLS, ESQUIRE
                    BY:  WILLIAM H. MILLIKEN, ESQUIRE
11                  BY:  JOHN C. ROZENDAAL, ESQUIRE

12                                  For the Teva Defendant

13
                    COZEN O'CONNOR
14                  BY:  KAAN EKINER, ESQUIRE
                    BY:  W. BLAKE COBLENTZ, ESQUIRE
15                  BY:  AARON LUKAS, Ph.D.

16                                  For the Apotex Defendant

17

18                      ***   PROCEEDINGS   ***

19

20                  DEPUTY CLERK:  All rise.  Court is now in

21    session.  The Honorable Jennifer L. Hall presiding.

22                  THE COURT:  All right.  Please be seated.

23                  We're here in *Vanda Pharmaceuticals vs. Teva* and

24    *Apotex*.  It's Civil Action Numbers 23-152 and 153.  We

25    scheduled a Markman hearing for this morning.
```

10:02:04 1          Let's go ahead and put our appearances on the

10:02:06 2  record.

10:02:07 3          MR. SILVER:  Good morning, Your Honor.  Dan

10:02:09 4  Silver from McCarter & English on behalf of Vanda

10:02:11 5  Pharmaceuticals, and I'm joined by my co-counsel from

10:02:11 6  McDermott Will & Emery.

10:02:14 7          With me at the table, Jason Leonard.

10:02:14 8          MR. LEONARD:  Good morning, Your Honor.

10:02:17 9          MR. SILVER:  Paul Hughes.

10:02:17 10          MR. HUGHES:  Good morning, Your Honor.

10:02:18 11          MR. SILVER:  And Mary Schnoor.

10:02:18 12          MS. SCHNOOR:  Good morning, Your Honor.

10:02:20 13          MR. SILVER:  And then right behind us is Sarah

10:02:20 14  Hogarth.

10:02:22 15          MS. HOGARTH:  Good morning, Your Honor.

10:02:22 16          THE COURT:  Great.  Great to see everybody.

10:02:25 17          MR. SILVER:  Thank you, Your Honor.

10:02:29 18          MR. HOESCHEN:  Good morning, Your Honor.  Nathan

10:02:31 19  Hoeschen from Shaw Keller on behalf of Teva Pharmaceuticals.

10:02:34 20  With me at counsel table from Sterne Kessler are William

10:02:39 21  Milliken, Deirdre Wells and J.C. Rozendaal.

10:02:42 22          THE COURT:  Good morning to all of you.

10:02:42 23          MR. MILLIKEN:  Good morning, Your Honor.

10:02:44 24          THE COURT:  All right.  I have in front of me

10:02:46 25  a --

10:02:48  1          MR. EKINER:  Your Honor --

10:02:50  2          MR. SILVER:  Your Honor, we have one more

10:02:51  3   Defendant.

10:02:51  4          THE COURT:  Oh, I'm so sorry.

10:02:52  5          MR. EKINER:  Good morning, Your Honor.  Kaan

10:02:54  6   Ekiner from Cozen O'Connor and we represent the Apotex

10:02:56  7   Defendants.  I'm joined with my colleagues, also from Cozen

10:03:01  8   O'Connor, Blake Coblentz and Aaron Lukas.

10:03:04  9          THE COURT:  Welcome.

10:03:04 10          MR. EKINER:  Thank you.

10:03:05 11          THE COURT:  Sorry for jumping the gun.

10:03:07 12          I have in front of me a joint claim construction

10:03:08 13   brief and a joint appendix.  I can tell you we carefully

10:03:12 14   reviewed the arguments.  I think we have a good

10:03:15 15   understanding.

10:03:15 16          We had set aside two hours for the arguments

10:03:17 17   today.  You're welcome to take it if you like, although I'm

10:03:22 18   not sure that much time is necessary.  But I understand you

10:03:24 19   may have prepared your presentations, and so we'll hear what

10:03:27 20   you have to say.

10:03:28 21          MR. SILVER:  Thank you, Your Honor.  Good

10:03:30 22   morning.  Dan Silver from McCarter & English on behalf of

10:03:32 23   Vanda.

10:03:33 24          I'll be addressing the first term, the claim

10:03:36 25   preamble, and hopefully we don't use nearly as much as the

10:03:39  1    time Your Honor allotted on this term.

10:03:41  2          So, Your Honor, I'll just start off -- if my

10:03:46  3    clicker works.

10:03:57  4          Thank you.

10:03:58  5          Apologies, Your Honor.

10:03:59  6          So, as Your Honor knows, the claim is directed

10:04:02  7    to a method of administering tasimelteon to a patient.  And

10:04:05  8    it says, "the improvement comprising."  It's a *Jepson* claim,

10:04:09  9    which is a fairly atypical claim form, but there are some

10:04:13 10    cases that address them.

10:04:14 11          And the parties' competing positions are set

10:04:17 12    forth on the slide.  Plaintiff Vanda contends that the term

10:04:21 13    is definite and doesn't require any further construction.

10:04:25 14    We think the language is straightforward enough that a lay

10:04:29 15    jury will understand it.

10:04:30 16          Defendants contend that the term is indefinite.

10:04:32 17    And, alternatively, they propose a construction that we'll

10:04:36 18    talk about in a minute.

10:04:38 19          So, in our view, there are three issues that

10:04:41 20    relate to term one.

10:04:43 21          The first is:  Are *Jepson* claim preambles always

10:04:46 22    limiting?

10:04:47 23          Having prepared for the hearing, I'm willing to

10:04:51 24    concede that the Federal Circuit case law on that issue is

10:04:53 25    less than crystal clear.  We've got cases on both sides

10:04:57 1    saying different things.

10:04:58 2                And so, unless Your Honor has any specific

10:05:01 3    questions about that issue, I think where the action really

10:05:04 4    is is going to be on the definiteness and the construction.

10:05:09 5    And so I'll just skip over that dispute, unless Your Honor

10:05:11 6    wants to talk about it.

10:05:13 7                THE COURT:  I guess, having reviewed the

10:05:15 8    briefing, the question about whether the preamble is

10:05:20 9    limiting really is just a gateway for them to argue

10:05:24 10   indefiniteness; right?  Because --

10:05:27 11               MR. SILVER:  That's right, Your Honor.

10:05:28 12               THE COURT:  -- the preamble talks about

10:05:33 13   administering the drug to a patient.  And, of course, the

10:05:36 14   body of the claim also describes administering the drug to a

10:05:39 15   patient.  So it's not really adding anything that's not

10:05:41 16   already in the body.

10:05:43 17               So really, this is just about definiteness.  So

10:05:45 18   we have to decide the issue of whether it's limiting if we

10:05:48 19   decide that it's definite?

10:05:50 20               MR. SILVER:  I don't believe so, Your Honor.

10:05:52 21   And I'm willing to skip over that whole dispute if we can

10:05:55 22   just talk about the definiteness and the construction.  If

10:05:56 23   they make a forceful argument about whether it's limiting,

10:06:00 24   I'll deal with that on rebuttal.

10:06:01 25               THE COURT:  That sounds perfect.  Thank you.

10:06:03  1          MR. SILVER:  Okay.  So the real questions we

10:06:05  2     have to decide, then, are is if the preamble of Claim 1 of

10:06:08  3     the '129 patent is a limitation, have Defendants, this side,

10:06:12  4     proven by clear and convincing evidence that the claim term

10:06:17  5     is indefinite?

10:06:17  6          And if they -- and then the second question we

10:06:20  7     have to address is:  If the preamble in Claim 1 is a

10:06:22  8     limitation, and we'll assume that it is, does it need to be

10:06:25  9     construed beyond its plain and ordinary meaning?

10:06:27 10          And so I just want to touch briefly on 37 C.F.R.

10:06:32 11     175 -- 1.75(e).  This is the regulatory provision that

10:06:37 12     addresses the *Jepson* claim.

10:06:39 13          And as you can see in (e)(1), it requires a

10:06:41 14     preamble comprising a general description of the elements or

10:06:45 15     steps of the claimed combination, which are conventional or

10:06:48 16     known.

10:06:48 17          Then a phrase, such as wherein the improvement

10:06:50 18     comprises.

10:06:51 19          And then in subsection three, those elements or

10:06:55 20     steps which the applicant considers as the new or improved

10:06:59 21     portion.

10:06:59 22          And if we put Claim 1 of the '129 patent side by

10:07:04 23     side with 37 C.F.R. 1.75(e), it's very clear that the claim

10:07:09 24     itself complies with the required language and structure of

10:07:14 25     Section 1.75(e).

10:07:16  1          And, importantly, Your Honor, for context, this

10:07:18  2   patent has a priority date going back to 2012.  While

10:07:23  3   tasimelteon was known as of 2012, there had not been an

10:07:27  4   approved drug product at that point, so it was very much

10:07:30  5   still in the nascent stages of the development of the

10:07:33  6   tasimelteon products.

10:07:35  7          There was prior art going back, I think, as far

10:07:37  8   as 2006 about it, but there hadn't been an approved drug

10:07:41  9   product.  And so this claim concedes in the preamble that

10:07:47 10   the method of administering tasimelteon to a patient is

10:07:50 11   known.

10:07:50 12          THE COURT:  Do you mean by "the method," like

10:07:53 13   the idea of administering the medication?

10:07:56 14          MR. SILVER:  Yes.

10:07:56 15          THE COURT:  Right.  Any --

10:07:57 16          MR. SILVER:  Any administration of tasimelteon.

10:07:58 17   So what the claim is not saying is we found a new compound

10:08:02 18   or we found an old compound that we can administer to a

10:08:06 19   patient.

10:08:06 20          It's conceding that tasimelteon has been

10:08:08 21   administered to patients, and it's saying, That's not what

10:08:11 22   we invented.  What we invented is this improvement.

10:08:14 23          THE COURT:  Can I ask you, out of curiosity:

10:08:17 24   It's rare to see a method of treatment claim that doesn't

10:08:23 25   describe the condition being treated.  And I recognize that

10:08:29  1    that's in dependent Claim 3.

10:08:33  2            Do you have any comment on that?  Maybe it's not

10:08:36  3    required, but when you see these types of patents, normally

10:08:40  4    the method claims are a method of treating "X".  And maybe

10:08:43  5    you don't need that because the idea is it's a method of

10:08:47  6    administration, but it is just -- it did seem to us to be

10:08:51  7    curious.

10:08:52  8            MR. SILVER:  So that's, you know, fair.  I think

10:08:54  9    I've seen other claims that are directed to a method of

10:08:57 10    administration that don't have the particular indication.

10:09:00 11            And I think here, you know, given that it has

10:09:04 12    the dosing regimen and the avoidance of the drug-drug

10:09:07 13    interaction, it's sufficiently inventive that you don't have

10:09:10 14    to necessarily pin it down to a particular indication.

10:09:13 15    Particularly if, when you take into account the fact that

10:09:17 16    there hadn't been an approval, an FDA approval at the time

10:09:21 17    of the priority date, so there were still -- there was still

10:09:25 18    other indications being explored and whatnot.

10:09:29 19            So and, Your Honor, I just want to compare and

10:09:32 20    contrast our Claim 1 with the Claim 1 in the *Newron* case.

10:09:36 21    In the *Newron* case, the preamble recited a method of

10:09:40 22    treating idiopathic Parkinson's disease in a patient

10:09:43 23    receiving a stable dose of levodopa.  The improvement

10:09:46 24    comprising.  And then it goes on to teach the administration

10:09:49 25    of a second therapeutic agent, while also continuing to

10:09:53  1    maintain the stable dose of levodopa.

10:09:55  2          In our view, although Claim 1 of the preamble of

10:09:59  3    Claim 1 of the '129 patent is broader in that it's not

10:10:04  4    limited to a particular indication, it's also more

10:10:07  5    reasonably -- more easily understood by a person of skill in

10:10:10  6    the art because it doesn't contain something like a stable

10:10:13  7    dose of levodopa, which if you read the *Newron* decision -- I

10:10:18  8    don't know if Your Honor has suffered through all of our

10:10:20  9    cases -- but in the *Newron* decision, the Court found that

10:10:23 10    the stable dose of levodopa was sufficiently definite.

10:10:26 11          And that's the type of thing that -- where there

10:10:28 12    might be a bona fide dispute.  Does a POSA know what this

10:10:31 13    claim is talking about?  What's a stable dose of levodopa?

10:10:33 14          In our claim preamble, it's merely a reference

10:10:36 15    to administering tasimelteon to a patient, which any POSA

10:10:40 16    could readily understand.

10:10:41 17          And, then, Your Honor, going back, just if we

10:10:48 18    look at the body of the claim, the elements or steps that

10:10:52 19    correspond with 1.75(e)(3).  There's real specificity here

10:10:58 20    as to what is claimed.  A person of skill in the art reading

10:11:01 21    this claim knows exactly what the claim is directed to, what

10:11:05 22    the improvement is and how to practice it.  There's no

10:11:08 23    question about that.

10:11:08 24          So what Defendants do is they look at the

10:11:14 25    preamble in isolation and they say, Well, there are many

10:11:18  1    methods of -- potentially many methods of administering

10:11:22  2    tasimelteon.  We don't know what this is directed to.

10:11:24  3              That is legal error, Your Honor, because the

10:11:26  4    question is not:  If I focus on one term myopically, does it

10:11:29  5    tell me about the entirety of the claim?

10:11:31  6              As *Nautilus* teaches, the focus is on:  Do the

10:11:34  7    claims themselves, the full claim, provide reasonable

10:11:39  8    certainty to those skilled in the art?  And if you read this

10:11:41  9    claim in full, there's really no question about it.

10:11:44 10              So there's no doubt, Your Honor, that the

10:11:47 11    preamble here is definite.  The Defendants bear the burden

10:11:50 12    of proving indefiniteness by clear and convincing evidence,

10:11:53 13    and all they've come forward with is attorney argument.

10:11:56 14              There is no evidence whatsoever, no expert

10:11:59 15    declaration, nothing at all.  It's just attorney argument or

10:12:04 16    questions about what the method is directed to.  But the

10:12:07 17    claim answers those questions.

10:12:09 18              And interestingly enough, Your Honor, I think

10:12:11 19    Defendants are going to tacitly concede my point in about

10:12:14 20    two minutes because when I got their slides, they cite a

10:12:17 21    bunch of evidence that is not anywhere in the joint claim

10:12:21 22    construction brief, or the joint claim construction chart or

10:12:23 23    appendix.  So I'll wait to hear what they have to say about

10:12:27 24    that before addressing it, but it's interesting to me that

10:12:29 25    they've come forward with new evidence.

10:12:31 1          So the bottom line, Your Honor, is the method

10:12:33 2  improved upon is the prior art method of giving tasimelteon

10:12:36 3  to a patient.

10:12:38 4          THE COURT:  Thank you very much.

10:12:39 5          MR. SILVER:  And in terms of the construction,

10:12:41 6  we don't think it needs one.  The words are straightforward

10:12:44 7  enough.  If Your Honor is compelled to do anything, you

10:12:46 8  could insert the concept of the known prior art method.  It

10:12:50 9  just doesn't -- it doesn't aid the jury.  It makes it more

10:12:53 10  confusing, in our view.

10:12:56 11          THE COURT:  Thank you very much.  I appreciate

10:12:57 12  it.

10:12:58 13          MR. SILVER:  Yeah.  Sorry.  One more thing, Your

10:12:58 14  Honor.

10:12:58 15          Just one more thing just to respond to the

10:13:01 16  Defendants' construction, there's really no basis for it.

10:13:03 17          THE COURT:  Oh, sure.

10:13:03 18          MR. SILVER:  You know, the Defendants contend

10:13:05 19  that it's imperative that the Court construe the claim with

10:13:08 20  sufficient precision to advise the public of what is still

10:13:09 21  open to them.  The claim read as a whole absolutely does

10:13:12 22  that.  You don't need to add to the preamble to do that.

10:13:15 23          And if you look at side by side, Claim 1 on the

10:13:19 24  left.  Claim right would be Defendants' proposed

10:13:20 25  construction of Claim 1.  They're just grabbing language

10:13:23  1    from the body of the claim and inserting it into the

10:13:26  2    preamble.

10:13:26  3         And there's no justification for that, and it

10:13:28  4    violates one of the cardinal rules of claim construction,

10:13:30  5    which is you shouldn't render claim terms superfluous, which

10:13:33  6    is exactly what their claim construction does.

10:13:36  7         THE COURT:  All right.  Thank you very much.

10:13:37  8         MR. SILVER:  Thank you.

10:13:45  9         MS. WELLS:  Good morning, Your Honor.

10:13:48  10        THE COURT:  Good morning.

10:13:58  11        (Discussion held off the record:)

10:13:59  12        MS. WELLS:  Deirdre Wells, Your Honor, on behalf

10:14:00  13   of Defendants.  I will be presenting the first term and my

10:14:03  14   colleague, William Milliken, will be presenting on the

10:14:06  15   second two terms.

10:14:08  16        All right.  So I'm going to be focused, like I

10:14:16  17   said, on the first term, the preamble.  And what we've

10:14:21  18   pasted here on the slide on the far left-hand corner is the

10:14:25  19   term in dispute.  In the middle in red is Vanda's

10:14:28  20   construction.  And on the far right is Defendants'

10:14:31  21   construction.

10:14:32  22        It is our position that this preamble is

10:14:35  23   indefinite.  We have provided an alternative construction,

10:14:37  24   but we believe that the term is indefinite.

10:14:40  25        Now, I don't think there's any dispute that this

10:14:45 1   is a fairly unique claim.  We don't often see *Jepson* claims.

10:14:49 2   And *Jepson* claims follow a very particular structure, which

10:14:54 3   is listed out in 37 C.F.R. 1.75(e).  Again, no dispute here,

10:15:00 4   I don't believe, between the parties.

10:15:02 5           The steps, according to the statute, are that

10:15:04 6   you have a preamble comprising a general description of all

10:15:07 7   of the elements or steps of the claimed combination, which

10:15:11 8   are conventional or known.

10:15:12 9           That's followed by a transitional phrase.  It's

10:15:15 10  typically wherein the improvement comprises or the

10:15:17 11  improvement comprising.

10:15:19 12          And then the third part is the part of the

10:15:22 13  invention that is new and improved over those known steps in

10:15:26 14  the preamble.

10:15:27 15          And this structure is particularly important

10:15:32 16  because it allows the public to clearly see both what the

10:15:36 17  improvement is under Part 3, but also under Part 1 to see

10:15:41 18  what known method that improvement improves upon.  And so we

10:15:47 19  heard from Vanda.  They pointed to the *Newron* case.

10:15:53 20          And as we can see quite clearly from that case,

10:16:00 21  the primary purpose of the definiteness requirement is to

10:16:04 22  ensure that the claims are written in such a way that they

10:16:06 23  give notice to the public of the extent of the legal

10:16:09 24  protection afforded by the patent, so that interested

10:16:13 25  members of the public, e.g. competitors of the patent owner,

10:16:15  1  can determine whether or not they infringe.

10:16:19  2          And that is exactly the problem with this

10:16:20  3  preamble.  Here, because we don't know which known steps the

10:16:27  4  alleged improvement improves upon, we don't know the scope

10:16:30  5  of the claim.

10:16:31  6          And let me walk through that.

10:16:33  7          THE COURT:  Isn't --

10:16:35  8          MS. WELLS:  Yes.

10:16:35  9          THE COURT:  So we heard Mr. Silver say, it's

10:16:37 10  any -- it's administering the drug to a patient.  That's

10:16:40 11  what it is.

10:16:42 12          Why do we have to know more than that?  He's

10:16:44 13  saying it covers anything administering the drug to a

10:16:48 14  patient.

10:16:48 15          MS. WELLS:  Because depending on which of the

10:16:50 16  known steps you apply this improvement to, the scope of the

10:16:53 17  claim is going to change.  And so a person reading this

10:16:56 18  claim, without knowing which known steps to apply the

10:16:59 19  improvement to, can't tell whether or not they fall within

10:17:03 20  or outside the claim.

10:17:04 21          And we know this because if we take, for

10:17:10 22  example, there was a -- we heard from Vanda that this was a

10:17:14 23  new area.  There's a disagreement there between the parties.

10:17:17 24          This is an excerpt from Judge Connolly's

10:17:21 25  December 13th, 2022 opinion in the first trial that the

10:17:24 1    parties had.  And he was relying on what the parties

10:17:29 2    referred to as the '244 publication, which is -- the full

10:17:33 3    cite is WO2007137244.  This was a key piece of prior art

10:17:40 4    that featured prominently in Judge Connolly's invalidity

10:17:44 5    opinion.

10:17:44 6          It's also a publication by Vanda.  And it's

10:17:48 7    indisputably prior art.  This was published in 2007.  The

10:17:52 8    very earliest provisional that the '129 patent claims

10:17:55 9    priority to wasn't filed until five years after that in

10:17:58 10   2012.  So if we take just this one example reference that

10:18:01 11   the parties know intimately, we can see how the scope of

10:18:05 12   this claim changes, depending on which known method you

10:18:10 13   apply.

10:18:10 14         So, again, as found by Judge Connolly, he said

10:18:15 15   at Paragraph 80, "By 2007, Vanda filed international patent

10:18:18 16   application (referred to as the '244 publication) directed

10:18:22 17   to administering tasimelteon to treat circadian rhythm

10:18:25 18   disorders and sleep disorders."

10:18:27 19         And as we can see, just looking at this one --

10:18:33 20   this one reference from 2007, five years before the '129

10:18:37 21   patent, there were a variety of known methods of

10:18:40 22   administering tasimelteon to patients.  So, for example,

10:18:43 23   there were a variety of doses that were known.

10:18:46 24         So here's, again, an excerpt from Judge

10:18:50 25   Connolly's December 13th, 2022 decision, where he said, "The

10:18:53 1   '244 Publication describes several clinical studies

10:18:56 2   assessing the safety and efficacy of tasimelteon and

10:18:59 3   concludes from these studies that tasimelteon was well

10:19:02 4   tolerated at doses of 10, 20, 50 and 100 milligrams."  So we

10:19:07 5   see there, there's a variety of known daily doses.

10:19:10 6        This is also pulled directly from the '244

10:19:14 7   publication itself.  The Summary of Invention, it says that

10:19:17 8   it comprises orally administering MA-1, which is -- which

10:19:20 9   was their code word for tasimelteon -- to the subject in

10:19:23 10  amounts of about 10 to about 100 milligrams per day.

10:19:28 11       In addition to a variety of daily amounts, we

10:19:30 12  also know from the '244 Publication that there were a

10:19:34 13  variety of routes of administration that were known,

10:19:37 14  everything from oral to intravenous to lozenge to

10:19:43 15  transdermal or transmucosal.

10:19:45 16       We also know on Slide 15 that there are a

10:19:50 17  variety of frequencies of administration known.  So here's

10:19:54 18  an example where the adult patient is suffering from a

10:19:56 19  depressive disorder, and they could be prescribed one to

10:19:59 20  four tablets to be taken once, twice or three times daily.

10:20:03 21       And as Your Honor noted, Claim 1 of the '129

10:20:05 22  patent is broad enough to cover any indication that would

10:20:08 23  include depressive disorder.  It's not until Claim 3 that

10:20:11 24  the claims actually narrow down to 924.

10:20:15 25       We also know from the '244 patent that

10:20:19 1    tasimelteon was known that it could be administered at

10:20:22 2    different times of the day.  So Claim 7 of Vanda's '244

10:20:26 3    patent -- sorry, publication said that tasimelteon was to be

10:20:29 4    administered at or within about two hours prior to bedtime.

10:20:33 5    Claim 8 narrowed that down to about a half hour prior to

10:20:37 6    bedtime.

10:20:37 7          So what this tells us, looking just at this one

10:20:42 8    reference, the '244 publication from Vanda five years before

10:20:45 9    the earliest priority date for the '129 patent, is there was

10:20:49 10   a lot known in the prior art.  You could administer

10:20:53 11   different dosage amounts at different times of day by

10:20:56 12   different routes for different indications.  And the problem

10:21:00 13   is, in the '129 patent, because of its *Jepson* form, and its

10:21:05 14   allegation that it's improving over a known method in the

10:21:09 15   prior art, we need to know which of those known methods it

10:21:12 16   is so that we can figure out the scope of the claim.

10:21:15 17         So let me walk through what I mean by that.  So

10:21:19 18   we have here just an example.  What I did is I took one of

10:21:24 19   those examples.  So this is the 100 milligrams of

10:21:27 20   tasimelteon daily.  We saw that.  That was in Claim 1 of

10:21:32 21   Vanda's '244 publication, talked about administering about

10:21:36 22   10 milligrams to about 100 milligrams per day.

10:21:38 23         So just for -- just as an example, I said, Okay.

10:21:41 24   Well, what if that's the known prior art method that Vanda

10:21:44 25   was attempting to improve upon in the '129 patent, the

10:21:48  1    100 milligrams per day?  Well, what happens if we plug that

10:21:50  2    into the preamble where they're supposed to list all of the

10:21:54  3    known steps?

10:21:56  4         So then we have a method of administering --

10:21:58  5    again, I inserted this -- 100 milligrams tasimelteon daily

10:22:01  6    to a patient.  The rest of the claim remains the same.

10:22:04  7         Now, in order to fall within this claim, someone

10:22:08  8    has to do the alleged improvement of the 20 milligrams that

10:22:13  9    follows the improvement comprising.  But they still have to

10:22:16 10    get to the 100 milligrams of tasimelteon daily in the

10:22:20 11    preamble.

10:22:20 12         So just administering 20 milligrams of

10:22:23 13    tasimelteon wouldn't be sufficient.  You would fall outside

10:22:26 14    of the claim.

10:22:27 15         This claim, if this is the prior art that

10:22:31 16    Vanda's '129 patent is meant to improve upon requires

10:22:34 17    administering, at minimum, 100 milligrams of tasimelteon

10:22:37 18    daily.  It's a comprising claim.  So it's possible.  Perhaps

10:22:41 19    you could administer more tasimelteon.  But, at a minimum,

10:22:44 20    you would need to administer a hundred milligrams of

10:22:46 21    tasimelteon daily in order to fall within this claim.

10:22:51 22         But if the known method that Vanda was

10:22:55 23    attempting to improve upon with the '129 patent was instead

10:23:00 24    something falling within Claim 7 where they're administering

10:23:05 25    50 milligrams per day two hours before bedtime -- again, a

10:23:09 1    known method.  This is Vanda's own '244 publication, five

10:23:13 2    years before the earliest priority date -- when we plug that

10:23:17 3    into the claim, again, the red is what I've inserted.  We

10:23:21 4    have a method of administering 50 milligrams of tasimelteon

10:23:24 5    about two hours before the target bedtime, and then the rest

10:23:28 6    of the claim remains the same.

10:23:29 7            So to fall within the scope of this claim, if

10:23:32 8    this is the known method Vanda was attempting to improve

10:23:36 9    upon, someone would need to administer 50 milligrams of

10:23:40 10   tasimelteon two hours before bedtime and then administer an

10:23:43 11   additional 20 milligrams of tasimelteon one half hour to

10:23:47 12   about one-and-a-half hours before bedtime.

10:23:50 13           So now the person needs to administer, at

10:23:53 14   minimum, 70 milligrams of tasimelteon.  So, again, because

10:23:57 15   of the number of known ways to administer tasimelteon before

10:24:03 16   the '129 patent was filed -- and we're not talking about

10:24:06 17   close.  This was five years before the '129 patent was

10:24:09 18   filed, the earliest possible provisional -- we can't tell

10:24:14 19   what falls within and outside of the claim.  Because when

10:24:19 20   you change the known method that Vanda was attempting to

10:24:23 21   improve upon, it changes the scope.

10:24:25 22           And this is not a distinction for no reason.

10:24:29 23   Defendants' labels say nothing about 100 milligrams of

10:24:32 24   tasimelteon.  They say nothing about administering

10:24:35 25   50 milligrams two hours before bed.  That was known in the

10:24:38 1    art.

10:24:38 2    So if either of these two methods, just as

10:24:42 3    examples, are the known methods that Vanda was attempting to

10:24:46 4    improve upon with the '129 patent, there's no possible

10:24:49 5    allegation that Defendants infringe this patent.

10:24:52 6    But more to the point on indefiniteness, there's

10:24:55 7    no way for someone to tell, right. We saw in the *Newron*

10:25:00 8    case, right. The point of definiteness is so that someone

10:25:03 9    in the public, in particular, a company's competitors, can

10:25:07 10   look at a claim and say, Do I fall within this? Do I fall

10:25:10 11   outside of this? And the problem here is we just don't

10:25:15 12   know.

10:25:22 13   Making the problem perhaps even worse is that

10:25:24 14   when we raised this as an issue and gave Vanda a chance to

10:25:27 15   identify which known method of administering tasimelteon

10:25:31 16   they believed the patent improved upon, they couldn't

10:25:35 17   identify one. We saw that here this morning.

10:25:37 18   Their proposed construction on Slide 4 simply

10:25:41 19   says that it is a known prior art method for administering

10:25:47 20   tasimelteon. But, of course, that doesn't solve the

10:25:49 21   indefiniteness problem, as we just went through with just

10:25:52 22   one example. There were a variety of known methods of

10:25:57 23   administering tasimelteon. And depending on which of those

10:26:00 24   known methods you choose, the scope of this claim changes.

10:26:04 25   And that is the definition of indefiniteness

10:26:06 1    when the scope of the claim changes, so that people cannot

10:26:09 2    tell if they fall within or outside of the claims.

10:26:12 3              For our part, we did try to come up with our

10:26:16 4    best guess of a known method that Vanda meant to improve

10:26:19 5    upon in the '129 patent.  And you see that in our

10:26:21 6    alternative construction here on the right-hand side.

10:26:24 7              THE COURT:  Is that exactly the language that

10:26:26 8    Judge Connolly held was obvious?

10:26:29 9              MS. WELLS:  Yes.  I'm so glad that you asked

10:26:31 10   that.

10:26:31 11             THE COURT:  Well, I just -- I understand what

10:26:33 12   the argument is here.

10:26:34 13             Yeah.  Okay.

10:26:35 14             MS. WELLS:  Yeah.  So if we go to Slide 19,

10:26:41 15   this -- our language tracks the steps that Judge Connolly

10:26:46 16   found were invalid in the last litigation.  So what I have

10:26:49 17   on Slide 19 is on the far left, we have the '129 patent,

10:26:52 18   Claim 1.  That's the claim we're talking about here this

10:26:55 19   morning.

10:26:56 20             In the middle, I have Claims 1 through 3 from

10:26:58 21   the RE46604 patent.  Claim 3 is one of the -- Claim 3 of the

10:27:04 22   '604 patent is one of the claims that Judge Connolly found

10:27:07 23   invalid.

10:27:08 24             And then on the far right-hand side again, I

10:27:10 25   have our construction.  As you can see, the sort of two

10:27:14  1    parts of our construction come directly from the -- one of

10:27:19  2    the claims that Judge Connolly found invalid.

10:27:21  3            In the yellow, we have administering to a

10:27:23  4    patient 20 milligrams of tasimelteon once daily.

10:27:25  5            And in the blue, we have the time.  One half

10:27:28  6    hour to about one-and-a-half hours before the target

10:27:31  7    bedtime.

10:27:31  8            Again, this was already found.  And this was

10:27:36  9    also affirmed by the Federal Circuit.  These are three

10:27:39 10    excerpts from the Federal Circuit affirming Judge Connolly's

10:27:42 11    invalidity ruling.

10:27:44 12            In the first excerpt, the Federal Circuit said,

10:27:47 13    "The district court found that the claim element 'orally

10:27:49 14    administering to the patient 20 mg of tasimelteon' was

10:27:52 15    disclosed in Hardeland, the '244 Publication and Lankford."

10:27:56 16            That's the yellow.  That's the yellow

10:27:58 17    "administering to a patient 20 mg of tasimelteon once

10:28:01 18    daily."

10:28:01 19            And Hardeland and Lankford are just other prior

10:28:06 20    art references.  The '244 is what we've been talking about

10:28:08 21    here today.

10:28:09 22            The second excerpt from the Federal Circuit

10:28:11 23    opinion, they said, "The '244 Publication stated that 'an

10:28:14 24    oral dose of about 20 to about 50 mg is effective in

10:28:18 25    treating sleep disorders when administered about 1/2 hour

10:28:22  1    before sleep time."

10:28:23  2            So that's the timing.  That was in blue on the

10:28:25  3    last slide.

10:28:25  4            And then, "In sum, we find no error in the

10:28:28  5    district court's determination that Claim 3 of the RE604

10:28:31  6    patent is invalid for obviousness."

10:28:33  7            So it should be undisputed that the steps in

10:28:37  8    yellow and blue in our proposed construction were known in

10:28:40  9    the art.  I believe Vanda is actually estopped from arguing

10:28:44 10    otherwise at this point.

10:28:45 11            But it's clear from the briefing that Vanda does

10:28:48 12    not agree with this construction.  What they said, and this

10:28:51 13    is from the joint claim construction brief, the bottom of

10:28:55 14    Page 26 is that our -- is that Defendants' alternative

10:28:58 15    construction "arbitrarily singles out one particular prior

10:29:02 16    art method."

10:29:03 17            And we do agree it is one of the many known

10:29:06 18    prior art methods.  I wouldn't say that we're arbitrarily

10:29:10 19    singling it out because we see -- we do see that language in

10:29:13 20    the claim.  That had been the focus of the last case.  So we

10:29:17 21    were trying to infer what Vanda was trying to improve upon

10:29:21 22    with the '129 patent.  It seems like we got it wrong, but

10:29:24 23    where we're left is we don't know.

10:29:26 24            There were too many known prior art methods to

10:29:30 25    have a claim that just says "in a method of administering

10:29:33  1    tasimelteon."  Or as Vanda's construction, "a known method

10:29:37  2    of administering tasimelteon."  There were too many to know

10:29:41  3    because that scope of the claim is going to change based off

10:29:45  4    of which of those known methods you choose.

10:29:47  5            The other point that I would like to make is

10:29:52  6    we've heard from Vanda's counsel, a comparison to the *Newron*

10:29:56  7    Claim 1.  That was on Page 6 of their slides.

10:30:00  8            And I would just note that this is a very

10:30:02  9    different claim.  The *Newron* preamble specifies the

10:30:06 10    condition being treated, and it also specifies the amount of

10:30:10 11    the active ingredient that was being given.  The language of

10:30:13 12    the claim is a stable dose of levodopa.

10:30:17 13            And it was that phrase "stable dose" that was

10:30:19 14    really the focus of the analysis in that case and whether

10:30:23 15    that phrase was indefinite.  So it wasn't whether the

10:30:26 16    preamble was limiting.  It was whether stable dose was a

10:30:29 17    definite.  And in that case, what the Court said is, No.  We

10:30:33 18    have a clear construction of this.  It's actually pulled

10:30:36 19    directly from the Notice of Allowance.  So it is clear to

10:30:39 20    competitors out there what this term means.

10:30:42 21            That is very different than the case here where

10:30:44 22    we know there's a variety of known methods of administering

10:30:48 23    tasimelteon.  The one that we choose to fill into this claim

10:30:52 24    impacts the scope of the claim, and we have no way of

10:30:55 25    knowing which one to choose.

10:31:00 1            The other comment that I would like to make is

10:31:03 2    that there are, of course, other ways that Vanda could draft

10:31:07 3    a claim, if they didn't want it to be tied to a particular

10:31:10 4    known method of administering.  Those are your typical

10:31:14 5    non-*Jepson* claims.

10:31:16 6            Something that comes to mind is something like a

10:31:18 7    method of administering tasimelteon to a patient taking a

10:31:18 8    beta adrenergic receptor antagonist comprising --

10:31:26 9    instructing the patient to cease treatment and then

10:31:28 10   administering the steps of the claim.

10:31:31 11           That's not the route that they went.  They went

10:31:34 12   with the *Jepson* claim.

10:31:35 13           And, again, 37 C.F.R. 1.75(e) is crystal clear

10:31:39 14   that if you choose to do a *Jepson* claim, this is the

10:31:42 15   structure you must follow.  You must, in the preamble, list

10:31:45 16   all of the known steps.  And then in that Part 3, specify

10:31:51 17   what it is that you are saying is new and an improvement

10:31:55 18   over what was known.  And that's simply missing here.

10:32:00 19           THE COURT:  Thank you very much.

10:32:02 20           MR. SILVER:  Your Honor, just very briefly.  The

10:32:09 21   analysis that counsel provided, based on Judge Connolly's

10:32:13 22   decision in JTX 041 is nowhere found in the briefing or the

10:32:17 23   joint appendix, so I'd ask the Court to disregard it.

10:32:20 24           But even if the Court were to consider it, we're

10:32:23 25   here for claim construction, not summary judgment.  So what

10:32:25  1    -- you know, what Judge Connolly found is in the prior art,

10:32:28  2    whether Vanda is precluded from or estopped from disputing

10:32:32  3    that, that issue will be litigated in this case, and we'll

10:32:36  4    deal with it at the appropriate time.

10:32:37  5          The question here is:  What is the appropriate

10:32:39  6    construction of the preamble of Claim 1?  And when Vanda

10:32:44  7    chose to use a *Jepson* claim form, what that means is it's

10:32:48  8    conceding that what it puts in the preamble is not what it

10:32:53  9    invented.  It's invented an improvement upon that invention.

10:32:58 10    And so it's acknowledging, it's conceding that administering

10:33:03 11    tasimelteon to a patient was known in the art.  There's no

10:33:06 12    question about that.

10:33:07 13          The fact that there are different forms of

10:33:08 14    administration, and different doses and whatnot, that's in

10:33:11 15    the specification of the '129 patent.  That's not a secret.

10:33:14 16    They weren't trying to hide that.  They're saying, Look,

10:33:17 17    everyone now knows, tasimelteon is a novel compound that was

10:33:22 18    invented under a previous invention, can be administered to

10:33:25 19    a patient.  You know, we're in this general sphere.  That's

10:33:27 20    not our invention.  Our invention is this over here, this

10:33:30 21    particular dosing regimen.

10:33:31 22          And that's clear to a POSA.  And if there were

10:33:35 23    any doubt about it, counsel would have come forward, not

10:33:38 24    with attorney argument, but with a declaration from a POSA

10:33:41 25    actually supporting their indefiniteness theory, which they

10:33:44  1    failed to do.

10:33:45  2         Unless Your Honor has any questions, I'll move

10:33:49  3    on to term two.

10:33:50  4         THE COURT:  I have no questions.  Thank you.

10:33:52  5         MR. SILVER:  That will be Mr. Leonard from

10:33:54  6    Vanda, Your Honor.

10:33:55  7         THE COURT:  That's fine.

10:33:57  8         MR. LEONARD:  Good morning, Your Honor.

10:34:03  9         THE COURT:  Good morning.

10:34:04 10         MR. LEONARD:  So I will be handling the term

10:34:08 11    two, the "determining" claim term.  And Vanda's position on

10:34:12 12    this term is that the term should be limiting and that it

10:34:17 13    should be given its plain and ordinary meaning as we have on

10:34:19 14    the slide here.

10:34:20 15         Now, Defendants are arguing that this claim

10:34:22 16    term, the determining step, is not limiting, and that if the

10:34:26 17    Court is going to construe it that it should be artificially

10:34:29 18    narrowly limited to just asking, not the full scope of

10:34:32 19    determining, but asking as we have here on the slide.

10:34:35 20         So turning to the first issue whether this is

10:34:38 21    limiting, of course, the Court understands that claim terms

10:34:41 22    are normally limiting.  That's the general rule.

10:34:44 23         The Defendants are actually arguing in this case

10:34:46 24    that the determining step is covered under what's called the

10:34:49 25    printed matter doctrine, which is a narrow exception to

10:34:53  1    whether a claim element would be limiting.  And here on the

10:34:56  2    slide, we have the two-step analysis that the Court needs to

10:34:59  3    look at for printed matter.

10:35:01  4            And so in the first step, Your Honor, what the

10:35:03  5    Court needs to do is, again, assess whether it's printed

10:35:06  6    matter.  And the way the Court will do that is, first, they

10:35:09  7    will look to see if the claim claims the content of the

10:35:14  8    information.  So that's the critical inquiry, whether the

10:35:17  9    matter claimed is for what it communicates, that alone.  So

10:35:21 10    it's a very narrow inquiry.

10:35:22 11            If the Court then decides that it is claiming

10:35:24 12    the information, it would go to the second step, which we

10:35:27 13    have here.  And that is whether the printed matter,

10:35:31 14    nevertheless, should be given patentable weight.

10:35:33 15            And if the Court's looking at that step now, the

10:35:36 16    Court then needs to look to see whether it's functionally or

10:35:39 17    structurally related to the substrate.  So in lay terms, it

10:35:42 18    just means:  Does that information now relate to some other

10:35:46 19    portion of the claim?  And we'll walk through that.

10:35:48 20            So, first, just top level, the determining step,

10:35:52 21    if you just look at the language, it does not claim

10:35:55 22    information.  It's not covered under the printed matter

10:35:57 23    doctrine.

10:35:58 24            And, in fact, what determining requires is it

10:36:00 25    requires an affirmative step, inquiring, researching,

10:36:05  1    looking through medical records, making measurements.  Those

10:36:08  2    are all affirmative steps.  That's not just communicating

10:36:11  3    information.

10:36:12  4            And it's our position, Your Honor, that this

10:36:15  5    particular claim term is indistinguishable from this Court's

10:36:20  6    decision in *Otsuka*.  I don't know if the Court recalls that

10:36:23  7    decision, but we'll just briefly walk through that.

10:36:25  8            So in *Otsuka*, the Court was looking at the claim

10:36:27  9    term "administering of a long-acting suspension is avoided

10:36:30 10    when the patient is taking a CYP3A4 inducer."

10:36:35 11            And when the Court looked at this under the

10:36:38 12    printed matter doctrine, the Court concluded that, Well,

10:36:41 13    although implicitly it does rely on certain information, the

10:36:45 14    information about the drug, but it's not claiming that

10:36:47 15    information alone.  It's actually doing something with it.

10:36:50 16    It's looking at the -- what specific act is going to occur

10:36:54 17    in response to a trigger, right, whether I'm going to give

10:36:58 18    one drug if the patient is taking another drug.

10:37:00 19            So then looking -- and, again, it's Vanda's

10:37:03 20    position that this is analogous to the situation in the '129

10:37:07 21    patent.  And, again, in the chart on the slide, we're just

10:37:10 22    comparing the language so you can see in *Otsuka* where the

10:37:12 23    Court said the trigger was when the patient is taking

10:37:15 24    another drug.  That was the trigger.  That's analogous to

10:37:19 25    this determining step where it's determining whether the

10:37:21  1    patient's being treated with another drug.

10:37:23  2           And then the specific action is administering

10:37:26  3    the other drug is avoided.  Whereas here, and Mr. Hughes

10:37:30  4    will get into the third term, but we have a similar term

10:37:33  5    "administering to a patient or instructing it or

10:37:35  6    administering."  So, again, it's our view that this is

10:37:38  7    analogous to the situation here, and that this is why the

10:37:41  8    printed matter doctrine does not apply.

10:37:43  9           Now, Defendants do rely on this *Praxair* case.

10:37:47 10    This is a printed matter case, and it involves -- we have

10:37:50 11    the claim element that the Court looked at here.  And the

10:37:53 12    claim element was really looking at only a mental process.

10:37:57 13    And what the claim element required is just the practitioner

10:38:01 14    to evaluate whether the potential benefit of a treatment

10:38:05 15    outweighed the risk.  So that was a purely mental step.  And

10:38:08 16    that's what the Court concluded in *Praxair*.

10:38:10 17           But this Court in *Otsuka* actually distinguished

10:38:12 18    it from the situation, the administering where another drug

10:38:16 19    was also being taken.  Because of -- and you can see here,

10:38:19 20    it merely required the medical provider to think about it.

10:38:22 21    But as we go through in our brief and as I explained, the

10:38:24 22    determining step here requires an affirmative act.  That act

10:38:28 23    of, again, inquiring, searching medical records, making

10:38:32 24    measurements, which was not in Praxair.

10:38:35 25           So now if the Court does conclude that it's

10:38:39 1    printed or claiming the information, it will turn to the

10:38:42 2    second step, which is, again, this functionally related

10:38:44 3    step.  And really what that means is "determining" here

10:38:47 4    dictates how the patient is being treated in the next step.

10:38:50 5    So we color-coded it to make clear the determining step here

10:38:53 6    is the top one in yellow.

10:38:55 7            And then once that step -- the medical provider

10:38:58 8    takes that action and determines that the patient's taking

10:39:01 9    or not taking a beta blocker, the outcome is then used in

10:39:04 10   the next steps of the method.  So it is structurally related

10:39:09 11   to the method, as you can see by the color-coding, depending

10:39:13 12   on whether they're taking it or not.  It will either be

10:39:15 13   administering or instructing and administering.  So we

10:39:18 14   certainly meet this test.

10:39:19 15           Now, in the briefing, Defendants do suggest that

10:39:22 16   the test is we can just strike determining in the claim.

10:39:26 17   The operative steps are the same.  But that's clearly not

10:39:29 18   the case, because if we removed all the determining, that

10:39:33 19   action of the medical provider would not occur.  The

10:39:36 20   language that would be left is there would just be some sort

10:39:38 21   of they're taking or not taking.  It would then be implicit.

10:39:42 22   Whereas the claim as written requires action.  It requires

10:39:44 23   action in the determining.

10:39:46 24           Now, finally, Your Honor, looking at the plain

10:39:50 25   and ordinary meaning of the term, it's our position that the

10:39:53 1  term "determining" should be given its plain and ordinary

10:39:56 2  meaning, and that the jury will easily be able to understand

10:39:58 3  that.  The Defendants actually argued that point in their

10:40:01 4  judgment on the pleadings to the Court that it needed no

10:40:04 5  further construction.  They're here today to now ask you for

10:40:06 6  this artificially narrow construction that determining means

10:40:10 7  asking.

10:40:10 8         But, again, they don't point to anything in the

10:40:13 9  intrinsic record.  They don't provide any expert testimony,

10:40:16 10  no declarations, no extrinsic evidence or any case law.

10:40:20 11  They cite one case.  But that case there, the jury actually

10:40:24 12  did consider the plain and ordinary meaning.  So, therefore,

10:40:27 13  we believe that's the proper construction.

10:40:29 14         Unless there's any questions, I'll just reserve

10:40:34 15  for rebuttal.

10:40:35 16         THE COURT:  No, that's fine.  Thank you.

10:40:46 17         MR. MILLIKEN:  Good morning, Your Honor.  May it

10:40:49 18  please the Court, William Milliken for Teva.  I'll be

10:40:51 19  arguing the second and third terms for Defendants.

10:40:54 20         The second disputed term is the "determining"

10:40:58 21  step.  And this limitation is not entitled to patentable

10:41:02 22  weight because it is broad enough to encompass purely mental

10:41:06 23  steps.  That is simply recognizing or appreciating the fact

10:41:11 24  that the patient is not taking a beta blocker.

10:41:14 25         And, in fact, the Federal Circuit held in the

10:41:17 1    *Cybersource* case that we cited in the briefing that a claim

10:41:19 2    limitation that required determining whether a credit card

10:41:23 3    transaction was valid was a mental step because it included

10:41:28 4    "logical reasoning that can be performed entirely in the

10:41:31 5    human mind."

10:41:32 6            And the same is true here.  One could determine

10:41:35 7    whether a patient is taking a beta blocker or not simply by

10:41:38 8    engaging in logical reasoning in their brain.

10:41:41 9            Federal Circuit law is quite clear that steps

10:41:44 10    like this don't limit claims unless they have a functional

10:41:48 11    relationship with something that is elsewhere in the claim.

10:41:52 12    And this step doesn't for two reasons.

10:41:57 13            The first reason, which is shown on the slide

10:41:59 14    here, is that even if you excise all mention of the

10:42:04 15    determining limitation from Claim 1, the operative steps of

10:42:08 16    the claim -- that is, the things that the doctor actually

10:42:11 17    does in the world -- remain exactly the same.

10:42:14 18            And the second reason is that no matter the

10:42:18 19    outcome of the determining step, the actual method of

10:42:22 20    administration the doctor performs is the same.  You

10:42:26 21    administer 20 milligrams of tasimelteon a half hour to an

10:42:30 22    hour and a half before bedtime.

10:42:32 23            Now, to be sure, the claim says that, in the

10:42:35 24    case that the patient is taking the beta blocker, the

10:42:38 25    physician instructs the patient to discontinue it.  But as

10:42:42  1    we pointed out in the briefing, the claim doesn't require

10:42:44  2    that the patient, in fact, stop taking the beta blocker.

10:42:49  3    The claim as written is broad enough to encompass a

10:42:52  4    situation where the physician gives the instruction.  The

10:42:54  5    patient ignores it.  And then the physician administers 20

10:42:58  6    milligrams tasimelteon.

10:42:59  7           So as this claim is written, the step in no way

10:43:03  8    transforms the actual process of taking the drug.  And that

10:43:07  9    means that the limitation is not entitled to patentable

10:43:10 10    weight under *King Pharmaceuticals* and similar cases.

10:43:13 11           To put this last point a slightly different way,

10:43:16 12    the only way that the determining step is even arguably

10:43:20 13    related to anything elsewhere in the claim is that it can

10:43:24 14    trigger the physician to give the patient some information,

10:43:28 15    namely that they should stop taking the beta blocker.  But

10:43:31 16    the claim doesn't require that the patient actually do

10:43:34 17    anything with that information.  And the provision of

10:43:38 18    information standing alone can't supply patentable weight

10:43:42 19    either, as the Federal Circuit pointed out in the *Ioengine*

10:43:45 20    case.  So there's no functional relationship between

10:43:48 21    determining and the steps that the physician actually

10:43:50 22    carries out.

10:43:51 23           Now, I'll briefly address the *Otsuka* case, since

10:43:56 24    my friend on the other side discussed it at some length.  If

10:43:59 25    you take a look at Vanda's Slide 16, they say that *Otsuka* is

10:44:05 1    analogous because there was both a trigger and a specific

10:44:09 2    action required in response to that trigger in *Otsuka*.

10:44:13 3         I'd submit that neither prong of this analogy

10:44:17 4    actually holds because *Otsuka* required that the patient, in

10:44:22 5    fact, be taking another drug; whereas the '129 patent frames

10:44:26 6    this limitation in terms of the physician mentally

10:44:29 7    determining whether the patient's taking another drug.

10:44:32 8         That's a very different circumstance.  It brings

10:44:34 9    this case within the Federal Circuit's mental step cases.

10:44:37 10        And then the other problem is that, as I was

10:44:40 11   alluding to just now, the *Otsuka* claim required actually

10:44:44 12   avoiding administration of the other drug, and this claim

10:44:48 13   doesn't.  This claim doesn't require that the patient stop

10:44:50 14   taking the beta blocker.  It just requires that the

10:44:53 15   physician tell the patient to stop taking the beta blocker.

10:44:56 16   So I think *Otsuka* is simply inapposite for that reason.

10:45:00 17        Now, I'll briefly discuss the reasons underlying

10:45:06 18   our alternative construction because I think it actually

10:45:09 19   reinforces our front-line position of why this term isn't

10:45:12 20   entitled to patentable weight.  If the Court were to

10:45:16 21   conclude that that this limitation should receive patentable

10:45:20 22   weight, it needs to be construed narrowly enough to exclude

10:45:24 23   purely mental activity.

10:45:25 24        And so that's why we proposed, in the

10:45:27 25   alternative, that the limitation be construed as asking the

10:45:31 1    patient if he or she is taking a beta blocker.  Under that

10:45:36 2    construction, it would actually require the doctor to do

10:45:39 3    something in the world.

10:45:40 4            Now, Vanda disagrees with that construction

10:45:43 5    because, as it appears from the briefing, they want to

10:45:47 6    interpret this step to be broad enough to encompass all

10:45:51 7    manner of purely cognitive processes.  And so that

10:45:55 8    reinforces our point that, as written, the limitation is so

10:45:59 9    broad that it does encompass purely mental steps.  And so

10:46:03 10   for that reason, it should not be entitled to patentable

10:46:06 11   weight.

10:46:06 12           If the Court has any questions, I'm happy to

10:46:09 13   answer them.

10:46:09 14           THE COURT:  No.  Thank you very much.  I

10:46:10 15   appreciate it.

10:46:15 16           MR. LEONARD:  Your Honor, just some brief

10:46:20 17   rebuttal?

10:46:21 18           THE COURT:  Of course.

10:46:22 19           MR. LEONARD:  So just on the first point, they

10:46:24 20   keep pointing to "determining" and saying that it

10:46:26 21   encompasses purely cognitive processes.  And we certainly

10:46:30 22   disagree with that.  We believe determining requires the

10:46:33 23   provider to do affirmative acts outside of that.

10:46:35 24           So we just don't agree with that.  I know

10:46:37 25   they're trying to fit it into the case law where terms that

10:46:40  1   were purely cognitive, like we saw in *Praxair*, where it said

10:46:44  2   evaluating, elsewhere in the claim the information was

10:46:46  3   collected, et cetera.

10:46:48  4        But when the Court looked at just evaluating

10:46:50  5   risk versus benefit, that was purely cognitive.  That's not

10:46:53  6   determining.  They don't have a determining case that says

10:46:55  7   determining acts in that way.

10:46:57  8        Second, on the transformative.  Just looking at

10:47:00  9   the way this -- the claim is laid out, they're saying that

10:47:04 10   the determining step doesn't inform or doesn't show what the

10:47:07 11   outcome would be.  But, of course, there are two branches

10:47:10 12   which, of course, is for the third term.  But one is where

10:47:13 13   it's administering.  And the other one requires an

10:47:16 14   instructing.

10:47:16 15        Again, another action.  And that action is

10:47:19 16   triggered from the determining step.  So, therefore, that

10:47:22 17   step is transformative.  It is not merely -- it could be

10:47:25 18   crossed out and it's not functional.

10:47:26 19        THE COURT:  All right.  Thank you very much.

10:47:28 20        MR. LEONARD:  Thank you.

10:47:30 21        MR. SILVER:  And, Your Honor, Mr. Hughes will be

10:47:32 22   addressing the third term for Vanda.

10:47:33 23        THE COURT:  That's fine.  Thanks.

10:47:40 24        MR. HUGHES:  Good morning, Your Honor.

10:47:42 25        THE COURT:  Good morning.

10:47:45  1                    MR. HUGHES:  So to discuss the third term, and

10:47:48  2       I'd be pleased to address any questions the Court may have.

10:47:50  3                    THE COURT:  Do you understand what the dispute

10:47:51  4       is here?

10:47:52  5                    MR. HUGHES:  Your Honor, I think I do, because

10:47:54  6       there's no dispute about the claim language.  I think the

10:47:57  7       dispute here is:  Is it a single method with conditional

10:48:01  8       branching, which is our position.

10:48:03  9                    Defendants' position is there are two separate

10:48:06 10       methods that are contained within the claim.  And so they

10:48:09 11       are asking for that, because when it comes to obviousness,

10:48:12 12       they're going to say if one branch is invalidated, the whole

10:48:16 13       claim is invalidated.

10:48:17 14                    So that's, I think, the nature of this dispute.

10:48:19 15       But I don't think it really goes to any dispute about the

10:48:21 16       understanding of the claim language.  We all know what the

10:48:23 17       claim language means.

10:48:26 18                    THE COURT:  I mean, it seems like both sides are

10:48:36 19       asking me for something that will allow their position to

10:48:39 20       have some facial appeal in front of the jury as opposed to

10:48:42 21       actually construing anything.

10:48:45 22                    You don't dispute that you can only perform --

10:48:48 23       in performing the claimed method, you can only do one or the

10:48:50 24       other thing; right?

10:48:51 25                    MR. HUGHES:  Yes, Your Honor.

10:48:52 1          THE COURT:  Okay.  All right.

10:48:57 2          Why don't you finish your argument?  I don't

10:48:59 3    know if there's that much more to argue about, because I

10:49:03 4    don't think there's a dispute here.

10:49:04 5          MR. HUGHES:  I don't disagree, Your Honor.  I

10:49:06 6    think the key issue here is, again, is:  What is this claim?

10:49:09 7    Is it a conditional branch or is it two methods?

10:49:13 8          And what we just want to highlight is we know

10:49:16 9    what -- to go back, what a single method with conditional

10:49:20 10   branching looks like because the *Hytera* decision from the

10:49:23 11   Federal Circuit and Judge Stark's decision in *Interdigital*

10:49:26 12   tell us what you do for both infringement and invalidity

10:49:32 13   with a claim of this sort.  And we think this fits this

10:49:34 14   pattern exactly.

10:49:35 15         So putting up Claim 1 of the '129, we know that

10:49:40 16   the hub here is the determining step.  So the provider makes

10:49:44 17   the determination.  And then there's a branch, either it's

10:49:47 18   determining the patient is on a beta blocker or not on a

10:49:52 19   beta blocker.  And there's that single determination that's

10:49:53 20   the branch.

10:49:54 21         This is exactly like Claim 7 that was at issue

10:49:56 22   in *Hytera*.  There was a single conditional branch.  There

10:50:00 23   was a determining step.

10:50:02 24         If the time slot is the current desired time

10:50:05 25   slot, you go down one pathway of the branch.  And then you

10:50:09 1    have an -- otherwise, you go down the other pathway of the

10:50:11 2    branch.  It's the exact same formation or formulation.

10:50:15 3            *Interdigital*, the Judge Stark decision from

10:50:18 4    Claim 4, exactly the same.  You have receiving information.

10:50:22 5    And then there's one condition that a first uplink channel

10:50:25 6    is received.  A second condition that it's not received.

10:50:28 7    And, again, you have two conditional branches.

10:50:32 8            Now, my friends prefer a case, *Schulhauser*.

10:50:34 9    This is a decision from the PTAB that I'll talk about in a

10:50:38 10   moment.  But the way that this is clearly distinguishable

10:50:41 11   and not our circumstance here is when you look at this,

10:50:43 12   there are four separate -- at Claim 1 that was at issue in

10:50:47 13   the decisions, at least four separate conditional branches.

10:50:51 14           So Figure 4 is illustrating this.  It's not just

10:50:53 15   one determination that has a branch, yes, no.  It has four

10:50:56 16   separate branches.

10:50:57 17           And so in *Schulhauser* itself, it says Claim 1 as

10:51:02 18   written covers at least two methods.  Now, in *Hytera*, the

10:51:06 19   Federal Circuit looked at *Schulhauser*, and first, it said,

10:51:10 20   We're not going to comment on whether or not this PTAB

10:51:12 21   decision is correctly decided.  I think that sort of

10:51:15 22   suggests that there's at least some question about the

10:51:18 23   correctness of *Schulhauser* on the face of it.

10:51:20 24           But, second, what the Court said is Claim 7 of

10:51:23 25   the patent in the '991, the *Hytera* case, which is exactly

10:51:27 1    like ours, is distinguishable from what's going on in

10:51:30 2    *Schulhauser*, because in *Schulhauser*, you had -- could be

10:51:33 3    construed as each one is a standalone method claim.  So we

10:51:36 4    think that's pretty distinguishable.

10:51:38 5            Here is where I think the rubber meets the road.

10:51:41 6    Again, I'm not sure it's a today question, Your Honor, but

10:51:44 7    this is what the Defendants are driving at is they have a

10:51:47 8    theory that our position on infringement is somehow

10:51:49 9    different than our position on validity.  And that, I think,

10:51:52 10   is driving the nature of their claim construction.

10:51:54 11           And I just think that's wrong because

10:51:57 12   *Interdigital* and *Hytera* both describe how infringement and

10:52:00 13   invalidity work for a claim that has a conditional branch to

10:52:05 14   it.  And what *Interdigital* says for infringement, this comes

10:52:09 15   from both, you know, *Lincoln* and *Hytera*, Judge Stark said

10:52:13 16   *Lincoln* and *Hytera* make clear that each condition need not

10:52:15 17   actually be practiced at the same time, but only that the

10:52:18 18   patented embodiments be capable of doing so.

10:52:21 19           And my friends in their brief agree that a

10:52:23 20   doctor is capable of going down both branches based on what

10:52:26 21   the prescriber or the treater determines through that active

10:52:30 22   step.  And, again, determining has to be an active step.

10:52:33 23   It's not something that one can do solely in one's mind.

10:52:36 24   There's no way to look at a patient and determine whether or

10:52:37 25   not they're on a beta blocker without doing something active

10:52:40 1    in the real world.

10:52:42 2            So what *Interdigital* says is bound by both

10:52:44 3    *Lincoln* and *Hytera* is that you don't have to do both things

10:52:47 4    at the same time, but that is a valid claim.

10:52:49 5            And then *Hytera* makes clear, also resting on

10:52:53 6    *Lincoln*, that to invalidate this kind of claim, you have to

10:52:57 7    have -- prior art must teach each step of the claim.  And

10:53:02 8    that's where Defendants are ultimately driving because they

10:53:05 9    want to say this is not a claim like Hytera.  So if they

10:53:08 10   have prior art invalidating one branch that that invalidates

10:53:11 11   the entire claim.  They want to suggest that it's two

10:53:14 12   independent claims that are put within the same claim.

10:53:17 13           But that's just simply not how it's drafted.

10:53:19 14   This is drafted in a very different way where the

10:53:21 15   determining step has weight.  It is an active step that the

10:53:27 16   provider must accomplish, that serves as the hub.  And then

10:53:30 17   there is conditional branching from there.

10:53:33 18           Last point is I think my friends say that cases

10:53:35 19   like *Hytera*, *Interdigital* and *Lincoln* are in a technology

10:53:39 20   context rather than a pharmaceutical context.  I don't think

10:53:42 21   that really in any way alters the law of infringement or

10:53:45 22   invalidity that the Federal Circuit and Judge Stark

10:53:48 23   identified.  It's just a distinction without any difference.

10:53:52 24           And *Schulhauser* -- that they prefer -- is just

10:53:53 25   dealing with a very different circumstance.  But I'd be

10:53:56 1    happy to take any of the Court's questions.

10:53:57 2                  THE COURT:  No.  Thank you very much.

10:54:00 3                  MR. HUGHES:  Thank you.

10:54:02 4                  MR. MILLIKEN:  Thank you, Your Honor.  William

10:54:22 5    Milliken again.

10:54:22 6                  So I want to focus on two things that Mr. Hughes

10:54:30 7    said.

10:54:30 8                  First, I think he accurately summarized the

10:54:33 9    consequences of this dispute and why we are having it.  The

10:54:37 10   dispute is about:  Do we need to show that both conditional

10:54:41 11   branches of this claim are in the prior art to render it

10:54:44 12   obvious or just one?

10:54:45 13                 The other thing I want to emphasize that he said

10:54:49 14   is, I believe he agreed that they -- that Vanda agrees with

10:54:55 15   us that only one of these two branches needs to be practiced

10:55:01 16   for the claim to be practiced.  That's sort of self-evident,

10:55:06 17   but I think it's very critical.  So I want to walk through

10:55:09 18   it here.

10:55:09 19                 If the patient's not taking a beta blocker, then

10:55:13 20   you administer the 20-milligrams tasimelteon, the step after

10:55:17 21   one, and then you are finished with the method.  You don't

10:55:20 22   need to do the stuff that's after two.  You're done.

10:55:23 23                 If, on the other hand, the patient is taking a

10:55:26 24   beta blocker, you instruct them to stop the beta blocker and

10:55:30 25   then you administer 20 milligrams tasimelteon, and then

10:55:33  1    you're done.  You don't care about anything that's after the

10:55:37  2    one there.  Infringement has happened, and everything after

10:55:43  3    the one is irrelevant.

10:55:44  4         And the consequence of that is that the prior

10:55:49  5    art only needs to disclose one of these two steps to

10:55:52  6    invalidate the claim, not both.  The Federal Circuit made

10:55:56  7    precisely this point in a case called *Brown vs. 3M*, which

10:56:00  8    held that if you have a claim that would be infringed by one

10:56:04  9    of several alternative things, that same claim would

10:56:07 10    necessarily be invalidated by any one of those alternative

10:56:11 11    things appearing in the prior art.  Because it's bedrock

10:56:14 12    patent law that "that which would infringe if later,

10:56:17 13    anticipates if earlier."

10:56:19 14         And I do think that this is a claim construction

10:56:22 15    dispute, not something for the parties to argue about at

10:56:25 16    trial, because it implicates in a very real way what is the

10:56:30 17    scope of the claim.  What's its scope for infringement?

10:56:34 18    What's its scope for purposes of invalidity?  So I do think

10:56:37 19    that the issue is properly presented at the claim

10:56:40 20    construction stage.

10:56:40 21         THE COURT:  Well, but they agree with you.  You

10:56:42 22    can only do one or the other.

10:56:44 23         So what's the dispute?

10:56:47 24         MR. MILLIKEN:  The dispute is whether that

10:56:49 25    interpretation also holds for purposes of invalidity.  They

10:56:53 1    do agree with us for infringement.  They say, to infringe

10:56:56 2    the claim, you only have to perform one of the conditional

10:56:59 3    branches.  But then they turn around and say that to prove

10:57:03 4    anticipation or obviousness, we would need to show that both

10:57:07 5    conditional limitations are in the prior art.

10:57:10 6            That just can't be right if we're going to

10:57:13 7    respect the maximum that you have to interpret claims the

10:57:16 8    same way for infringement that you have to do for

10:57:20 9    invalidity.

10:57:20 10            THE COURT:  So what -- do you want me just to

10:57:23 11    say you can't perform both steps, and you have to interpret

10:57:25 12    the claims the same -- that both -- they don't dispute --

10:57:28 13    you don't dispute that, as a matter of law, that the claims

10:57:30 14    are the same for infringement and invalidity; right?

10:57:33 15            MR. HUGHES:  No, Your Honor.  We think

10:57:36 16    *Interdigital* and *Hytera* --

10:57:36 17            THE COURT:  That's what it is.  Everybody agrees

10:57:38 18    on both of those things.

10:57:39 19            So what else do we need to do here for claim

10:57:42 20    construction purposes?

10:57:42 21            MR. MILLIKEN:  Sorry.  On both of what things,

10:57:44 22    Your Honor?

10:57:44 23            THE COURT:  The things that you can't -- you

10:57:46 24    only have to perform one or the other of the steps.

10:57:49 25            MR. MILLIKEN:  Right.

10:57:50 1          THE COURT:  And then you interpret the claims

10:57:52 2     the same way for infringement and validity.  We all agree on

10:57:54 3     both of those things.

10:57:55 4          So what is the remaining dispute, if any?

10:57:57 5          MR. MILLIKEN:  So, for our purposes, I think

10:57:59 6     that's enough because I think that that sort of makes clear

10:58:03 7     that our position is correct.  One thing I do want to point

10:58:06 8     out is something that happened as part of the

10:58:09 9     meet-and-confer process, which I think kind of sharpened the

10:58:13 10    dispute that the parties actually have here.

10:58:15 11         So during the meet and confers, Vanda asked if

10:58:17 12    we would agree to a construction on the -- that's on the

10:58:21 13    left side here, that basically has the two conditional steps

10:58:26 14    labeled by A and B.  And it says, "for clarity only, either

10:58:29 15    A or B must occur to practice the claim."

10:58:31 16         We responded and we said that we could agree

10:58:33 17    with that if we also clarify that only either A or B needs

10:58:37 18    to be obvious to render the claim obvious.

10:58:39 19         THE COURT:  Yeah, that's not a claim

10:58:41 20    construction.  I understand.  I understand perfectly what's

10:58:43 21    going on here.

10:58:44 22         Is there anything else you wanted to add?

10:58:46 23         MR. MILLIKEN:  I'll just -- I will add that

10:58:50 24    Vanda's sort of principal argument here is that this -- what

10:58:54 25    I think is a very illogical position as compelled by

10:58:58 1    precedent and specifically, the Federal Circuit's *Lincoln*

10:59:01 2    *National* case.

10:59:01 3            That's the only precedential decision they rely

10:59:04 4    on.  I think that's wrong for two reasons.

10:59:06 5            The first is that the claim in *Lincoln National*

10:59:08 6    was just very different.  It required administering an

10:59:11 7    annuity by paying out money over a set period of time,

10:59:15 8    regardless of whether the underlying account had any funds

10:59:17 9    in it.  It wasn't really a conditional claim at all.

10:59:20 10           And on those facts, the Federal Circuit

10:59:22 11   reasonably said that to prove infringement, you've got to

10:59:25 12   show that the accused product would actually pay the funds

10:59:27 13   even if the account was exhausted.  It's not enough to just

10:59:31 14   show that the product would make the payments if there were

10:59:34 15   funds in the account.

10:59:35 16           Here, that logic doesn't work because everyone

10:59:37 17   agrees that you only have to perform one branch of the claim

10:59:40 18   to infringe.

10:59:42 19           And the second problem is that *Lincoln*

10:59:44 20   *National* -- and this also goes for the other

10:59:46 21   non-precedential cases that Vanda relies on -- is that they

10:59:49 22   involved computer-performed methods.  And that's a context

10:59:52 23   where it could make sense to ask whether an accused product

10:59:55 24   is programmed to perform one of two mutually exclusive

11:00:01 25   options in the counterfactual worlds in which the conditions

11:00:05 1    triggering those options is satisfied.  You can just look at

11:00:07 2    the algorithm.

11:00:09 3            You can't do an analogous inquiry in the context

11:00:11 4    of a claim like this.  All you can ask is:  Did the

11:00:15 5    physician perform the step required by the condition that it

11:00:19 6    actually obtained in the world?  And so I'd submit that this

11:00:23 7    case is exactly like *Schulhauser*.

11:00:25 8            And just the last point that I'll make is that

11:00:28 9    if you look at Vanda Slide 25 and their sort of diagram of

11:00:32 10   the claim in *Schulhauser*, it is exactly the same as the

11:00:36 11   claim that we have here.  They have the Box 104 that says,

11:00:41 12   "Is STEMI indicated from ECG data?"

11:00:44 13           Yes, you go to one branch.  You go to the right.

11:00:47 14           If the answer is no, you go to another branch.

11:00:49 15   You go down.

11:00:50 16           And the PTAB said, because you only have to

11:00:53 17   perform one of those two branches in order to infringe, you

11:00:56 18   only need to show that one of those two branches is in the

11:00:59 19   prior art to render the claim obvious.  And the same is true

11:01:02 20   here.

11:01:02 21           If the Court has any questions, I'm happy to

11:01:05 22   answer them.

11:01:05 23           THE COURT:  No.  Thank you.

11:01:06 24           MR. MILLIKEN:  Thanks.

11:01:08 25           MR. HUGHES:  Your Honor, if I may just make two

11:01:10  1    very brief points?

11:01:11  2                THE COURT:  Yeah.  Absolutely.

11:01:13  3                I wasn't trying to trick you.  Everybody agrees

11:01:15  4    that you interpret the claims the same way for infringement

11:01:18  5    and validity; right?

11:01:19  6                That wasn't -- I wasn't looking for some kind of

11:01:22  7    an admission.  We all agree on that.

11:01:24  8                MR. HUGHES:  Of course, Your Honor.

11:01:25  9                THE COURT:  Yeah.

11:01:25 10                MR. HUGHES:  I think the issue that we have with

11:01:27 11    respect to my friends' claim construction is they work into

11:01:30 12    the claim construction saying that there are two methods.

11:01:33 13    And so they're asking the Court at claim construction to say

11:01:36 14    there are two methods because of the implications that has.

11:01:39 15                Our fundamental point is this is one method.  It

11:01:41 16    is one method with conditional branches that looks exactly

11:01:46 17    -- next slide, Jason -- it looks exactly like *Hytera* and

11:01:50 18    exactly like *Interdigital*.  We have precedent that tells us

11:01:54 19    exactly how to do infringement and invalidity against these

11:01:57 20    claims.

11:01:57 21                We just -- the only thing we're asking for here

11:02:00 22    is the Court to reject the notion at this stage that there

11:02:02 23    are two methods.  I think that is properly reserved at best

11:02:07 24    for summary judgment or otherwise resolved in Vanda's favor

11:02:09 25    at this point because this is exactly like what we have in

11:02:13  1    *Hytera* and *Interdigital*.

11:02:14  2            And just last point.  My friend made mention of

11:02:18  3    *Brown vs. 3M*.  It's a completely distinguishable case as

11:02:22  4    Hytera distinguished because *Brown vs. 3M* is about

11:02:24  5    alternative conditions.  There were three different either

11:02:27  6    two digit, three digit or four-digit numbers, and they were

11:02:30  7    equally good.

11:02:31  8            And as *Hytera* said, that's not discussing what

11:02:33  9    we have here, which is a conditional branch.  The

11:02:35 10    conditional branch here is you first make a determination

11:02:38 11    and then you have to go one of two pathways.  They're not

11:02:41 12    alternative pathways.  They're conditional about what

11:02:43 13    happens previously in the claim.

11:02:45 14            And so that's why the logic of *Brown vs. 3M* does

11:02:48 15    not apply.  Rather, *Lincoln Financial*, *Hytera* and

11:02:53 16    *Interdigital* provide the framework.  And they will provide

11:02:56 17    the framework when we get to both infringement and

11:02:57 18    invalidity.

11:02:58 19            THE COURT:  All right.  Thank you very much.

11:03:01 20            MR. HUGHES:  Thank you, Your Honor.

11:03:01 21            MR. MILLIKEN:  Your Honor, can I make a very

11:03:03 22    brief point in response?

11:03:03 23            THE COURT:  Sure.

11:03:04 24            MR. MILLIKEN:  I agree with Mr. Hughes that one

11:03:06 25    way to think about this is whether the claim includes two

11:03:10 1    separate methods, but I think Vanda's concession that the

11:03:13 2    claim has been practiced once you perform either branch, and

11:03:17 3    you don't care about what's in the other branch, I think

11:03:19 4    that resolves that dispute in our favor.  There are two

11:03:22 5    conditional -- two separate conditional methods here just

11:03:25 6    like in *Schulhauser*.

11:03:26 7          THE COURT:  All right.  Thank you very much.

11:03:27 8          MR. MILLIKEN:  Thank you.

11:03:27 9          THE COURT:  Okay.  It's about five after 11:00

11:03:32 10   right now.  We prepared a great deal for the hearing today

11:03:35 11   so that we could get the most out of the arguments, and I

11:03:38 12   think I could be prepared to get you some answers.

11:03:42 13          So I'm going to take a brief recess to compile

11:03:46 14   my notes and consult with my clerks.  We'll be back at about

11:03:51 15   11:25.  If it turns out we need more time, which I don't

11:03:54 16   think we will, we'll have Mr. Koehler let you know.  We'll

11:03:57 17   be back in 20.

11:03:58 18          DEPUTY CLERK:  All rise.

11:04:00 19          (Recess was taken.)

11:30:03 20          DEPUTY CLERK:  All rise.

11:30:08 21          THE COURT:  All right.  Please be seated.

11:30:10 22   Thanks for your patience.

11:30:11 23          All right.  I'm prepared to issue the Court's

11:30:26 24   rulings on the pending claim construction disputes.  We

11:30:30 25   won't be issuing a separate written opinion, but I want to

11:30:33  1    emphasize that we followed a full and thorough process for

11:30:38  2    coming to the conclusions I'm about to state.  Of course, we

11:30:41  3    carefully reviewed the patent.  The parties submitted a

11:30:44  4    joint appendix with the portions of the prosecution history

11:30:46  5    and additional evidence.  And we had lengthy oral argument

11:30:50  6    today.

11:30:50  7             I'm not going to read into the record my

11:30:52  8    understanding of the general legal principles of claim

11:30:55  9    construction.  We set forth the relevant standards in prior

11:30:59 10    opinions, including in *3Shape vs. Align*, which is at 2020 WL

11:31:05 11    2188857.  And I incorporate the legal standards in that

11:31:11 12    opinion by reference.

11:31:12 13             So we'll start with term one, which is "in a

11:31:16 14    method of administering tasimelteon to a patient, the

11:31:20 15    improvement comprising."

11:31:23 16             That term appears in Claim 1 of the

11:31:26 17    patent-in-suit and is found in a preamble that follows the

11:31:30 18    *Jepson* claim format.  The disputes presented to the Court

11:31:34 19    are whether the preamble is limiting.  And if so, whether it

11:31:38 20    is indefinite.

11:31:39 21             I'll turn right to the indefiniteness issue.  I

11:31:42 22    agree with Mr. Silver that this claim is drafted in

11:31:47 23    accordance with the MPEP regulation governing *Jepson* claims

11:31:50 24    set forth at 37 C.F.R. 1.75(e).

11:31:54 25             I further agree with Plaintiff that Defendant

11:31:56 1    has not established by clear and convincing evidence that

11:31:59 2    Claim 1 fails to inform a person of skill in the art about

11:32:03 3    the scope of the invention with reasonable certainty.  The

11:32:06 4    preamble refers to administering tasimelteon to a patient.

11:32:11 5         I'm not persuaded that a person of skill in the

11:32:13 6    art would not understand what that means.  It means

11:32:16 7    administering tasimelteon to a patient.

11:32:17 8         With respect to the parties' dispute about

11:32:20 9    whether the preamble is limiting, as we discussed during the

11:32:23 10   hearing today, that is sort of a sideshow because the body

11:32:26 11   of the claim requires administering tasimelteon to a

11:32:30 12   patient.

11:32:30 13        So I don't think that anything else has to be

11:32:33 14   said about the construction of this limitation.  If I'm

11:32:36 15   wrong about that, the parties can bring it up in the summary

11:32:39 16   judgment briefing and or in the context of the jury

11:32:42 17   instructions so that we can appropriately instruct the jury.

11:32:46 18        Turning to Claim 2 -- sorry, term two,

11:32:51 19   "determining whether the patient is being treated with a

11:32:55 20   beta adrenergic receptor antagonist."  The parties have a

11:32:58 21   dispute over whether this phrase implicates the printed

11:33:01 22   matter doctrine.

11:33:03 23        The Federal Circuit tells us that a limitation

11:33:05 24   is printed matter only if it claims the content of

11:33:08 25   information.  That's the *Ioengine* case, 100 F.4th. 1395 from

11:33:15  1    2024.  This claim limitation does not claim the content of

11:33:20  2    information.  That's all I will say about that.

11:33:24  3          Defendant also proffered -- Defendant has also

11:33:29  4    proffered an alternative construction, but I agree with

11:33:32  5    Plaintiff that it's too narrow.  It includes the concept of

11:33:36  6    asking the patient something.  And while asking may be one

11:33:39  7    way to determine a patient's medications, there's no basis

11:33:44  8    to limit the claim to that.

11:33:46  9          Finally, term three, which is in the case that

11:33:51 10    it is determined that the patient is not being treated with

11:33:54 11    a beta adrenergic receptor antagonist, it was clear to me

11:33:59 12    today that there is no genuine dispute over the claim scope.

11:34:03 13    The disagreement is not about what the claim means, but

11:34:07 14    rather about the legal consequences of its conditional

11:34:11 15    structure for purposes of validity.  Because there's no

11:34:15 16    genuine dispute over what the claim means, no further

11:34:20 17    construction is necessary.

11:34:21 18          And that concludes the Court's rulings.  Is

11:34:26 19    there anything else we need to address while everyone's in

11:34:28 20    the room?

11:34:29 21          MR. SILVER:  Not from Plaintiffs.  Thank you,

11:34:30 22    Your Honor.

11:34:34 23          MR. EKINER:  Not from our side, Your Honor.

         24          THE COURT:  Thanks very much, everyone.  Have a

         25    good weekend.

1                    DEPUTY CLERK:  All rise.

2                    (Court was adjourned at 11:34 a.m.)

3                    I hereby certify the foregoing is a true and

4      accurate transcript from my stenographic notes in the

5      proceeding.

6                    /s/ Heather M. Triozzi
                     Certified Merit and Real-Time Reporter
7                    U.S. District Court

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25